**FILED**

**NOVEMBER 21, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**07 C 6588**

ROYAL SLEEP PRODUCTS, INC.,
a Florida Corporation,

     Plaintiff,

vs.

RESTONIC CORPORATION,
an Illinois Corporation,
RESTONIC MATTRESS CORPORATION,
an Illinois Corporation
SLEEP ALLIANCE, LLC,
a Delaware Limited Liability Company,
ROYAL BEDDING COMPANY OF BUFFALO,
a New York Corporation,
JACKSON MATTRESS CO. LLC,
a North Carolina Limited Liability Company
CONTINENTAL SILVERLINE PRODUCTS L.P.,
a Texas Limited Partnership,
STEVENS MATTRESS MANUFACTURING CO.,
a North Dakota Corporation
TOM COMER, JR., an individual,
DREW ROBINS, an individual, and
RICHARD STEVENS, an individual

     Defendants.

_____/

**JUDGE PALLMEYER**
**MAGISTRATE JUDGE VALDEZ**

**Case No.:**

## COMPLAINT
**(Jury Trial Demanded)**

Plaintiff ROYAL SLEEP PRODUCTS, INC., by and through its undersigned

counsel, hereby sues Defendants RESTONIC CORPORATION, RESTONIC

MATTRESS CORPORATION, SLEEP ALLIANCE, LLC, ROYAL BEDDING

COMPANY OF BUFFALO, JACKSON MATTRESS CO., LLC, CONTINENTAL

SILVERLINE PRODUCTS, STEVENS MATTRESS MANUFACTURING CO., TOM

COMER JR., DREW ROBINS, and RICHARD STEVENS and in support thereof, state as follows:

## JURISDICTION, THE PARTIES, AND VENUE

### JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, in that the parties are citizens of different states and the matter in controversy exceeds, exclusive of interest, costs and attorneys' fees, the sum or value of Seventy Five Thousand Dollars ($75,000.00).

2.     This Court has personal jurisdiction over the Defendants pursuant to Illinois' long-arm statute, Ill. Rev. Stat. ch. 110, para. 2-209 ("Section 209") in that each of Defendants ROYAL BEDDING COMPANY OF BUFFALO, JACKSON MATTRESS CO. LLC, STEVENS MATTRESS MANUFACTURING CO. and CONTINENTAL SILVERLINE PRODUCTS L.P., through their respective owners, Defendants TOM COMER, JR., DREW ROBINS, and RICHARD STEVENS, made or performed a contract or promise substantially connected with Illinois and thereby transacted business in Illinois by invoking the benefits and protections of Illinois law in the contractual relationship, as the contracts executed by them are governed by Illinois law. The Court also has personal jurisdiction over Defendants SLEEP ALLIANCE, LLC, ROYAL BEDDING COMPANY OF BUFFALO, JACKSON MATTRESS CO. LLC, STEVENS MATTRESS MANUFACTURING CO. and CONTINENTAL SILVERLINE PRODUCTS L.P., and their respective owners, Defendants TOM COMER, JR., DREW ROBINS, and RICHARD STEVENS, pursuant to Section 209 in that such Defendants, shareholders of RMC (as hereinafter defined), breached the

fiduciary duties owed by them within the State of Illinois. Similarly, this Court possesses jurisdiction over Defendant TOM COMER, JR. as a result of his breach of his fiduciary duty to RMC and its licensees, including Plaintiff, as a member of RMC's Board of Directors. This Court also has personal jurisdiction over Defendants SLEEP ALLIANCE, LLC, ROYAL BEDDING COMPANY OF BUFFALO, JACKSON MATTRESS CO. LLC, STEVENS MATTRESS MANUFACTURING CO. and CONTINENTAL SILVERLINE PRODUCTS L.P., and their respective owners, Defendants TOM COMER, JR., DREW ROBINS, and RICHARD STEVENS, pursuant to Section 209 in that all such Defendants have committed a tortious act within Illinois, as fully set forth below. Further, this Court has personal jurisdiction over such Defendants in that such Defendants acquired ownership, possession or control of a thing of value located within Illinois, to wit: stock in RMC.

<u>PARTIES</u>

3.      Plaintiff ROYAL SLEEP PRODUCTS, INC. is a Florida corporation having its principal place of business in Miami, Florida.

4.      Defendant RESTONIC CORPORATION is an Illinois corporation having its principal place of business in Rosemont, Illinois.

5.      Upon information and belief, Defendant RESTONIC MATTRESS CORPORATION ("RMC") is an Illinois corporation having its principal place of business in Rosemont, Illinois.

6.      Upon information and belief, Defendant SLEEP ALLIANCE LLC is a Delaware corporation having its principal place of business in Delaware. Upon information and belief, none of the members of Sleep Alliance LLC are Illinois residents.

