# TOM COMER

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

------------------------------------------
ROYAL SLEEP PRODUCTS, INC.,
a Florida Corporation,

                    Plaintiff,

          - vs -        Case Number
                        1:07 CV 6588

RESTONIC CORPORATION, an Illinois Corporation;
RESTONIC MATTRESS CORPORATION,
an Illinois Corporation;
SLEEP ALLIANCE, LLC,
a Delaware Limited Liability Company;
ROYAL BEDDING COMPANY OF BUFFALO,
a New York Corporation;
JACKSON MATTRESS CO., LLC,
a North Carolina Limited Liability Company;
CONTINENTAL SILVERLINE PRODUCTS, L.P.,
a Texas Limited Partnership;
STEVENS MATTRESS MANUFACTURING CO.,
a North Dakota Corporation;
TOM COMER, JR., an individual;
DREW ROBINS, an individual; and
RICHARD STEVENS, an individual,

                    Defendants.
------------------------------------------

**EXHIBIT**
*A*

```
 1              Telephonic deposition of TOM COMER,

 2    Defendant, taken pursuant to Notice, at the Hilton

 3    Garden Inn, 4201 Genesee Street, Buffalo, New York,

 4    on July 2, 2008, commencing at 9:26 a.m., before

 5    LORI K. BECK, CSR, RDR, CRR, Notary Public.

 6

 7    APPEARANCES:        ZARCO EINHORN SALKOWSKI & BRITO, P.A.
                          By MELISSA L. BERHEIM, ESQ., and
                          ROBERT F. SALKOWSKI, ESQ.,
 8                        Bank of America Tower,
                          100 Southeast 2nd Street, Suite 2700,
 9                        Miami, Florida  33131,
                          Appearing via telephone for the
10                        Plaintiff.

11                        BURKE, WARREN,
                          MacKAY & SERRITELLA, PC,
12                        By FREDERIC A. MENDELSOHN, ESQ.,
                          330 North Wabash Avenue, 22nd Floor,
13                        Chicago, Illinois  60611,
                          Appearing via telephone for the
14                        Defendants, Restonic Corporation
                          and Restonic Mattress Corporation.

15                        SMITH & AMUNDSEN, L.L.C.,
16                        By THOMAS J. LYMAN, III, ESQ.,
                          150 North Michigan Avenue, Suite 3300
17                        Chicago, Illinois  60601,
                          Appearing for the Defendants,
18                        Sleep Alliance, LLC; Royal Bedding
                          Company of Buffalo; Jackson
19                        Mattress Co., LLC; Continental
                          Silverline Products L.P.;
20                        Tom Comer, Jr.; and Drew Robins.

21                        FULLBRIGHT & JAWORSKI, LLP,
                          By ANDREW FRIEDBERG, ESQ.,
22                        1301 McKinney, Suite 5100,
                          Houston, Texas  77010,
23                        Appearing via telephone for the
                          Defendants, Continental Silverline
24                        Products L.P. and Drew Robins.

25
```

```
 1                    DYKEMA GOSSETT PLLC,
                      By THOMAS R. HILL, ESQ.,
 2                    10 South Wacker Drive, Suite 2300,
                      Chicago, Illinois  60606,
 3                    Appearing via telephone for the
                      Defendants, Stevens Mattress
 4                    Manufacturing Co. and
                      Richard Stevens.
 5
      PRESENT         BRENT FORD,
 6                    via telephone.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    president.

2         Or that may have been the year where I

3    bought out the previous owner entirely, 1997.

4         Q.    Okay.  And you have -- and your

5    position has been president and -- or owner and CEO

6    since that time?

7         A.    Yes.

8         I believe it's 1997.  '97, '98.

9         Q.    Are there other officers and directors

10   currently of Royal Bedding?

11        A.    I don't believe so.

12        Q.    Are you the 100 percent owner, then?

13        A.    Yes.

14        Q.    Now, where are Royal -- or where are

15   Royal Bedding's offices located?

16        A.    19 Doat Street, Buffalo, New York,

17   14211.

18        Q.    Does Royal Bedding Company of Buffalo

19   have any offices in Illinois?

20        A.    No.

21        Q.    Did it ever?

22        A.    No.

23        Q.    What about employees?

24        A.    No.

25        MR. LYMAN:  You know what, Melissa?