7.     Defendant JACKSON MATTRESS Co. LLC is a North Carolina corporation having its principal place of business in Fayetteville, North Carolina.  Upon information and belief, none of the members of Jackson Mattress Co. LLC are Illinois residents.

8.     Upon information and belief, Defendant ROYAL BEDDING COMPANY OF BUFFALO is a New York corporation having its principal place of business in Buffalo, New York.

9.     Upon information and belief, Defendant CONTINENTAL SILVERLINE PRODUCTS, L.P. is a Texas Limited Partnership having its principal place of business in Houston, Texas.   Upon information and belief, none of the partners of Continental Silverline Products, L. P. are Illinois residents.

10.     Upon information and belief, Defendant STEVENS MATTRESS MANUFACTURING CO. is a North Dakota corporation with its principal place of business in Grand Forks, North Dakota.

11.     Defendant TOM COMER JR. is an individual over the age of eighteen (18), is *sui juris* and, upon information and belief, is a citizen of and resides in North Carolina.

12.     Defendant DREW ROBINS is an individual over the age of eighteen (18), is *sui juris* and, upon information and belief, is a citizen of and resides in Texas.

13.     Defendant RICHARD STEVENS is an individual over the age of eighteen (18), is *sui juris* and, upon information and belief, is a citizen of and resides in North Dakota.

<u>VENUE</u>

14.     Venue in this district is appropriate pursuant to 28 U.S.C.   Sec.1391(a).

15.     Plaintiff retained the undersigned law firms and has agreed to pay it a reasonable fee for its services.

16.     All conditions precedent to the filing of this action have either occurred or been waived.

**<u>GENERAL ALLEGATIONS</u>**

<u>The Background of the Parties</u>

17.     Restonic Corporation ("Restonic") has developed programs, services and know-how and is the owner of certain patents and trademarks, all of which are useful in connection with the manufacture and sale of bedding products.  Restonic is the parent company of Restonic Mattress Corporation.

18.     Restonic Mattress Corporation ("RMC") is a subsidiary corporation of Restonic.

19.     Royal Sleep Products, Inc. ("Royal") is a Restonic licensee located in Miami, Florida.  Royal specializes in the manufacturing of mattresses and box springs for retail stores, hotels and designers. Royal is owned by Gary Robinson ("Mr. Robinson") and maintains a manufacturing facility located at 3520 NW 46th Street, Miami, FL 33142 (the "Miami Facility").  Royal owns fifteen (15) shares of RMC stock.

20.     Royal Bedding Company of Buffalo ("Royal Bedding") is a Restonic licensee located in Buffalo, New York that specializes in the manufacturing of mattresses and box springs.  Royal Bedding is owned by Defendant Tom Comer, Jr., ("Mr. Comer"),

a member of the Board of Directors of RMC.  Royal Bedding owns fifteen (15) shares of RMC stock.

21.     Jackson Mattress Co. LLC ("Jackson") is a Restonic licensee located in Fayetteville, North Carolina that specializes in the manufacturing of mattresses and box springs, furniture and furnishings.  Jackson is also owned by Defendant Mr. Comer. Jackson owns sixty (60) shares of RMC stock.

22.     Continental Silverline Products ("Continental") is a Restonic licensee located in Houston, Texas that specializes in the manufacturing of mattresses and box springs.  Continental is owned by Defendant Drew Robins ("Mr. Robins").  Continental owns sixty (60) shares of RMC stock.

23.     Stevens Mattress Manufacturing, Inc. ("Stevens") is a Restonic licensee located in Grand Rapids, Michigan that specializes in the manufacturing of mattresses and box springs Stevens is owned by Defendant Richard Stevens ("Mr. Stevens"). Stevens owns forty-five (45) shares of RMC stock.

24.     Sleep Alliance is the result of a strategic alliance among Royal Bedding, Jackson, Mr. Comer, Continental, Mr. Robins, Stevens and Mr. Stevens, through which each of the aforementioned licensees and their owners gained majority ownership and control of Restonic and RMC.

The Sub-License Agreement

25.     On or about April, 2001, Royal became a sub-licensee of RMC through the execution of a sub-license agreement (the "Sub-License Agreement").  Based on numerous written and oral assurances from representatives of Restonic and RMC, Mr.

Robinson reasonably believed that Royal would operate the only manufacturing facility in the State of Florida.

26.     The Sub-License Agreement permitted Royal to participate in the utilization of patents of Restonic, the utilization of Restonic trademarks, as well as participation in Restonic programs for the manufacture of mattresses and bedding products.

27.     In addition to the Sub-License Agreement, Royal also became a signatory to the Restonic National Account Program (the "National Account Program").  The National Account Program mandates that with respect to national accounts obtained by Restonic, the Restonic licensee whose manufacturing facility is geographically the closest to the product shipping location must service the Restonic customer unless otherwise requested by the customer.