```
 1   a year.
 2          It's -- it's typically in relation to us
 3   being a licensee of Restonic Mattress Corporation.
 4          Q.   Okay.
 5          A.   And there may be --
 6          Q.   And so --
 7          A.   There may be committee meetings in
 8   Illinois or shareholder meetings in Illinois.
 9          Q.   When you say "committee meetings" --
10          A.   Yes.
11          MR. LYMAN:  I'm sorry, what was that
12   question again, Mr. Melissa?
13          MS. BERHEIM:  I'm striking the last question.
14   I want to go back a little bit.
15          MR. LYMAN:  Okay.
16          BY MS. BERHEIM:
17          Q.   Can you specifically name the employees
18   that you send to -- sorry, when I say "you," I mean
19   Royal Bedding -- that Royal Bedding Company sends
20   to committee meetings in Illinois?
21          A.    It would be our sales manager, Lori
22   Tokarz, who is on -- currently on the marketing
23   committee of Restonic Mattress Corporation.
24          Q.    And you -- you said just a few
25   questions back that you would send your employees a
```

```
 1    few times a year.

 2           Is that the same person, Ms. Tokarz?

 3           A.   Yes.

 4           Q.   And by "a few," is that three?  Four?

 5           Is it more than that?

 6           A.   Well, in 1997, she went to Chicago five

 7    times, and only once in 2006.

 8           Q.   Now, Ms. Tokarz is still a sales

 9    manager with Royal Bedding?

10           A.   Yes.

11           Q.   So based on your testimony, in the year

12    1998, she didn't go to Illinois at all.

13           MR. LYMAN:  '98 or did you mean '07?

14           THE WITNESS:  1998?

15           MR. LYMAN:  1997.

16           BY MS. BERHEIM:

17           Q.   Let me not -- let me not put words in

18    your mouth.

19           A.   Okay.

20           Q.   You said in '97, she went five times.

21           A.   Oh, I'm sorry.  If I said '97, I

22    misspoke.

23           It's 2007.

24           Q.   '07 she went five times.

25           A.   Yes, I'm sorry.
```

```
 1          2007 five times, 2006 once.
 2          Q.    And how long has she been your sales
 3  manager?
 4          A.    For the last two years.  Two, three
 5  years.
 6          Q.    So the trips you just described would
 7  be basically since she's been employed.
 8          A.    Well, she's been employed for the last
 9  six years, first as a representative and then
10  promoted to a sales manager.
11          Q.    As a rep, did she travel to Illinois?
12          A.    No.
13          Q.    Now, aside from -- from Ms. Tokarz, do
14  you -- does Royal Bedding have any other employees
15  that it regularly -- or sorry -- that it has sent
16  to Illinois?
17          A.    No.
18          Q.    Okay.  How often do you, Mr. Comer,
19  travel to Illinois?
20          A.    Only when called there for Restonic
21  Mattress Company business.
22          I was in Illinois five times in 2007 and
23  once in 2006.
24          Q.    Did you -- did you travel with
25  Ms. Tokarz?
```

1    Are those the same trips?

2    A.    Some of the trips were -- she and I

3  were involved in the meetings, yes.

4    Q.    Okay.  And -- and you -- when you

5  attend, are they typically -- when you say it's

6  only for Restonic Mattress business, are those

7  typically shareholder meetings?

8    A.    No.

9    As I look at the record, in 2007, most of

10  the trips were related to marketing meetings for --

11  for Restonic Mattress Corporation.

12    Q.    Do you also sit on the marketing

13  committee?

14    A.    No.

15    Q.    No?

16    A.    No.

17    Q.    So -- so I'm just -- why would you

18  attend the marketing meetings?

19    A.    Well, we were -- one of the meetings,

20  we were getting a presentation from a public

21  relations marketing consultant firm out of New York

22  City on our -- a promotion or campaign for our Las

23  Vegas show.

24    And since I was funding it, because Restonic

25  didn't have funds, they thought it was important