<u>Mr. Robinson's Relationship with Tom Comer Jr.</u>

28.     Sometime in 2002, Mr. Comer, through his company, Jackson, purchased the rights to the North Carolina, Tampa, and Jacksonville Restonic licenses from Gigi Girsch ("Ms. Girsch"), as well as Ms. Girsch's Jacksonville warehouse that was being utilized to ship Restonic licensed mattresses and bedding products.

29.     In 2002, Mr. Robinson and Mr. Comer met at the International Sleep Products tradeshow in Nashville, Tennessee.  During a discussion between the two, Mr. Robinson presented Royal's purchase offer whereby Mr. Robinson suggested that Jackson sell its Jacksonville license and warehouse and Tampa license to Royal, and use the proceeds from the sale to develop its Baltimore facility.  In doing so, Royal, Jackson, Royal Bedding and RMC would benefit because: (1) Royal would be able to expand its

shipments to Northern Florida without competition from Jackson; (2) Jackson would realize a financial gain; (3) Royal Bedding would receive increased cash flow to expand its production in Baltimore; and (4) RMC would benefit by the decreased inner-company competition and increased production and shipment of Restonic product overall.

30.     Mr. Comer rejected Royal's offer stating instead that he intended to run Royal out of business, push it out of Florida and make Mr. Robinson "regret the day he heard the Restonic name."

### The Formation of the Sleep Alliance and the Appointment of Mr. Comer to the RMC Board of Directors

31.     Sometime in the summer of 2006, Mr. Comer, owner of franchisee Jackson and Royal, and holder of seventy-five (75) shares of RMC stock, Drew Robins ("Mr. Robins"), owner of franchisee Continental Silverline Products ("Continental") and holder of sixty (60) shares of RMC stock, and Richard Stevens ("Mr. Stevens"), owner of franchisee Stevens Mattress Manufacturing Inc. ("Stevens") and holder of forty-five (45) shares of RMC stock, joined together to form the Sleep Alliance ("Sleep Alliance").

32.     Given the fact that there were a total of three hundred and forty-five (345) shares of outstanding Restonic and RMC stock, the partnership between Mr. Comer, Mr. Robins and Mr. Stevens resulted in the Sleep Alliance holding 52.2% of the Restonic stock.  Accordingly, Sleep Alliance became the majority shareholder of Restonic and RMC.

33.     In the fall of 2006, after Sleep Alliance became the majority shareholder of Restonic and RMC, Sleep Alliance fired Carlene Evenson from her position as Restonic President and replaced her with Steve Russo ("Mr. Russo"), a personal friend of Mr. Comer.

34.    Also in the fall of 2006, Sleep Alliance voted Adam Weinman ("Mr. Weinman"), a friend of Mr. Russo and Dan Cantor ("Mr. Cantor"), the former owner of the Buffalo Restonic license, as members of the RMC board of directors.

35.    Shortly after he was appointed, Mr. Weinman resigned his position on the RMC board of directors and Sleep Alliance voted to replace him with Mr. Comer. Accordingly, as of late fall, 2006, Mr. Comer became a member of the RMC board of directors.

<u>Sleep Alliance's Usurpation of the Restonic-Mattress Giant Business Relationship</u>

36.    Prior to the formation of Sleep Alliance, RMC, on behalf of itself and its licensees, began negotiations to conduct business with Mattress Giant.  The negotiations continued to advance in late 2005 when Donna Favia, the then Vice President of sales at RMC, ("Ms. Favia") took over the negotiation.

37.    On or about July 2006, in a meeting of the Restonic licensees at a trade show in Las Vegas, Nevada, Ms. Favia announced that the negotiations between RMC and Mattress Giant were going well.  Specifically, Ms. Favia reported that RMC had several meetings with Mattress Giant, including one at the Houston Restonic facility owned by Mr. Robins (the "Houston Meeting"), to show Mattress Giant some product samples.

38.    Pursuant to the negotiations with Mattress Giant, if RMC was awarded the Mattress Giant account many of the Restonic licensees, including Royal, would benefit, as the orders would be distributed equally amongst the licensees based on the geographic region for which the product was requested.  Specifically, the deal would be structured in the same way as all RMC national account business: the manufacturing facility closest to

the Mattress Giant warehouse issuing the order would be granted the business and produce the product. By structuring the deal in this manner, the Restonic licensees with warehouses or facilities located in Texas, Florida, New Jersey, New York and Pennsylvania, the regions in which Mattress Giant does business, would benefit from the acquisition of the Mattress Giant account.