```
 1    that I would attend.
 2           Q.    And what about the other meetings?
 3           A.    The other meeting, we interviewed a
 4    marketing firm, Brand Consulting Firms, to help
 5    Restonic rebrand itself.
 6           So we were interviewing brand consulting
 7    companies.
 8           I -- I had dinner with the bedding editor of
 9    Furniture Today, our trade magazine, with another
10    licensee that was in attendance -- our licensee
11    from the upper peninsula of Michigan -- to review
12    the outlooks for the new year for the article that
13    Furniture Today was running.
14           We did have a Sleep Alliance business review
15    meeting that was outside of Restonic Mattress
16    business once in 2007.
17           Q.    Okay.  Okay.  Great.  Let me just go
18    back a little bit.
19           All right.  Going back just to talk
20    generally about Royal Bedding, does Royal Bedding
21    own any real estate in Illinois?
22           A.    No.
23           Q.    Has it ever?
24           A.    No.
25           Q.    What about any bank accounts?
```

```
 1            BY MS. BERHEIM:
 2            Q.    Are you also affiliated with an entity
 3     known as Jackson Mattress Co., LLC?
 4            A.    Yes.
 5            Q.    What is your relationship to Jackson
 6     Mattress Co., LLC?
 7            A.    I'm the owner and CEO.
 8            Q.    Where is Jackson Mattress incorporated?
 9            A.    Fayette -- North Carolina.
10            Q.    And when was it incorporated?
11            A.    It's in the deposition documents.
12     I believe 2002, February of 2002.
13            Q.    Let me look at those documents.
14            Okay.  I'm going to mark the first
15     Exhibit here.  It's going to be Bates stamp numbers
16     RBC0093 through RBC -- got to look it up here --
17     0095.  Mark that as Plaintiff's Exhibit 1.
18            Mr. Comer, let me know when you have those
19     in front of you, okay?
20            MR. LYMAN:  Melissa, we're not going to mark
21     these, are we?
22            We're just going to use the Bates stamp?
23            MS. BERHEIM:  Well, I mean, I -- it's up to
24     you.  I mean, I don't -- I don't really care.
25            I've marked them in the past.  I've
```

Deposition of Tom Comer                          Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1          Q.    Okay.  And what are they, for the
 2    record?
 3          A.    The Articles of Organization of Jackson
 4    Mattress Company, LLC, February 2002.
 5          Q.    Okay.  And specifically February 4th of
 6    2002, correct?
 7          A.    Yes.
 8    I -- I purchased the company --
 9          Q.    I'm sorry?
10          A.    I purchased the company February 15th
11    of 2002.
12          Q.    So did you not incorporate the company?
13          A.    The -- the -- as I understand it, the
14    Articles of Organization -- the company was formed
15    February 4th, and this company purchased the assets
16    of the predecessor company on February 15th.
17          Q.    Okay.  I understand.
18          What is the primary business of Jackson
19    Mattress, LLC?
20          A.    To manufacture and sell mattresses --
21          Q.    Okay.
22          A.    -- principally along the Eastern
23    Seaboard of the United States.
24          Southeastern Seaboard.
25          Q.    You previously testified you are the
```

```
 1              Jackson Mattress Co. is -- is affiliated
 2     with Restonic; is that correct?
 3              A.   Yes, as a licensee.
 4              Q.   And when did -- when did Jackson become
 5     a licensee of Restonic?
 6              A.   I don't know, but before 2001 -- 2002.
 7              Q.   When you testified earlier that a
 8     company -- you said earlier that your company or a
 9     company -- I assume Jackson Mattress -- bought the
10     assets of a previous company.
11              A.   Yes.
12              Q.   And that's how it became Jackson
13     Mattress, LLC; is that correct?
14              A.   Yes.  Yes.
15              The --
16              Q.   What was the previous company?
17              A.   I'd have to look at the record, but I
18     believe it was Jackson Mattress Company, Inc.
19              Q.   Were you affiliated with Jackson
20     Mattress Company, Inc.?
21              A.   No.
22              Q.   But Jackson Mattress Company, Inc. was
23     a Restonic licensee?
24              A.   Yes.
25              So I -- I assumed the sublicense agreement
```

```
 1    with Restonic Mattress Corporation in February of
 2    2005.
 3          Excuse me, February of 2002.
 4          Q.   Okay.  And Royal Bedding is also a
 5    licensee of Restonic?
 6          A.   Yes.
 7          Q.   And when did Royal Bedding become a
 8    licensee of Restonic?
 9          A.   I'm told that it was 1938.
10          Q.   So you basically -- when you became
11    owner, that was the -- it was already a Restonic
12    licensee.
13          Royal Bedding was already a licensee of
14    Restonic.
15          A.   Yes.
16          Q.   Now, aside from the license agreement
17    that Royal Bedding possesses and the license
18    agreement that Jackson Mattress possesses, do you
19    personally or through some other entity have a
20    license agreement with Restonic?
21          A.   No.
22          The Restonic sublicense agreements are with
23    Royal Bedding Company and Jackson Mattress Company.
24          Q.   Where does Royal Bedding manufacture
25    out of?
```

```
 1   Illinois?
 2        A.   No.
 3        Q.   Does it have any employees in Illinois?
 4        A.   No.
 5        Q.   Has it ever sent any employees to
 6   Illinois?
 7        A.   No.
 8        It -- no, but the -- the subs Royal and
 9   Jackson employees would have gone to Illinois.
10        Q.   Jackson employees.  We -- we didn't --
11   we kind of glossed over that.
12        A.   Right.
13        Q.   But considering your testimony, has
14   Jackson sent employees to Illinois?
15        A.   Yes.
16        Q.   Now, are those the same employees we
17   spoke about earlier?
18        A.   No.