39.     Unfortunately however, shortly after the meeting in Houston, Sleep Alliance interfered with these negotiations and took over the Mattress Giant negotiations from RMC corporate on its own behalf. According to Mr. Comer, if a deal was reached with Mattress Giant by Sleep Alliance, it would be for the benefit of Sleep Alliance and not RMC and the Restonic licensees. Importantly, since Mr. Comer, Mr. Robins and Mr. Stevens were the members of Sleep Alliance, they would also personally benefit from a deal between Mattress Giant and Sleep Alliance.

40.     In making this statement, Mr. Comer and the other members of the Sleep Alliance immediately breached their fiduciary duty to all of the Restonic licensees and admitted to their unethical self-dealing. Indeed, by usurping the benefit of the Mattress Giant deal in favor of Mr. Comer, Sleep Alliance and its affiliated principals and entities, Sleep Alliance could bypass the National Account Program for its own pecuniary gain.

<u>Sleep Alliance's Agreement with Royal</u>

41.     Between September and December 2006, Sleep Alliance toured the Miami facility and with assistance from Deborah Gory, Sleep Alliance's Information Technology representative ("Ms. Gory"), reviewed Royal's financial statements. Subsequently, Sleep Alliance approached Royal with offers to either purchase Royal in its entirety, or, in the alternative, to enter into a supply agreement with Royal.

The Lady Americana Opportunity

42.     On July 7, 2007, Lady Americana, another licensing group that holds licenses for the production of mattresses, negotiated a deal to sell its product to Mattress Giant.

43.     Upon learning of this fact, Mr. Robinson contacted Kerry Tramell ("Mr. Tramell"), the president of Lady Americana, to express Royal's interest in manufacturing the Lady Americana product and supplying to Mattress Giant.

44.     Mr. Tramell requested that Mr. Robinson travel to Oklahoma and meet with corporate executives.

45.     On July 9, 2007, Mr. Comer called Mr. Robinson and asked him if Royal was becoming a Lady Americana franchisee. Mr. Robinson asked Mr. Comer how he had heard and Mr. Comer stated that he was not at liberty to say.

46.     Mr. Robinson flew to Oklahoma on July 10, 2007 and participated in a meeting with Lady Americana.

47.     The meeting with Lady Americana went well until such point as Mr. Tramell mentioned that he had spoken to Mattress Giant about Royal and Mattress Giant said they had heard negative things. Despite this statement from Mattress Giant, Mr. Tramell informed Mr. Robinson that he was personally impressed by Royal and wanted to do an inspection of the Miami Facility.

48.     On July 21, 2007, Steve Booker, the sales manager for Lady Americana ("Mr. Booker"), and Ray Frazier, the Texas franchisee for Lady Americana ("Mr. Frazier"), toured Royal's Miami Facility. They were very impressed with the Miami Facility and felt that Mattress Giant's negative impression was unsubstantiated. It was at

that time that Mr. Booker and Mr. Robinson discussed the previous issues that Royal had with Jackson and the telephone call from Mr. Comer that Mr. Robinson received on July 9, 2007. Mr. Booker then informed Mr. Robinson that a Mattress Giant representative told Mr. Booker confidentially that the negative comments came from someone at Restonic. Mr. Booker indicated that he believed the source of the comments was likely Mr. Comer.

49.     Upon learning this information, on July 22, 2007, Mr. Robinson called Mr. Robins and told him about the comments from Mr. Comer's facility. Mr. Robins informed Mr. Robinson that at the Houston meeting, Mr. Robins had heard the same negative comments about Royal from Mattress Giant but was unaware of the source.

<u>Defamation of Royal By Mr. Comer, Jackson and its Employees</u>

50.     On or about July 21, 2007, Mr. Robinson learned that Mr. Comer and Jackson were intentionally making defamatory statements about Royal. Specifically, in an effort to commandeer a potential business opportunity between Royal and Mattress Giant, one of the country's largest and fastest-growing specialty bedding retailers, Mr. Comer intentionally advised Mattress Giant, despite knowing that these statements were not true, that Royal was going out of business, that Royal was liquidating its business, that Royal did not follow product specifications, that Royal did not honor warranties, and that Restonic was considering terminating Royal's franchise agreement.

51.     On or about August 2007, Mr. Robinson had several conversations with Mr. Booker who indicated that he was trying to get a representative from Mattress Giant to inspect Royal's Miami facility to assure Mattress Giant's comfort with Royal as a Lady Americana franchisee.

52.     Not surprisingly, because of the negative comments about Royal made by Mr. Comer and representatives of Jackson to Mattress Giant, Mr. Comer and Sleep Alliance's breach of their fiduciary duty of loyalty, and Mr. Comer's intentional interference with Royal's negotiations with Lady Americana and Mattress Giant, Royal was unable to secure the deal with Mattress Giant.

53.     On September 11, 2007, Mr. Comer informed Mr. Robinson that Mr. Robins and Sleep Alliance's sales manager, Brent Ford, were having a meeting with Mattress Giant to discuss a business arrangement between Mattress Giant and Sleep Alliance.