19        Q.   Okay.  Let's -- let's go through that.
20        A.   Okay.
21        Q.   Okay.  Can you tell me which employees
22   Jackson Mattress has sent to Illinois?
23        A.   Yes.
24        Randy Bancroft was in Illinois four times in
25   2007, and --
```

```
 1        Q.    What is Randy's position?
 2        Is Randy a woman or a man?
 3        A.    A man.
 4        Q.    Okay.
 5        A.    His -- his title is president of
 6   Jackson Mattress Company.
 7        His principal role is operations.
 8        Q.    And what types of things did he travel
 9   to Illinois for?
10        A.    For fire-retardancy testing of product
11   at the UL, Underwriters Laboratories, in Illinois.
12        He went three times for certification of our
13   product to meet the new federal fire regulations
14   that went into effect July 1st of 2007.
15        Q.    Okay.
16        A.    He also attended a Restonic Mattress
17   Company-sponsored manufacturing fire-retardancy
18   meeting.
19        Q.    Okay.  Anything else?
20        A.    No, not for Randy Bancroft.
21        Q.    Okay.  Are there other employees?
22        A.    Yes.
23        Bryan Esterly.
24        Q.    What's Bryan's position at Jackson?
25        A.    Chief financial officer.
```

```
 1        Q.    Okay.  And how -- what did he travel to
 2   Illinois for?
 3        A.    He was twice in Illinois in 2007.
 4        One trip was to attend the manufacturing
 5   fire-retardancy meeting, same meeting that
 6   Mr. Bancroft attended.
 7        And the other meeting was for a Sleep
 8   Alliance business review session that we had.
 9        Q.    Anyone else?
10        A.    No.
11        Q.    All right.  Going back to Alliance
12   Sleep Products real fast, does Alliance Sleep
13   Products own any real estate in Illinois?
14        A.    No.
15        Q.    Has it ever done so?
16        A.    No.
17        Q.    What about -- does it maintain any bank
18   accounts in Illinois?
19        A.    No.
20        Q.    And I assume that the holding company
21   doesn't have an Internet website.
22        A.    Well, it -- it -- it -- it might.
23        And I believe that of the three, Alliance
24   would have a website that -- last I know, that --
25   it directs you to the Restonic Mattress Corporation
```

```
 1   Restonic Mattress Corporation block?
 2        A.   Yes.
 3        Q.   There was.
 4        So how -- so in other words -- well, let's
 5   strike that.
 6        How did you receive this document?
 7        A.   I believe through the mail.
 8        Q.   Through the mail.
 9        And as you just testified, when you received
10   it, the signature was already there, correct, from
11   the Restonic Mattress Corporation?
12        A.   That's what I recall, yes.
13        Q.   Okay.  And then how did you then
14   transmit this document -- I assume back to Restonic
15   Mattress Corporation?
16        A.   Yes.
17        Through the mail.
18        Q.   Through the mail.
19        And did you ever -- was there any
20   negotiation involved in the creation of this
21   agreement?
22        A.   There was dialogue, yes, on the -- the
23   fee structure.
24        Q.   And how did that dialogue take place?
25        A.   Telephonically.
```

```
 1          A.    Yes.

 2          Q.    And at the time you signed it, was

 3    Mr. Russo's signature already there?

 4          A.    Yes.

 5          Q.    Do you recall where you were when you

 6    signed it?

 7          A.    Buffalo, New York.

 8          Q.    Okay.  And again, was there any

 9    negotiation with regard to the contents of this

10    document?

11          A.    Again there was dialogue via the

12    telephone.

13          Q.    Okay.  And when you sent this back to

14    Restonic, did you send it by mail?

15          A.    Yes.

16          Q.    Okay.

17          MS. BERHEIM:  I'm introducing what I've

18    marked as Plaintiff's -- or Comer Group Exhibit 5,

19    and the Bates stamp numbers are R0103 through

20    R0120.

21          The following was marked for Identification:

22          COMER GRP. EXH. 5   documents Bates numbers

23                      R0103 through R0120.

24    BY MS. BERHEIM:

25          Q.    For the record, Mr. Comer, can you
```

```
 1    signature.
 2         A.    Yes.
 3         Q.    Okay.  How did you receive this
 4    document?
 5         A.    Via the mail.
 6         Q.    Now, at the time you received it, was
 7    there -- Mr. Russo's signature already present?
 8         A.    Yes.
 9         Q.    And where -- do you recall where you
10    were when you signed it?
11         A.    Buffalo, New York.
12         Q.    And again, was there any negotiation as
13    to the contents of this document?
14         A.    Telephonically.
15         MS. BERHEIM:  Now introducing what I'll
16    identify as Comer Group 6.
17         And that's Bates stamp numbers R0121 through
18    R0138.
19         The following was marked for Identification:
20         COMER GRP. EXH. 6   documents Bates numbers
21                   R0121 through R0138.
22         BY MS. BERHEIM:
23         Q.    Mr. Comer, do you recognize this
24    document?
25         A.    Yes.
```

```
 1   under the Restonic Mattress Corporation that
 2   appears to be Carlene Peterson?
 3        A.   Yes.
 4        Q.   Okay.  At the time you received this in
 5   the mail, was Ms. Peterson's signature already
 6   present?
 7        A.   I don't remember.
 8        Q.   Okay.  Do you recall where you were
 9   when you signed this particular agreement?
10        A.   Buffalo, New York.
11        Q.   And was there any negotiation between
12   you and -- and anyone at Restonic Mattress
13   Corporation regarding the content of this
14   particular agreement?
15        A.   You know, again, it would have been --
16   there would have been communication, and it would
17   have been by phone, telephone.
18        Q.   Okay.  Excellent.
19        Aside from the sublicense agreements that
20   Jackson Mattress and Royal Bedding have with
21   Restonic, do you recall any other agreements that
22   you would have executed with Restonic?