### Sleep Alliance's Withdrawal of the Buyout Offer and Supply Agreement

54.     In August, 2007, Mr. Russo approached Mr. Robinson to determine whether Mr. Robinson was willing to sell the Royal business as well as his fifteen (15) shares of RMC stock to the Alliance (the "Buyout").

55.     Thereafter, in approximately August 2007, Mr. Russo contacted Mr. Robinson to inquire if he would be willing to take payment over time for the Buyout. Mr. Robinson agreed.  Mr. Comer subsequently informed Mr. Robinson that before finalizing the Buyout, Sleep Alliance would need to see Royal's financials.  Mr. Robinson agreed but in return, requested that he also be provided a copy of Sleep Alliance financials.

56.     Initially, Sleep Alliance agreed to produce its financials.  Later however, Sleep Alliance retracted on this agreement, arguing that its lawyer had advised against it because Sleep Alliance was now contemplating opening its own manufacturing facility in Florida.  Despite the fact that Sleep Alliance had already reviewed Royal's financials

prior to negotiating the Buyout, Sleep Alliance, contended that its review of Royal's financials now, could potentially expose it to future legal action.

57.    Despite this, on or about September 18, 2007, Mr. Robinson and Mr. Robins had a telephone conversation.  During that conversation, Sleep Alliance indicated that it was going to terminate the Buy Out and Supply Agreement due to its intent to open its own manufacturing facility in Florida.

58.    According to Sleep Alliance, the motivation for Sleep Alliance to open its own facility in Florida was the fact that Mattress Giant would prefer to do business with a company that owned all of its own factories, as opposed to a licensing group that worked with individually-owned factories.   According to Sleep Alliance, because it already owned factories in New York, North Carolina, Iowa, North Dakota, Maryland and Texas, it made sense to add a factory in Florida.  This rationale however, is belied by the fact that Mattress Giant had previously entered into a deal with Lady Americana, which, like Restonic, is a mattress licensing group.   Thus, the justification provided by Sleep Alliance for its intention to open a Florida factory was clearly pretextual.

59.    Following this conversation, Mr. Robinson received a letter from Sleep Alliance indicating that all discussions relating to the Buyout and Supply Agreement were immediately terminated.

60.    The fact that Sleep Alliance was considering opening a manufacturing facility in Florida completely contradicted the representations, assurances and promises of the former RMC presidents that no additional facilities would be opened in Florida, and that the opening of such additional facilities would not be beneficial to Restonic and RMC.

61.     Indeed, after Mr. Robinson learned of Sleep Alliance's plans to open a manufacturing facility in Florida, Mr. Robinson contacted Mr. Russo to express his concerns in this regard.  Mr. Russo stated that such plans were a surprise to him and that Sleep Alliance opening a factory in Tampa or Jacksonville made no business or economic sense to him given the size of business currently being serviced and the plethora of issues that would result from it.  According to Mr. Russo, opening an additional manufacturing facility in Florida would be a very bad business move for Restonic and RMC and a very bad business move for Sleep Alliance.

RMC's Breach of the Sub-License Agreement

62.     Under the Sub-License Agreement, Royal was granted the right "to receive and use RMC Know-How and RMC Services on terms and conditions applicable to other RMC Sub-Licensees."

63.     The Sub-License Agreement defines "RMC Services" as "such services as RMC shall make available from time to time to RMC Sub-Licensees, including advertising services, recommendations regarding sources of components, marketing information and statistics and data processing services and also including all such services made available by Restonic to RMC."

64.     Given that Sleep Alliance was seeking to open its own facility in Florida for the purpose of attracting Mattress Giant to it, on October 19, 2007, Mr. Robinson contacted Ms. Favia, the RMC Vice President of Sales, and asked that RMC continue its prior negotiations with Mattress Giant on behalf of RMC.

65.     Ms. Favia responded to Mr. Robinson that she had to consult with Mr. Russo (Restonic's President appointed by Sleep Alliance) regarding Mr. Robinson's request.

66.     Prior to being appointed by Sleep Alliance as president of RMC, Mr. Russo worked in Tampa for Spring Air, a mattress licensing group based out of Chicago. As a result, Mr. Russo had extensive contacts in the mattress industry.  Mr. Robinson believed that asking Mr. Russo to use his contacts to help acquire several bedding accounts, including Famous Tates, would be beneficial to RMC, Restonic and Royal. Accordingly, on or about October 24, 2007, Mr. Robinson contacted Mr. Russo and asked that he contact Famous Tates on behalf of RMC.