23        And when I say "you," you through Jackson or
24   you through Royal Bedding.
25        A.   There are other agreements.
```

```
 1           You know, historically, there's a stock
 2   restriction agreement --
 3           Q.    Okay.
 4           A.    -- that I would not have signed, my
 5   predecessors would have signed of the companies
 6   that I purchased.  So I guess I assumed those
 7   documents.
 8           There's also a -- I think it's called a
 9   stockholder agreement, which obligates us to a --
10   in essence, a capital call should Restonic run into
11   financial difficulty.
12           Q.    Did you sign the stockholder agreement?
13           A.    I believe so.
14           I -- I -- it's one of the documents, I
15   believe.
16           Q.    Do you recall if there was any
17   negotiation regarding the stockholder agreement?
18           A.    You know, again, there -- there was
19   dialogue.
20           Q.    And that would have been between you in
21   Buffalo and -- and a representative of Restonic in
22   Illinois?
23           A.    A representative of Restonic Mattress
24   Corporation, yes.
25           Q.    Do you recall where you were when you
```

```
 1        Q.    Okay.  What types of items?
 2        A.    Point-of-purchase materials, marketing
 3   materials that would be used inside of a dealer's
 4   store.
 5        Q.    Okay.  And how often?
 6        A.   I don't know.
 7        I -- I would assume it would be monthly,
 8   quarterly.
 9        MS. BERHEIM:  Can we take -- go off the
10   record for 60 seconds?
11        Okay?
12        MR. LYMAN:  Sure.
13        MS. BERHEIM:  One second.
14        (A recess was then taken.)
15        BY MS. BERHEIM:
16        Q.   And then same question for Jackson
17   Mattress:
18        Does Jackson Mattress purchase the same
19   items from Restonic?
20        A.    Yes.
21        Q.   And again, you -- you do or don't
22   recall how often?
23        A.   I -- I -- I don't know.
24        It should be in the documents, the invoices.
25        Q.   Right.  Okay.
```

```
 1            Now, pursuant to the sublicense agreements
 2    that are held by both Royal and Jackson Mattress,
 3    do you -- you pay Restonic royalty fees, correct?
 4            A.    Correct.
 5            Q.    Okay.  Now, where do you pay those
 6    royalty fees to?
 7            A.    They're paid to Restonic Mattress
 8    Corporation.
 9            Q.    And how are they paid?
10    By check?  By --
11            A.    By check.
12            Q.    And how is the check transmitted to
13    Restonic?
14            A.    Via mail.
15            Q.    And since the time that you became CEO
16    and owner of both Jackson and Royal -- I only
17    want -- the date for this question is only since
18    the time you became CEO and owner of both Jackson
19    and Royal.
20            But is that the customary practice?
21            Is that always the way the companies have
22    paid their royalty payments?  Checks via mail?
23            A.    Yes.
24            Q.    All right.  Does Jackson Mattress have
25    any contract with any Illinois residents for the
```

```
 1   sale of mattresses?
 2           A.    I'm sorry, could you ask that again?
 3           Q.    Does Jackson Mattress have any
 4   contracts with any resident of the State of
 5   Illinois for the sale of mattresses?
 6           A.    No.
 7           Q.    What about Royal?
 8           A.    No.
 9           Q.    What about for the sale of any other
10   type of product besides mattresses?
11           A.    No.
12           Q.    Have you ever travelled -- have you
13   personally ever travelled to Illinois to sign a
14   contract?
15           A.    No.
16           Q.    Okay.  I'll talk a little bit now about
17   Sleep Alliance.
18           Can you describe to me what Sleep Alliance
19   is?
20           A.    It's a holding company combining the
21   assets of Continental Silverline, Jackson Mattress,
22   and Royal Bedding.
23           Q.    What about Stevens Mattress
24   Manufacturing?
25           A.    It initially included Stevens Mattress
```

```
 1    Comer.

 2         Q.    Now, prior to -- this is the current

 3    structure, correct?

 4         A.    Yes.

 5         Q.    Prior to and during the time when

 6    Mr. -- when Stevens Mattress was part of Sleep

 7    Alliance, was the structure different?

 8         A.    Well, different insofar that

 9    Mr. Stevens was included.

10         So again, I believe that the members would

11    have been his operating companies, you know,

12    Stevens Mattress.

13         And he was the manager, Richard Stevens.

14         Q.    Okay.  So what was the purpose -- what

15    is the purpose of Sleep Alliance?

16         What is its function?

17         A.    The -- the purpose was to consolidate

18    the -- the operating entities to attract an

19    investment -- to attract a buy-out, to attract an

20    investment partner.

21         Q.    Now, when you say "buy-out," do you

22    mean buy-out as in everyone getting out of --

23         A.    Well, no.  I guess you'd call it a

24    recapitalization.

25         That we would bring on an investment partner
```

```
 1   Mr. Comer and Mr. Rob -- well, forget Mr. Robins.
 2        BY MS. BERHEIM:
 3        Q.   Mr. Comer, you've travelled to
 4   Illinois, correct?
 5        A.   Yes.
 6        Q.   And you've testified previously that
 7   you've done so on behalf of Sleep Alliance for a
 8   certain meeting that was held there.
 9        Is that correct?
10        A.   Yes.
11        Q.   Okay.  How often would you say you've
12   travelled personally to Illinois on behalf of Sleep
13   Alliance?
14        A.   Twice in 2007.
15        Q.   What about in '06?
16        A.   None.  Zero.
17        Q.   Does Sleep Alliance have any contract
18   with Illinois residents for the sale of mattresses?
19        A.   No.
20        Q.   What about for the sale of any other
21   product?
22        A.   No.
23        MS. BERHEIM:  Let's look at what I'm going
24   to mark -- hold on for a second and see what
25   Exhibit we're up to now.  This is going to be 10.
```