67.     Mr. Russo replied that it was best for Mr. Russo to "stay away" from that account, as Fayetteville, the North Carolina factory owned by Mr. Comer, was also interested in acquiring it.  When Mr. Robinson suggested that Paragraph 4 of the Rules and Regulations of the National Account Program (which dictates which Restonic licensee receives business from national accounts) would alleviate any competition between Royal and Jackson, Mr. Russo still refused to contact Famous Tates.  Mr. Russo's failure to fulfill his obligation to assist a Restonic licensee such as Royal, in acquiring business accounts, was a clear violation of the provisions of the Sub-License Agreement.

68.     Based on the foregoing, it is clear that RMC was not providing the services due to Royal under the Sub-License Agreement because of Sleep Alliance's chokehold on the company, which constitutes a breach of such agreement.

## COUNT I
## BREACH OF FIDUCIARY DUTY OF LOYALTY
### (Against Mr. Comer)

69.    The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

70.    As set forth above, sometime in late July, early August 2006, Sleep Alliance, through Mr. Comer, informed Mr. Robinson that if a deal was reached with Mattress Giant by Sleep Alliance, it would be for the benefit of Sleep Alliance and not RMC and its licensees.

71.    In making this intention clear, Mr. Comer, as a member of the RMC board of directors, immediately breached his fiduciary duty of loyalty to Royal through his admitted unethical self-dealing.

72.    As a member of the RMC board of directors, Mr. Comer owes an unyielding fiduciary duty to RMC and all of its stockholders, including Royal, not to act in any manner that was preferential to himself and prejudicial to Royal.

73.    Mr. Comer breached that duty as early as July 9, 2007, when he first interfered with Royal's negotiations with Lady Americana and ultimately caused Royal to lose the deal with Lady Americana and Mattress Giant.

74.    Royal suffered substantial harm and damages as a direct and proximate result of Mr. Comer's breaches of his fiduciary duty of loyalty.

**WHEREFORE**, Royal demands judgment against Mr. Comer as follows:

1.    To recover any losses suffered by Royal as a result of Mr. Comer's breach of his fiduciary duty owed to Royal;

2.    Additional damages, as provided by law;

1.      Attorneys' fees, costs and disbursements as provided by law; and

2.      Such other and further relief as this Court may deem just and proper.

**COUNT II**
**BREACH OF FIDUCIARY DUTY OF LOYALTY**
**(Against Sleep Alliance, Jackson,**
**Continental, Stevens, Mr. Robins and Mr. Stevens)**

75.     The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

76.     Sometime in late July, early August, 2006, Sleep Alliance, through Mr. Comer, informed Mr. Robinson that if a deal was reached with Mattress Giant by Sleep Alliance, it would be for the benefit of Sleep Alliance and not RMC and its licensees.

77.     In making this intention clear, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens as majority shareholders of RMC, immediately breached their fiduciary duty to Royal to refrain from such unethical self-dealing.

78.     Sleep Alliance further compounded this breach on September 11, 2007, when Mr. Comer admitted to Mr. Robinson that Mr. Robins and Sleep Alliance's sales manager, Brent Ford, were meeting with Mattress Giant to discuss a business arrangement between the parties.

79.     As majority shareholders, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens owed a fiduciary duty of loyalty to all of the RMC shareholders, including Royal.   Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens breached their fiduciary duty as a result of the actions described above.

80. Royal suffered substantial harm and damages as a direct and proximate result of Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens' breaches of their fiduciary duty of loyalty.

**WHEREFORE**, Royal demands judgment against Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens as follows:

1. To recover any losses suffered by Royal as a result of Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens' breach of their fiduciary duty owed to Royal;

2. Additional damages, as provided by law;

3. Attorneys' fees, costs and disbursements as provided by law; and

4. Such other and further relief as this Court may deem just and proper.

**COUNT III**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY OF LOYALTY**
**(Against Sleep Alliance, Jackson,**
**Continental, Stevens, Mr. Robins and Mr. Stevens)**

81. The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

82. In the alternative, should the Court determine that despite Sleep Alliance's position as the majority shareholder it somehow does not owe Royal a fiduciary duty of loyalty, Sleep Alliance and its members, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens, are liable for aiding and abetting Mr. Comer's breach of his fiduciary duty of loyalty.

83. As a member of the board of directors, Mr. Comer owed a fiduciary duty of loyalty to Royal.

84. Mr. Comer breached that fiduciary duty.

85.     As described in Count II of this Complaint, Sleep Alliance, through its members, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens, knowingly participated and obtained a benefit in Mr. Comer's breach of his fiduciary duty of loyalty.

86.     Royal suffered irreparable harm and substantial damages as a direct and proximate result of Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' aiding and abetting Mr. Comer's breaches of his fiduciary duty of loyalty.