Deposition of Tom Comer                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1    fact, sent from you?
 2         A.   Yes.
 3         Q.   Okay.  And this e-mail describes a
 4    Sleep Alliance 2007 business review and a 2008
 5    business planning session, correct?
 6         A.   Yes.
 7         Q.   And this meeting was held October 23rd
 8    and 24th of 2007 in Chicago, correct?
 9         A.   Yes.
10         Q.   Okay.  Why was it held in Chicago?
11         A.   A convenient location.
12         Q.   And it's addressed to various people.
13    Who is Mike Watson?
14         A.   He is an investment banker with Mann
15    Armistead Epperson.
16         Q.   And what was his purpose at the
17    meeting?
18         A.   He's -- he was a consultant.
19         Q.   For?
20         A.   For Sleep Alliance.
21         Q.   Was he involved in trying to locate an
22    equity partner for you?
23         A.   Correct.
24         Q.   And what about Jim Mann?
25         A.   Same as Mr. Watson.
```

Deposition of Tom Comer                                Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1        Stock is held by actually the member
 2   companies of Sleep Alliance.
 3        Q.   Okay.
 4        MS. BERHEIM:  I -- you know, I was trying to
 5   do this without introducing an Exhibit, but I think
 6   we're just going to have to do it, because it's
 7   going to be easier for you.
 8        So I'm introducing what is now Exhibit 14 as
 9   document Bates stamp JM0004.
10        It's one document.
11        The following was marked for Identification:
12        COMER EXH. 14    document Bates number
13                         JM0004.
14   BY MS. BERHEIM:
15        Q.   Mr. Comer, do you recognize that
16   document?
17        A.   Yes.
18        Q.   Okay.  And for the record, it's a check
19   from Jackson Mattress Company, LLC to CDW Computer
20   Centers, Inc.; is that correct?
21        A.   Yes, for $38.
22        Q.   Okay.  And CDW Computer Centers, Inc.,
23   according to the check, is located in Chicago,
24   Illinois, correct?
25        A.   Yes.
```

```
 1          Q.    Okay.  What service or function does
 2   CDW Computer Centers provide for Jackson Mattress?
 3          A.    We purchased computers or software from
 4   CDW.
 5          Q.    Do you still use them?
 6          A.    Yes.
 7          Q.    Does Jackson Mattress still use them?
 8          A.    I believe so, yes.
 9          Q.    Okay.
10          MS. BERHEIM:  I'm now looking at what I'll
11   introduce as Comer Number 15.
12          It's document Bates stamp JM0007.
13          The following was marked for Identification:
14          COMER EXH. 15   document Bates number
15                          JM0007.
16   BY MS. BERHEIM:
17          Q.    Mr. Comer, do you recognize that
18   document?
19          A.    Yes.
20          Q.    Okay.  And for the record, that is a
21   check from Jackson Mattress Company, LLC for $1600
22   to Dun & Bradstreet; is that correct?
23          A.    Yes.
24          Q.    Okay.  And the Dun & Bradstreet is
25   located in Chicago, Illinois, correct?
```