**WHEREFORE**, Royal demands judgment against Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens as follows:

1.     To recover any losses suffered by Royal as a result of Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' aiding and abetting Mr. Comer's breaches of his fiduciary duty owed to Royal;

2.     Additional damages, as provided by law;

3.     Attorneys' fees, costs and disbursements as provided by law; and

4.     Such other and further relief as this Court may deem just and proper.

<u>COUNT IV</u>
<u>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE WITH LADY AMERICANA</u>
<u>(Against Mr. Comer)</u>

87.     The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

88.     Royal had a reasonable expectation of entering into a valid business relationship with Lady Americana.

89.     Mr. Comer had knowledge of Royal's expectancy.

90.     Mr. Comer's interference with Lady Americana and Royal's prospective economic advantage represents an intentional and unjustified interference.

91.     Mr. Comer's purposeful interference prevented Royal from realizing a valid business relationship with Lady Americana.

92.     As a result of Mr. Comer's interference, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Mr. Comer as follows:

1.     To recover any losses suffered by Royal as a result of Mr. Comer's intentional tortious interference with Royals' prospective economic advantage with Lady Americana;

2.     Additional damages, as provided by law;

3.     Attorneys' fees, costs and disbursements as provided by law; and

4.     Such other and further relief as this Court may deem just and proper.

<u>**COUNT V**</u>
<u>**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**</u>
<u>**ADVANTAGE WITH LADY AMERICANA**</u>
**(Against Restonic, RMC, Sleep Alliance, Jackson,**
**Continental, Stevens, Mr. Robins and Mr. Stevens)**

93.     The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

94.     Royal had a reasonable expectation of entering into a valid business relationship with Lady Americana.

95.     Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens had knowledge of Royal's expectancy.

96.     Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens interference with Lady Americana and Royal's prospective economic advantage represents an intentional and unjustified interference.

97.    Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens' purposeful interference prevented Royal from realizing a valid business relationship with Lady Americana.

98.    As a result of Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens interference, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens as follows:

1.    To recover any losses suffered by Royal as a result of Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens intentional tortuous interference with Royals' prospective economic advantage with Lady Americana;

2.    Additional damages, as provided by law;

3.    Attorneys' fees, costs and disbursements as provided by law; and

4.    Such other and further relief as this Court may deem just and proper.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE WITH MATTRESS GIANT
### (Against Mr. Comer)

99.    The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

100.    Royal had a reasonable expectation of entering into a valid business relationship with Mattress Giant.

101.    Mr. Comer had knowledge of Royal's expectancy.

102.    Mr. Comer's purposeful interference with Mattress Giant and Royal's prospective economic advantage represents an intentional and unjustified interference.

103.    Mr. Comer's purposeful interference prevented Royal from realizing a valid business relationship with Mattress Giant.

104.    As a result of Mr. Comer's interference, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Mr. Comer as follows:

1.    To recover any losses suffered by Royal as a result of Mr. Comer's intentional tortious interference with Royals' business relationship with Mattress Giant;

2.    Additional damages, as provided by law;

3.    Attorneys' fees, costs and disbursements as provided by law; and

4.    Such other and further relief as this Court may deem just and proper.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE WITH MATTRESS GIANT**
**(Against Restonic, RMC, Sleep Alliance, Jackson,**
**Continental, Stevens, Mr. Robins and Mr. Stevens)**

105.    The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

106.    Royal had a reasonable expectation of entering into a valid business relationship with Mattress Giant.

107.    Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens had knowledge of Royal's expectancy.

108.     Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens' purposeful interference with Mattress Giant and Royal's prospective economic advantage represents an intentional and unjustified interference.

109.     Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens' purposeful interference prevented Royal from realizing a valid business relationship with Mattress Giant.

110.     As a result of Restonic's, RMC's, Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' interference, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Restonic, RMC, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens as follows:

1.     To recover any losses suffered by Royal as a result of Restonic's, RMC's, Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' intentional tortious interference with Royals' business relationship with Mattress Giant;

2.     Additional damages, as provided by law;

3.     Attorneys' fees, costs and disbursements as provided by law; and

4.     Such other and further relief as this Court may deem just and proper.

<u>**COUNT VIII**</u>
<u>**TORTIOUS INTERFERENCE WITH SUB-LICENSE AGREEMENT**</u>
**(Against Mr. Comer)**

111.     The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

112.     Royal and RMC entered into a valid, binding and enforceable contract, to wit: the Sub-License Agreement.

113.    Mr. Comer had knowledge of Royal's contractual relationship with RMC.

114.    Through the actions described herein, Mr. Comer intentionally and unjustifiably induced RMC to breach the Sub-License Agreement.