Deposition of Tom Comer                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1        A.    They give us credit reports on any
 2   potential retailer we're looking to sell.
 3        Q.    Do you -- does Jackson Mattress still
 4   use Dun & Bradstreet for that purpose?
 5        A.    Yes.
 6        MS. BERHEIM:  I'm now looking at what I've
 7   marked as Comer Exhibit Number 16.
 8        It's document number JM0 -- Bates stamp, I'm
 9   sorry, JM0012.
10        The following was marked for Identification:
11        COMER EXH. 16    document Bates number
12                         JM0012.
13        BY MS. BERHEIM:
14        Q.    Okay.  Mr. Comer, do you recognize this
15   document?
16        A.    Yes.
17        Q.    Okay.  For the record, this is a check
18   from Jackson Mattress Company, LLC to Bekins or
19   Bekins Worldwide Solutions in the amount of $310.60
20   sent to an address at 1 -- I don't know if it's 35
21   or 55 South LaSalle, Department 1624, in Chicago,
22   Illinois, correct?
23        A.    Yes.
24        Q.    Okay.  What -- what service or product
25   does Bekins Worldwide provide to Jackson
```

```
 1   Mattress -- or did Bekins Worldwide provide to
 2   Jackson Mattress?
 3        A.   I'm not certain.
 4        It may have been a delivery request by a
 5   retailer.
 6        Q.   Are they a moving company or --
 7        A.   Yes.
 8        Q.   Do you know if Jackson Mattress still
 9   uses Bekins?
10        A.   No, I don't believe so.
11        Q.   Okay.
12        MS. BERHEIM:   Looking at what I've marked as
13   Exhibit Number 17, Bates stamp number JM0016.
14        The following was marked for Identification:
15        COMER EXH. 17   document Bates number
16                        JM0016.
17        BY MS. BERHEIM:
18        Q.   Mr. Comer, do you recognize this
19   document?
20        A.   Yes.
21        Q.   Okay.  And for the record, this is
22   another check from Jackson Mattress Co. to Home
23   Direct, Inc. located at the same address as Bekins
24   Worldwide, 135 South LaSalle, Department 1624,
25   Chicago, Illinois.
```