115.    As a result of Mr. Comer's intentional and unjustifiable inducement of RMC to breach the Sub-License Agreement and as a result of RMC's subsequent breach of the Sub-License Agreement, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Mr. Comer as follows:

1.      To recover any losses suffered by Royal as a result of Mr. Comer's, intentional and unjustifiable inducement of RMC to breach the Sub-License Agreement;

2.      Additional damages, as provided by law;

3.      Attorneys' fees, costs and disbursements as provided by law; and

4.      Such other and further relief as this Court may deem just and proper.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH SUB-LICENSE AGREEMENT**
**(Against Sleep Alliance, Jackson, Continental,**
**Stevens, Mr. Robins and Mr. Stevens)**

116.    The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

117.    Royal and RMC entered into a valid, binding and enforceable contract, to wit: the Sub-License Agreement.

118.    Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens had knowledge of Royal's contractual relationship with RMC.

119.    Through the actions described herein, Sleep Alliance, Jackson, Continental, Stevens, Mr. Robins and Mr. Stevens intentionally and unjustifiably induced RMC to breach the Sub-License Agreement.

120.     As a result of Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' intentional and unjustifiable inducement of RMC to breach the Sub-License Agreement and as a result of RMC's subsequent breach of the Sub-License Agreement, Royal has suffered substantial harm and damages.

**WHEREFORE**, Royal demands judgment against Sleep Alliance, Jackson, Mr. Comer, Continental, Stevens, Mr. Robins and Mr. Stevens as follows:

1.     To recover any losses suffered by Royal as a result of Sleep Alliance's, Jackson's, Continental's, Stevens', Mr. Robins' and Mr. Stevens' intentional and unjustifiable inducement of RMC to breach the Sub-License Agreement;

2.     Additional damages, as provided by law;

3.     Attorneys' fees, costs and disbursements as provided by law; and

4.     Such other and further relief as this Court may deem just and proper.

**COUNT X**
**DEFAMATION**
**(Against Mr. Comer and Jackson)**

121.     The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

122.     Mr. Comer and certain Jackson employees, on various occasions, made defamatory statements concerning Royal, which adversely affected Royal's reputation.

123.     Specifically, Mr. Comer and certain Jackson employees, made defamatory statements about Royal to third parties, including customers and/or potential customers. Those statements consisted of assertions that Royal was going out of business, that Royal was liquidating its business and that Restonic was considering terminating Royal's franchise agreement.

124. Further, Mr. Comer and certain Jackson employees, made defamatory comments about Royal to Mattress Giant at or around the same time that Royal was negotiating to secure the Lady Americana/Mattress Giant account.

125. All of the foregoing statements made by Mr. Comer and certain Jackson were false. Moreover, these false and defamatory statements were unlawfully publicized by Mr. Comer and certain Jackson employees to third parties, including customers and/or potential customers. As a result of all of these defamatory statements, Royal suffered significant harm and damages due to the lost business and a tarnished reputation.

**WHEREFORE**, Royal demands judgment against Mr. Comer and certain Jackson employees as follows:

1. To recover any losses suffered by Royal as a result of the defamatory statements made by Mr. Comer and employees of Jackson;

2. Additional damages, as provided by law;

3. Attorneys' fees, costs and disbursements as provided by law; and

4. Such other and further relief as this Court may deem just and proper.

**COUNT XI**
**BREACH OF CONTRACT**
**(Against RMC)**

126. The allegations set forth in Paragraphs 1 through 68 above are re-alleged as if fully set forth herein.

127. Royal and RMC entered into a valid, binding and enforceable contract, to wit: the Sub-License Agreement.

128. RMC breached the Sub-License Agreement by refusing and failing to provide to Royal the RMC Services, as defined therein.

129.    Royal performed all of its required obligations under the Sub-License Agreement.

130.    Royal has suffered damages by reasons of the breach, for which Royal is entitled to recover actual, compensatory and consequential damages, including lost future profits.

**WHEREFORE**, Royal demands judgment against RMC as follows:

1.    To recover any losses suffered by Royal, including actual, compensatory, and consequential damages and lost profits;

2.    Additional damages, as provided by law;

3.    Attorneys' fees, costs and disbursements as provided by law; and

4.    Such other and further relief as this Court may deem just and proper.

Date: November 21, 2007          Respectfully submitted,

Brian Ira Tanenbaum, Esq.
John A. Benson, Jr., Esq.
THE LAW OFFICES OF
BRIAN IRA TANENBAUM, LTD.
2970 Maria Avenue
Suite 207
Northbrook, IL 60062
Telephone: (847) 562-1636
Facsimile: (847) 562-1637

By:_____
BRIAN IRA TANENBAUM (IL. Bar #6181447)
JOHN A. BENSON, JR. (IL. Bar #6289042)

ZARCO EINHORN SALKOWSKI, P.A.
*Attorney for Defendants*
Bank of America Tower
100 S.E. Second Street, Suite 2700
Miami, Florida 33131
Telephone: (305) 374-5418
Telecopier: (305) 374-5428