```
 1          Do you recall -- I'm sorry, in the amount of
 2    $281 -- $281.75.
 3          Mr. Comer, do you recall what service Home
 4    Direct provided for Jackson Mattress?
 5          A.    I believe Home Direct and Bekins are
 6    the same.
 7          Q.    Okay.
 8          A.    And then again, they would have handled
 9    delivery, I would think, per the request of a
10    retail customer of ours.
11          Q.    Okay.  Great.
12          MS. BERHEIM:  Now looking at what I've
13    marked as Exhibit Number 18.
14          It's Bates stamp -- document Bates stamp
15    number JM0019.
16          The following was marked for Identification:
17          COMER EXH. 18   document Bates number
18                          JM0019.
19          BY MS. BERHEIM:
20          Q.    For the record, this is a check from
21    Jackson -- Jackson Mattress Co. to Nielsen &
22    Bainbridge.  It's P.O. Box 99670 located in
23    Chicago, Illinois, for the amount of $957.36.
24          Mr. Comer, do you recall what service or
25    product Nielsen & Bainbridge provided to Jackson?
```

```
 1    of a moving company within the State of Illinois?

 2         A.   It's -- that's correct.

 3         We don't sell in Illinois.

 4         Q.   All right.

 5         MR. LYMAN:   Those are all the questions I

 6    have.

 7         Melissa, do you have anything further?

 8         MS. BERHEIM:   No, I don't.

 9         MR. LYMAN:   Okay.   We will reserve signature

10    so that Mr. Comer can --

11         MS. BERHEIM:   Hold on, please.   Time out.

12         I want to -- just one other question.

13         MR. LYMAN:   That's okay.   Go ahead.

14

15         FURTHER EXAMINATION BY MS. BERHEIM:

16

17         Q.   With respect to the question,

18    Mr. Comer, that Mr. Lyman just asked you regarding

19    what we had marked as Exhibit 16 and Exhibit 17,

20    which were the two checks, one to Bekins Worldwide

21    and one to Home Direct, you indicated that these

22    may have been for customers' requests that you

23    ship -- that you use these companies to ship a

24    mattress.

25         Do you know where the mattress went?
```

```
 1            A.    No, I don't.
 2            Q.    Were they shipped within Illinois?
 3            A.    I don't know.
 4            Q.    Okay.  Would you have a way to find
 5    out?
 6            A.    I -- yes.  I think -- I would think so.
 7            Q.    Great.
 8            MS. BERHEIM:  That's all I have.
 9            MR. LYMAN:  Okay.
10
11            FURTHER EXAMINATION BY MR. LYMAN:
12
13            Q.    Just following up on that, Tom, for a
14    second:
15            It's your understanding that none of your
16    companies ship mattresses or products to the State
17    of Illinois; is that correct?
18            A.    That's correct.
19            Q.    Okay.  And I think earlier you told us
20    the states that Jackson Mattress concentrates or
21    sells its product and mattresses in, and you also
22    told us the states that Royal Bedding also sells
23    its product and mattresses to.
24            Correct?
25            A.    Correct.
```

```
 1   STATE OF NEW YORK)

 2                    ss:

 3   COUNTY OF ERIE   )

 4

 5        I DO HEREBY CERTIFY as a Notary Public in and

 6   for the State of New York, that I did attend and

 7   report the foregoing deposition, which was taken

 8   down by me in a verbatim manner by means of machine

 9   shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18   -------------------------------
                LORI K. BECK,
19              CSR, RDR, CRR,
                Notary Public.
20

21

22

23

24

25
```