```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
 2
   ROYAL SLEEP PRODUCTS, INC.
 3 a Florida Corporation,          Case No:   1:07 CV 6588

 4      Plaintiff.

 5 V.

 6 RESTONIC CORPORATION,
   an Illinois Corporation,
 7 RESTONIC MATTRESS CORPORATION,
   an Illinois Corporation,
 8 SLEEP ALLIANCE, LLC,
   a Delaware Limited Liability Company,
 9 ROYAL BEDDING COMPANY OF BUFFALO,
   a New York Corporation,
10 JACKSON MATTRESS CO., LLC,
   a North Carolina Limited Liability Company,
11 CONTINENTAL SILVERLINE PRODUCTS, L.P,
   a Texas Limited Partnership,
12 STEVENS MATTRESS MANUFACTURING CO.,
   a North Dakota Corporation,
13 TOM COMER, JR., an individual,
   DREW ROBINS, an individual, and
14 RICHARD STEVENS, an Individual,

15      Defendants.

16

17 ****************************************************

18              ORAL DEPOSITION OF

19                 DREW ROBINS

20               MAY 29, 2008

21 ****************************************************

22

23

24

25
```

ORIGINAL

EXHIBIT
B

1        ORAL DEPOSITION OF DREW ROBINS, produced as a

2   witness at the instance of the Plaintiff and duly

3   sworn, was taken in the above-styled and numbered

4   cause on MAY 29, 2008, from 12:13 p.m. to 1:41 p.m.,

5   before Denyce M. Sanders, CSR, RPR, in and for the

6   State of Texas, recorded by machine shorthand, at the

7   offices of Fulbright & Jaworski, L.L.P.,

8   1301 McKinney, Suite 5100, Houston, Texas, pursuant to

9   the Illinois Rules of Civil Procedure and the

10  provisions stated on the record or attached hereto;

11  that the deposition shall be read and signed before

12  any notary public.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4          ZARCO EINHORN SALKOWSKI & BRITO, P.A.
            Bank of America Tower
 5          100 Southeast 2nd Street, Suite 2700
            Miami, Florida  33131
 6          Mr. Robert F. Salkowski
            (via telephone)
 7
       FOR THE DEFENDANTS CONTINENTAL SILVERLINE PRODUCTS,
 8     L.P. AND DREW ROBINS:

 9          FULBRIGHT & JAWORSKI, LLP
            1301 McKinney, Suite 5100
10          Houston, Texas  77010
            Mr. Andrew Friedberg
11
       FOR THE DEFENDANTS RESTONIC CORPORATION AND RESTONIC
12     MATTRESS CORPORATION:

13          BURKE, WARREN, MacKAY & SERRITELLA, PC
            330 North Wabash Avenue, 22nd Floor
14          Chicago, Illinois  60611
            Mr. Frederic A. Mendelson
15          (via telephone)

16     FOR THE DEFENDANTS CONTINENTAL SILVERLINE PRODUCTS,
       L.P, JACKSON MATTRESS CO., LLC, ROYAL BEDDING COMPANY
17     OF BUFFALO, SLEEP ALLIANCE, LLC, DREW ROBINS AND TOM
       CONNER, JR.:
18
            SMITH & AMUNDSEN, L.L.C.
19          150 North Michigan Avenue, Suite 3300
            Chicago, Illinois  60601
20          Mr. Thomas J. Lyman III
            (via telephone)
21
       FOR THE DEFENDANTS STEVENS MATTRESS MANUFACTURING
22     COMPANY AND RICHARD STEVENS:

23          DYKEMA GOSSERT PLLC
            10 South Wacker Drive, Suite 2300
24          Chicago, Illinois  60606
            Ms. Michelle Fisher
25          (via telephone)
```

```
1                          EXAMINATION INDEX

2

3    WITNESS:        DREW ROBINS

4    EXAMINATION                                        PAGE

5       BY MR. SALKOWSKI                                  8

6    SIGNATURE REQUESTED                                 68

7    REPORTER'S CERTIFICATION                            70

8                              EXHIBIT INDEX

9
                                                        PAGE
10
     EXHIBIT NO. 1
11       Defendants Continental Silverline
         Products L.P. and Drew Robins'
12       Responses to Plaintiff's Request
         For Production of Documents
13
     EXHIBIT NO. 2
14       Affidavit of Drew Robins

15   EXHIBIT NO. 3                                        16
         License Agreement
16
     EXHIBIT NO. 4                                        19
17       Stockholders Agreement

18   EXHIBIT NO. 5
         Letter dated September 11, 2006,
19       to Carlene Peterson from J. A. Robins
         with attachments
20
     EXHIBIT NO. 6
21       Consent and Acknowledgement

22   EXHIBIT NO. 7
         Letter dated March 29, 2007,
23       to "Gentlemen" signed by J. A. Robins

24   EXHIBIT NO. 8                                        20
         Amended and Restated Sublicense Agreement
25
```

Deposition of Drew Robins                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1    EXHIBIT NO. 9                                    20
          Amended and Restated Sublicense Agreement
 2
      EXHIBIT NO. 10                                   37
 3        Hotel charges

 4    EXHIBIT NO. 11                                   37
          Airline and hotel charges
 5
      EXHIBIT NO. 12                                   50
 6        Invoices

 7    EXHIBIT NO. 13
          Invoice
 8
      EXHIBIT NO. 14                                   50
 9        Invoice

10    EXHIBIT NO. 15
          Invoice
11
      EXHIBIT NO. 16
12        Invoice and check stub

13    EXHIBIT NO. 17                                   50
          E-mail string
14
      EXHIBIT NO. 18
15        Invoices

16    EXHIBIT NO. 19                                   50
          Invoice
17
      EXHIBIT NO. 20                                   50
18        Invoice

19    EXHIBIT NO. 21
          Invoices
20
      EXHIBIT NO. 22
21        Invoice

22    EXHIBIT NO. 23                                   50
          Invoices
23
      EXHIBIT NO. 24                                   48
24        Copies of checks

25
```

Deposition of Drew Robins                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1    EXHIBIT NO. 25                                    48
          Copies of checks
 2
      EXHIBIT NO. 26                                    48
 3        Copies of checks

 4    EXHIBIT NO. 27
          Memo to RMC Licensees from Edward J. Scott
 5
      EXHIBIT NO. 28                                    22
 6        Term Promissory Note

 7    EXHIBIT NO. 29
          Letter dated January 13, 2006,
 8        to Drew from Carlene Peterson

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    know the purpose of Restonics having borrowed $45,000

 2    from you or from Continental Silverline Products?

 3        A.    I believe so.

 4        Q.    I'm sorry, sir, either I got cut off -- I

 5    didn't hear your answer.

 6        A.    Yes.  I believe I do, yes, sir.

 7        Q.    Okay.  And what is the reason why Continental

 8    Silverline Products had lent Restonic Mattress

 9    Corporation money?

10        A.    Because they had a liquidity problem with

11    some activities they wanted to engage in.

12        Q.    Okay.  And was that the development of an

13    outlet in Nevada?

14        A.    A showroom in Nevada.

15        Q.    A showroom in Nevada?

16            MR. FRIEDBERG:  Robert, I don't mean to

17    cut off your line of questioning.  Just a quick point

18    for clarification, since I don't -- since Mr. Robins

19    has the actual exhibit.  Is Continental No. 670 part

20    of this exhibit?

21            MR. SALKOWSKI:  I don't believe it is.

22            MR. FRIEDBERG:  And I ask that question

23    only because I think it relates --

24            MR. SALKOWSKI:  That's the letter

25    between Restonic and -- and they relate, but I don't
```

```
 1    think it was part of the exhibit.

 2              MR. FRIEDBERG:  That's fine.  Just for

 3    clarification.  My apologies.

 4        Q.   (BY MR. SALKOWSKI) Mr. Robins, with respect

 5    to this promissory note, how was the -- how was this

 6    promissory note negotiated between you and Restonics?

 7    Was it by telephone, or was it in person?

 8        A.   I think it was by telephone.

 9        Q.   Now, this promissory note is signed by

10    Carlene Peterson, who, at the time, I believe was the

11    president of Restonic Mattress Corporation.  Did you

12    ever meet personally with Ms. Peterson to discuss

13    the -- the terms of the promissory note or the

14    possibility of Continental Silverline Products lending

15    money?

16        A.   No, sir.

17        Q.   Did you ever attend -- or do you recall ever

18    attending any meetings in Chicago to discuss with

19    anyone from Restonics any of your license agreements

20    or this promissory note before they were executed?

21        A.   I -- I don't recall doing that in Chicago,

22    no, sir.

23        Q.   Okay.  Where do you recall doing that, sir,

24    if anywhere?

25        A.   In Houston, Texas.
```

```
 1        A.    I don't understand "for Restonic business."
 2   I don't understand the question.
 3        Q.    Okay.  Have you ever -- well, let's start
 4   with this, I guess the basic question.  Have you ever
 5   been in the state of Illinois?
 6        A.    Yes, sir.
 7        Q.    All right.  And approximately how many times
 8   have you been in Illinois?
 9        A.    In my lifetime?
10        Q.    In your lifetime.
11        A.    20.
12        Q.    And when was the last time that you were in
13   Illinois?
14        A.    I can't recall the exact date, but within the
15   last year.
16        Q.    All right.  And what was the reason that you
17   were in Illinois within the last year?
18        A.    I believe it was related to Restonic
19   marketing effort.
20        Q.    Was that a marketing committee?
21        A.    I believe so.
22        Q.    And you personally attended that meeting?
23        A.    Yes.
24        Q.    All right.  And what was the purpose of the
25   meeting?  I -- I believe it's almost self-explanatory,
```

```
 1   but I just wanted to get an understanding of what it

 2   was.  Was it to market a particular line of bed or the

 3   Restonic company?

 4        A.    Yes.

 5        Q.    Okay.  Well, what -- was it for both and --

 6        A.    Yes.

 7        Q.    Let me restate the question.  Was that

 8   Restonic marketing meeting that you attended within

 9   the last year in Chicago for the purposes of marketing

10   a new line of product?

11        A.    A new product.

12        Q.    All right.  And what was that product, sir?

13        A.    A green bed.

14        Q.    What is a green bed?

15        A.    Environmentally sensitive --

16        Q.    Okay.

17        A.    -- bed.

18        Q.    And prior to that marketing committee meeting

19   that you traveled to Illinois on, do you recall how

20   many times, approximately, you've been in the state of

21   Illinois within the past five years?

22        A.    I don't recall, but I would be willing to

23   guess four times or five times.

24        Q.    And what was the reasons why you would travel

25   to Illinois within those past five years?
```

```
 1        A.    Some Restonic meeting.

 2        Q.    And, sir, what type of meetings would

 3   Restonic hold in Illinois that -- that you attended in

 4   that state?

 5        A.    Again, I -- I can't exactly recall what --

 6   what they were.

 7        Q.    Well, let me try to help you out a little

 8   bit, if I may.  You indicated that you were part of

 9   the -- the marketing committee; is that correct?

10        A.    No, sir.

11        Q.    I'm sorry.  Did you attend a meeting on

12   behalf of marketing for Restonics in Illinois?

13        A.    I was invited to attend one marketing

14   meeting.

15        Q.    Okay.  But you were not on the marketing

16   committee; is that correct?

17        A.    That's correct.

18        Q.    And who invited you to attend that meeting?

19        A.    I don't recall.

20        Q.    Do you know why you were invited?

21        A.    As a courtesy.

22        Q.    Do you know if other licensees besides

23   yourself were invited, as well?

24        A.    I believe so.

25        Q.    Do you know who besides yourself attended
```

```
 1   Illinois?
 2        A.    I believe Restonic had -- had or has an
 3   advisory board.
 4        Q.    And, sir, do you sit on that board?
 5        A.    No, sir.
 6        Q.    Has there ever been an occasion where
 7   Restonic, as a courtesy, invited you to attend an
 8   advisory board meeting in the state of Illinois?
 9        A.    Not that I can recall.
10        Q.    I understand, also, from, you know, some of
11   the materials I've read, that Restonic also has a
12   licensing meeting from time to time in the state of
13   Illinois; is that correct?
14        A.    Yes.
15        Q.    And so what are -- what's generally discussed
16   at these licensing meetings that Restonics has in the
17   state of Illinois?
18        A.    Licensing issues.
19        Q.    All right.  Could you give me an example of
20   what those licensing issues may be?
21        A.    Fees.
22        Q.    Now, have you ever personally attended a
23   licensing meeting held by Restonic in the state of
24   Illinois?
25        A.    Yes.
```

```
 1        Q.   And what was the last one you recall
 2   attending?
 3        A.   I really don't recall attending one recently.
 4   Years ago, in my recollection.
 5        Q.   I understand that Restonic is holding another
 6   meeting of -- strike that.
 7                  I understand next week Restonics has
 8   scheduled another licensing meeting.  Are you planning
 9   to attend that personally?
10        A.   I am hoping to attend it, yes, sir.
11        Q.   And now, sir, are you familiar with the Sleep
12   Alliance?
13        A.   Yes.
14        Q.   What is the Sleep Alliance?
15        A.   It's a holding company.
16        Q.   And who are the members of the holding
17   company?
18        A.   Alliance Sleep and Continental Silverline
19   Products.
20        Q.   And what is the purpose of this Sleep
21   Alliance holding company?
22        A.   Carry on business.
23        Q.   Selling mattresses and the like; is that
24   right?
25        A.   Yes, sir.
```

```
 1        Q.    Sir, have you ever attended any meetings of
 2   the Sleep Alliance in the state of Illinois?
 3        A.    Not that I can recall.
 4        Q.    Do you recall any meetings that the Sleep
 5   Alliance held in the state of Illinois?
 6        A.    Again, not that I can recall.
 7        Q.    And have you ever attended any shareholder
 8   meetings in the state of Illinois on behalf of
 9   Restonic Corp. or Restonic?
10        A.    Not on behalf of Restonic Corporation.
11        Q.    Okay.  What type of shareholder meetings have
12   you attended in Illinois, if not on behalf of
13   Restonic?
14        A.    I've attended Restonic shareholder meetings
15   on my own behalf.
16        Q.    As a shareholder?
17        A.    Correct.
18        Q.    And how many times have you attended
19   shareholder meetings for Restonic in Illinois?
20        A.    I don't know an exact number, sir.
21        Q.    Now, sir, are you familiar with an individual
22   named Brent Ford?
23        A.    Yes.
24        Q.    And who is Mr. Ford?
25        A.    He's an employee of Continental Silverline
```

1   Products.

2       Q.   All right.  And to your knowledge, has

3   Mr. Ford ever traveled to the state of Illinois for

4   Restonic-related business?

5       A.   Yes.

6       Q.   And do you know how many times Mr. Ford

7   traveled to Illinois for the Restonic business?

8       A.   No.

9       Q.   Do you know -- do you have any idea how many

10  times Mr. Ford has been in the state of Illinois for

11  the purposes of Restonics-related business?

12      A.   From time to time.

13      Q.   Do you know if it's more than two times per

14  year?

15      A.   No, I don't know that.

16      Q.   All right.  Now, do you know whether or not

17  Mr. Ford ever attends any of the various meetings that

18  we discussed?  Meaning, do you know whether or not

19  Mr. Ford ever attended a product development meeting

20  in Illinois?

21      A.   I'm not certain about a product development

22  meeting.

23      Q.   Okay.  Are you certain of any meetings

24  Mr. Ford has attended in Illinois?

25      A.   I believe he has attended some Restonic

```
 1   meetings in Illinois.
 2       Q.    You just don't know which -- which meetings
 3   he's attended; is that right?
 4       A.    Correct.
 5       Q.    And did Continental Silverline Products send
 6   Mr. Ford to Illinois to attend these meetings?
 7       A.    Yes.
 8       Q.    Do you have any idea how many times Mr. Ford
 9   has been to Illinois for Restonic business?
10       A.    No, sir.
11       Q.    Does Mr. Ford submit any type of expense
12   reports that -- for expenses he's incurred traveling
13   to Illinois?
14       A.    Yes, sir.
15       Q.    And have those been produced to us, to your
16   knowledge?
17       A.    I don't know.
18       Q.    Okay.  Did you ever -- do you know if you've
19   provided your attorneys with expense reports that
20   Mr. Ford provided to you for his trips to Illinois?
21       A.    I don't know.
22       Q.    Are you able to recall asking anyone to
23   produce the expense reports of Mr. Ford when he
24   traveled to Illinois?
25       A.    No, sir.
```

```
 1        Q.    And do you still maintain those expense
 2   reports at your offices in Houston?
 3        A.    Yes, sir.
 4        Q.    I'm sorry, I didn't hear you.  Was that
 5   "yes"?
 6        A.    Yes.
 7        Q.    And I apologize.  I'm not asking, you know,
 8   to repeat any of your answers.  I just can't hear you
 9   sometimes.
10             Now, are you familiar with an individual
11   named Rosa Ortiz, O-R-T-I-Z?
12        A.    Yes.
13        Q.    And who is Ms. Ortiz?
14        A.    She's an employee of Continental Silverline
15   Products.
16        Q.    And have you ever sent Ms. Ortiz to the state
17   of Illinois on behalf of Continental Silverline
18   Products as it relates to the Restonics business?
19        A.    I believe so.
20        Q.    And how many times have you sent Ms. Ortiz to
21   Illinois for the Restonics business?
22        A.    I don't know.
23        Q.    Do you know if it was more than five times?
24        A.    I really don't know, sir.
25        Q.    All right.  Now, what position does Ms. Ortiz
```

```
 1    have with Continental Silverline?

 2        A.    She's an operations manager.

 3        Q.    And what is her responsibilities as an

 4    operations manager?

 5        A.    She's in charge of the operations.

 6        Q.    Do you know if Ms. Ortiz ever attended any

 7    licensing meetings in the state of Illinois on behalf

 8    of your company?

 9        A.    Not to my knowledge.

10        Q.    Do you know if Ms. Ortiz ever attended any

11    product development meetings in the state of Illinois?

12        A.    I believe she has.

13        Q.    Do you know how many she's attended?

14        A.    No, sir.

15        Q.    All right.  Do you know if Ms. Ortiz ever

16    attended any marketing meetings in the state of

17    Illinois on behalf of Continental Silverline?

18        A.    Not to my knowledge.

19        Q.    How about advisory board meetings?  Are you

20    aware of any participation by Ms. Ortiz in any

21    advisory board meetings sponsored by Restonics in the

22    state of Illinois?

23        A.    No, sir.

24        Q.    Other than Ms. Ortiz and Mr. Ford, are you

25    aware of any other employees employed by Continental
```

```
 1   Silverline that have traveled to Illinois on behalf of
 2   your business?
 3       A.   No, sir.
 4       Q.   Give me one second.  I've got to find another
 5   document.
 6            MR. SALKOWSKI:  If the court reporter
 7   could hand Mr. Robins Exhibits 10 and 11.
 8            MR. FRIEDBERG:  Could you give us the
 9   Bates number?
10            MR. SALKOWSKI:  Exhibit 10 is
11   Continental 155, and Exhibit 11 begins with
12   Continental 466.  But it's not consecutively numbered,
13   Exhibit 11.
14       Q.   (BY MR. SALKOWSKI) Mr. Robins, if you could
15   just quickly look through Exhibits 10 and 11 and let
16   me know when you're done.  I'm going to ask you
17   certain questions on that.
18       A.   Okay.
19       Q.   Sir, Exhibit No. 10 is a receipt -- or
20   appears to be a receipt from the Doubletree Hotel and
21   the second page of Exhibit 10 is a receipt of the
22   Sofitel, both in Chicago.
23            The first receipt, Continental 155 is a
24   receipt dated November 16th of 2007, and it was to the
25   customer, Brent Ford.  Do you recall why Mr. Ford
```

```
 1    traveled to Illinois --
 2         A.    No, sir.
 3         Q.    -- on this date?
 4         A.    No, sir.
 5         Q.    Do you know if it was on behalf of
 6    Continental Silverline's business?
 7         A.    I would imagine it was, sir.
 8         Q.    All right.  And, sir, the second invoice is
 9    from the Sofitel Hotel, and it's dated a month
10    earlier, October of '07, where it looks like Mr. Ford
11    spent two days at this location.  Do you know why
12    Mr. Ford traveled to Illinois in October of '07 on
13    behalf of Continental Silverline?
14         A.    No, sir.
15         Q.    Sir, if you turn to Exhibit No. 11.  And just
16    for the sake of everyone involved, I'm going to refer
17    to the Bates stamp numbers within it because, like I
18    said, they're not sequential.
19              Sir, on the first page of Exhibit 11, which
20    is Continental Bates stamp 466, there was a flight
21    from Houston to O'Hare in October of '06, where
22    Ms. Rosa Ortiz appeared to have traveled.  Do you see
23    that?
24         A.    Yes, sir.
25         Q.    And do you know why Ms. Ortiz traveled to
```

```
 1   Illinois in October of '06 on behalf of Continental
 2   Silverline?
 3       A.   No, sir.
 4       Q.   The next page is Continental Silverline Bates
 5   203.  And it has what appears to be two separate
 6   charges to Continental Airlines, both for Rosa Ortiz,
 7   where she traveled to Houston -- I'm sorry -- from
 8   Houston to -- to Chicago's O'Hare Field.  Do you see
 9   that?
10       A.   Yes, sir.
11       Q.   Do you know, sir, why Ms. Ortiz traveled to
12   Illinois on behalf of Continental Silverline in August
13   of 2007?
14       A.   No, sir.
15       Q.   I'm sorry?
16       A.   No, sir.
17       Q.   All right.  Now, sir, do your employees tell
18   you that they're going to Chicago, or do they have
19   somewhat of an independence within your company where
20   you may not know specifically what they're doing on a
21   particular day?
22       A.   The answer is "yes" to both of those
23   questions.
24       Q.   So the employees may travel to Chicago and
25   you may not know about it; is that correct?
```

```
 1        A.    That would be possible.
 2        Q.    Sir, if you turn to the next page of Exhibit
 3   No. 11, which is Continental Bates stamp 215, there
 4   appears to be a ticket that -- or airplane that
 5   Mr. Brent Ford took in -- on the 26th day of August
 6   2007, from Houston to O'Hare.  Do you see that?
 7        A.    Yes, sir.
 8        Q.    Do you know why Mr. Ford traveled to
 9   Illinois --
10        A.    No, sir.
11        Q.    -- on this day?
12        A.    No, sir.
13        Q.    If you turn to the next page, Bates stamp
14   Continental 940, there was a trip that you appear to
15   have taken in -- on September 13th, and it
16   appears -- and I could be wrong -- another trip you
17   took on September 27th to Chicago.  Do you see that?
18        A.    I see both of them, yes, sir.
19        Q.    And, sir, what were the reasons why you
20   traveled to Chicago on these two days?
21        A.    I don't believe I traveled to Chicago on both
22   those dates.
23        Q.    Okay.  So you only traveled one of the two
24   days; is that right?
25        A.    I'm uncertain, but I believe that's the case.
```

```
 1        Q.   And what was the reason why you traveled to
 2   Chicago on either of these two dates?
 3        A.   I can't recall the specific reason, sir.
 4        Q.   Was it on behalf of the Restonic business?
 5        A.   I would imagine it was, yes, sir.
 6        Q.   Sir, if you turn to the next page --
 7   Continental Silverline 170 is the Bates stamp
 8   number -- there appears to be a charge for -- charges
 9   that were incurred at the Doubletree Hotel and the
10   Arlington -- somewhere in Arlington Heights, Illinois,
11   for lodging, food and beverage.   Do you see that?
12        A.   Yes, sir.
13        Q.   And do you know who -- do you recall -- I'm
14   sorry.   Strike that.
15             Do you know if it was you who stayed at
16   the Doubletree Hotel in Arlington Heights on
17   September 27th or on or about September 27th of '07?
18        A.   I'm uncertain, but I think it was probably
19   me.
20        Q.   And do you recall what the purpose was for
21   you having been in Illinois on this date?
22        A.   No, sir.
23        Q.   And, sir, if you turn to the next page,
24   Continental 171, there was a charge on October 22nd of
25   '07 that you made at the Morton steakhouse in
```

Deposition of Drew Robins                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1    Rosemont, Illinois.  Do you see that?
 2         A.    Yes, sir.
 3         Q.    Do you know whether or not -- I'm sorry.  Do
 4    you know, was that a charge that you made or somebody
 5    else made on your behalf?
 6         A.    I really don't know.
 7         Q.    Okay.  Do you ever recall eating at the
 8    Morton's in Rosemont?
 9         A.    Yes, sir.
10         Q.    I'm sorry.  Did you answer, sir?
11         A.    Yes, sir.  I recall.
12         Q.    Okay.  And -- and you recall that -- do you
13    recall why you were in Illinois having dinner at
14    Morton's in Rosemont, Illinois?
15         A.    No, sir.
16         Q.    Now, there's another ticket that Brent Ford
17    purchased on Continental Airlines from O'Hare to
18    Houston on October 24th, 2007.  Do you know why
19    Mr. Ford was in Houston on that day?
20         A.    Could you ask me the question again, please?
21         Q.    Sure.  Under the Morton's charge, there is a
22    charge on October 24, 2007, where it appears that
23    Mr. Ford flew from O'Hare to Houston on Continental
24    Airlines.  Do you see that?
25         A.    Yes, sir.
```

Network Reporting Corporation          (305)358-8188 * (888)358-8188                    Page: 42

1    Q.   Do you know why Mr. Ford was in Houston on or

2    about October 24, 2007?

3    A.   I don't know specifically why.

4    Q.   All right.  Let me ask you this:  What are

5    some of the reasons why Mr. Ford travels to Illinois

6    on behalf of Continental Silverline?

7    A.   Well, it could be a marketing committee

8    meeting or some related topic.

9    Q.   Does he do any work on behalf of Restonic?

10   A.   I don't understand the question.

11   Q.   Does he do any work on behalf of Restonic?

12   Meaning, does Restonic employ him in any capacity?

13   A.   No, sir.

14   Q.   Does the Alliance employ Mr. Ford in any

15   capacity?

16   A.   No, sir.

17   Q.   How about Ms. Ortiz, is she employed by

18   either Restonics or the Sleep Alliance in any

19   capacity?

20   A.   No, sir.

21   Q.   Now, has -- well, let me go through that a

22   little bit more.  We just have a few more pages.

23        The next page, Continental Bates stamp 159,

24   it has two charges.  One appears to be a flight from

25   Houston to O'Hare that Mr. Ford took again in November

```
 1    of '07 on Continental Airlines.  Do you see that, sir?

 2         A.   Yes, sir.

 3         Q.   Do you know why Mr. Ford was in Illinois on

 4    or about November 12, 2007, as it relates to the

 5    Restonics business?

 6         A.   No, sir.

 7         Q.   But would you agree with me that he was in

 8    Illinois in some capacity on behalf of Continental

 9    Silverline?

10         A.   Yes, sir.

11         Q.   All right.  Now, sir, there's a charge on

12    November 15th of '07 at the Gibson steakhouse in

13    Rosemont, Illinois.  Do you see that?

14         A.   Yes, sir.

15         Q.   Do you know if that was a charge made by

16    Mr. Ford, or was that a charge that you made?

17         A.   I would believe it was Mr. Ford.

18         Q.   Okay.  And again, do you know why he may have

19    been in Chicago on the 15th of November?

20         A.   No, sir.

21         Q.   Does Mr. Ford, to your knowledge, go to

22    Chicago or the state of Illinois every month --

23         A.   No, sir.

24         Q.   -- on behalf of Continental Silverline?

25         A.   No, sir.
```

Deposition of Drew Robins                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1        Q.    Has his travel to Illinois increased or
 2   decreased over -- over the past two years?
 3        A.    I don't know.
 4        Q.    Now, sir, if you turn to the -- two or three
 5   pages down, it's marked Bates stamp Continental 927.
 6   There's a -- looks like two tickets, one for
 7   Continental; one more Northwest Airlines.  One is
 8   dated December 17; the other is December 19th, both in
 9   2007, and the passenger is Brent Ford.  Do you see
10   those two tickets?
11        A.    Yes.
12        Q.    Do you know why Mr. Ford traveled to Illinois
13   on or about the 17th of December, 2007?
14        A.    No, sir.
15        Q.    But it was on behalf of Continental
16   Silverline; is that correct?
17        A.    Yes, sir.
18        Q.    All right.  And, sir, if you look at the next
19   ticket for Northwest Airlines, it's dated 12-19 of
20   '07; but if you see on the right, it has a departure
21   date of January 1st, which I assume was 2008.  Do you
22   see that?
23        A.    Yes, sir.
24        Q.    And do you know why Mr. Ford traveled to
25   Illinois from Texas on or about January 1, 2008, as it
```

1   relates to the Restonic business?

2       A.    No, sir.

3       Q.    Okay.  Now, sir, there's handwritten notes

4   next to both of these charges.  And it appears to me

5   that it says "Restonic expense."  Do you see that?

6       A.    Yes, sir.

7       Q.    Were these expenses paid by Restonic to you?

8       A.    I don't know that.

9       Q.    To your knowledge, has Restonics ever

10  reimbursed you for travel expenses made by either

11  yourself, Mr. Ford or Mr. Ortiz -- Ms. Ortiz?

12      A.    I believe in Mr. Ford's case, they have.

13      Q.    And what was the reason why Restonics had

14  reimbursed you for travel made by Mr. Ford from

15  Houston to Illinois?

16      A.    I'd have to look up the specific time to know

17  that.

18      Q.    Well, do you recall any specific instance or

19  reason why you were reimbursed by Restonic for travel?

20      A.    If there was a specific request by Restonic

21  to donate time for a meeting, I imagine they might pay

22  for that -- expense for that.

23      Q.    And so -- and I'm sorry, I need to be a

24  little clearer.

25          Restonic asked you to donate your employee's

```
 1    time to them; is that right?
 2        A.    For a meeting.
 3        Q.    And what type of meeting would -- would you
 4    donate Mr. Ford's time to so he could attend in
 5    Illinois?
 6        A.    Some type of marketing or product issue.
 7        Q.    Now, does Mr. Ford ever have conversations
 8    with you when he returns from Illinois as to the
 9    reason or reasons he was there?
10        A.    Yes, sir.
11        Q.    And do you recall Mr. Ford having any
12    conversations with you after any of his 2007 travel as
13    to why he was in Illinois?
14        A.    Not -- no, sir, I don't.
15        Q.    Other than Mr. Ford or Ms. Ortiz, have you
16    ever sent any other employees to Illinois?
17        A.    Not that I can recall.
18        Q.    Sir, under the various license agreements
19    that exist between Continental Silverline and
20    Restonics, you pay a licensing fee; is that correct?
21        A.    Yes.
22        Q.    And that's based on the sales made by
23    Restonics -- I'm sorry, the sales made by Continental
24    Silverline; is that correct?
25        A.    Yes.
```

```
 1       Q.   I'm going to ask that you be provided
 2   Exhibits 24, 25 and 26.  And let me know when you've
 3   had an opportunity to -- to review those.  They're all
 4   various checks.
 5              MR. FRIEDBERG:  Do you have the Bates
 6   numbers?
 7              MR. SALKOWSKI:  Exhibit 24 starts with
 8   Bates stamp 302, Exhibit 25 starts with Bates stamp
 9   270, and Exhibit 26 starts with Bates stamp 229.
10   Again, I'll represent these are documents Mr. Robins
11   has produced in this case.
12       A.   24, 25 and 26?
13       Q.   (BY MR. SALKOWSKI) That's right, sir.
14       A.   Yes, sir, I have them.
15       Q.   Now, sir, I know there are a lot of checks in
16   these three exhibits.  I'm not going to ask you
17   specifically what each check was for.  But, in
18   general, are these checks that you have made to
19   Restonics in Illinois for the royalty, the licensing
20   fees that you pay under the various agreements?
21       A.   It looks like many of them are.
22       Q.   Okay.  And in addition to the licensing fees,
23   when you pay Restonics under the license agreement we
24   just looked at a little while ago, do you also make
25   purchases of anything from Restonics that you pay
```

```
 1    Restonic for?

 2        A.    Yes, sir.

 3        Q.    And what do you make -- what do you purchase

 4    from Restonic?

 5        A.    Point of purchase material.

 6        Q.    Marketing materials and the like?

 7        A.    Yes, sir.

 8        Q.    Is that right?

 9        A.    Yes, sir.

10        Q.    And are those shipped from Illinois, to your

11    knowledge, to you in Houston?

12        A.    I don't really know, but I don't think so.

13        Q.    Do you know where they're coming from?

14        A.    Various vendors.

15        Q.    You ever utilized vendors in Chicago that

16    Restonics designated?

17        A.    I'm uncertain, but it's possible.

18        Q.    Now, sir, have you ever billed Restonic for

19    anything?

20        A.    Yes, sir.

21        Q.    What would you bill Restonics for?

22        A.    A sample that we were asked to send

23    somewhere.

24        Q.    And why would Restonic ask you to send a

25    sample to -- and when you say "sample," you're
```

1    referring to a bedding sample or a component of a bed;

2    is that right?

3        A.    Yes.

4        Q.    And why would Restonic be asking you or your

5    company to send a sample of a bedding component to

6    another entity?

7        A.    There are various reasons, sir.

8        Q.    Well, give me one.

9        A.    We're the closest factory to get the job

10   done.

11              MR. SALKOWSKI:  All right.  I'm going to

12   ask that Mr. Robins be provided with Exhibit 12,

13   Exhibit 14, Exhibit 15, Exhibit 18, Exhibit 20,

14   Exhibit 22, and Exhibit 23.  And I'll give you a

15   minute to find those documents and review them.

16              MR. FRIEDBERG:  And if you'll bear with

17   us, that was 12, 14, 15, 18, 20, 22 and 23?

18              MR. SALKOWSKI:  Right.

19              MR. FRIEDBERG:  It would be easier to

20   tell us which ones not to give him.

21              MR. SALKOWSKI:  Obviously I'm not there.

22   So when Mr. Robins is given those and if he has an

23   opportunity to quickly look through them, just let me

24   know and I'll start my questions.

25              MR. FRIEDBERG:  Okay.

1      A.    Okay, sir.

2      Q.    (BY MR. SALKOWSKI)  Okay.  Just give me

3  30 seconds here.

4           All right, sir.  Exhibit 12, Bates stamp

5  Continental 374, appears to be a invoice dated 12-27

6  of '07 from Continental Silverline to Restonic.  Do

7  you see that?

8      A.    Yes, sir.

9      Q.    And there's a description of what item or

10  items were sold or shipped to Restonic.  Do you see

11  that?

12      A.    Yes, sir.

13      Q.    And in this particular example on Exhibit 12,

14  there appears to be some latex foam --

15      A.    Yes, sir.

16      Q.    -- that was sent?

17           Freight charges -- outbound freight charges,

18  as well as -- appears to be expenses for a meeting

19  with Premier Foam about Green mattress, I assume --

20      A.    Uh-huh.

21      Q.    -- that took place between Brent Ford and Bob

22  Quinn.  Do you see that?

23      A.    Yes, sir.

24      Q.    Do you know what this invoice was for, other

25  than -- you know, why were you shipping foam

```
 1   and -- and toppers to Restonic on or about this date?
 2        A.   Well, we made this sample and I believe
 3   it -- I don't know, but I believe it was sent so it
 4   would be available for a meeting.
 5        Q.   In Chicago?
 6        A.   I don't know that.
 7        Q.   Okay.  Do you know who this Bob Quinn is?
 8        A.   Yes, sir.
 9        Q.   Who is he?
10        A.   He works for a Restonic licensee in New
11   Albany, Indiana.
12        Q.   And was that licensee also involved in this
13   Green mattress campaign?
14        A.   I believe so.
15        Q.   Now, sir, how involved was Continental
16   Silverline in how things -- Restonics with this Green
17   mattress?
18             THE REPORTER:  Can you repeat that?
19        Q.   (BY MR. SALKOWSKI) How involved was
20   Continental Silverline in assisting Restonics with
21   this Green mattress campaign?
22        A.   I don't understand how to answer that, sir.
23        Q.   Well, was Continental Silverline asked by
24   Restonics to help Restonics with coming up with a
25   Green mattress?
```

```
 1        A.    Along with many other licensees, I suspect.

 2        Q.    All right.  And what type of assistance

 3   generally did you give to Restonics in assisting it

 4   with coming up with a Green mattress?

 5        A.    Apparently we made one.

 6        Q.    And you had shipped it to Illinois?

 7        A.    Again, I don't believe we shipped it to

 8   Illinois.  I'm not sure where we shipped it.

 9        Q.    All right.  Well, sir, if you look at the top

10   of Exhibit 12, it says "Ship to Restonic Corp." --

11        A.    Yeah.

12        Q.    -- in Palatine, Illinois.  Do you see that?

13        A.    I do.

14        Q.    Was that -- would there be a different

15   shipping address?

16        A.    Absolutely possible, sir.

17        Q.    Okay.  Do you know where you could have

18   shipped it, if not Illinois?

19        A.    I don't know, sir.

20        Q.    All right.  Sir, if you go to the next

21   exhibit, 14, which is Continental Bates stamp 417 --

22        A.    Yes, sir.

23        Q.    -- the invoice is dated April 12, 2007?

24        A.    Yes, sir.

25        Q.    Do you see that?
```

1          MR. SALKOWSKI:  And I understand that.

2          MR. FRIEDBERG:  But Mr. Robins can

3    continue to answer the question.

4       A.   I'm sorry, what was the question again?

5       Q.   (BY MR. SALKOWSKI) Do you know why Mattress

6    Giant elected not to purchase mattresses from this

7    group of Restonic licensees and Restonic after this

8    presentation in the fall of 2006?

9       A.   I know what they told us.

10      Q.   Yeah, what did they tell you?

11      A.   They elected to stay with the same vendor

12   that they were considering replacing.

13      Q.   Do you know the individual at Mattress Giant

14   who told you that?

15      A.   No.  The two -- the two people we were

16   dealing with, but I don't recall their names.

17      Q.   Now, sir, if you could go to the next

18   exhibit, 18, Bates stamp 384.

19      A.   Yes, sir.

20      Q.   See that, sir?

21      A.   Yes, sir.

22      Q.   It looks like you're asking for reimbursement

23   from Restonics for about $15,000.  Do you see that?

24      A.   Yes, sir.

25      Q.   And do you recall why -- what was being

```
 1    considered in this product development committee

 2    meeting that Restonics was reimbursing you for costs?

 3        A.   I don't recall.  But it says "F/R Expense."

 4    I know what I think that means.

 5        Q.   And is that fire retardant expense?

 6        A.   Yes, sir.

 7        Q.   And were you performing -- I'm sorry.  Was

 8    Continental Silverline performing fire retardant tests

 9    on various lines of mattresses on behalf of Restonic?

10        A.   Yes, sir.

11        Q.   And do you know if the results of those tests

12    were going to be used by all franchisees?

13        A.   Yes, sir.

14        Q.   I'm sorry, or licensees?

15        A.   Yes, sir.

16        Q.   All right.  Thank you.

17             If you turn to Exhibit 20, it's an invoice

18    sent to Restonics by Continental Silverline for about

19    $900, $920.  It looks like for some tests associated

20    with a company called Intertek.  Do you see that?

21        A.   Yes, sir.

22        Q.   And is that this fire retardant issue we were

23    discussing?

24        A.   To the best of my knowledge.

25        Q.   All right.  Now, do you know why Restonics
```

```
 1    chose you to perform these fire retardant tests, sir,

 2    as opposed to another licensee or them doing it

 3    themselves?

 4        A.    I would imagine because Intertek is in San

 5    Antonio, Texas.

 6        Q.    All right.  And when Intertek certified that

 7    these mattresses were up to the standards that the

 8    government recently approved at the time, do you know

 9    if that certificate could be used by all the Restonic

10    licensees?

11        A.    Yes, it could.

12        Q.    It could, okay.  I'm not going to ask you

13    about the other invoices.

14           Now, sir, in addition to your meetings with

15    Restonics that you have -- or that you may have in

16    Illinois, do you ever have occasion to speak by

17    telephone with anyone at Restonics, you or your -- or

18    any of your employees?

19        A.    Yes, sir.

20        Q.    And, obviously, I'm not going to ask you

21    every specific conversation.  But just generally, what

22    are the nature of the conversations?  Does it relate

23    to the Restonic license business that you have?

24        A.    It can.

25        Q.    I'm sorry?
```

1    A.    It can.

2    Q.    All right.  How frequently would you say you

3   communicate with Restonics in Illinois by telephone?

4    A.    Me, personally?

5    Q.    You, personally.

6    A.    I don't know.  Five or six times a year.

7    Q.    How about your employees -- Continental

8   Silverline's employees, how frequently would you say

9   they communicate by telephone with Restonics in

10   Illinois?

11    A.    I don't know, but I wouldn't imagine it's

12   more than a couple of times a month.

13    Q.    And in addition to telephone, do you have

14   frequent e-mail communications between Continental

15   Silverline and Restonic in Illinois?

16    A.    We receive a number of e-mails from Restonic

17   Mattress Corporation.

18    Q.    Generally about the business; is that right?

19    A.    Marketing notices.

20    Q.    Now, sir, are you familiar with the national

21   account program that Restonics maintains?

22    A.    Vaguely.

23    Q.    What is your vague understanding of the

24   national accounts program?

25    A.    That it exists.

```
 1        Q.   All right.  Do you -- does Continental
 2   Silverline participate in the national accounts
 3   program?
 4        A.   I don't believe there's ever come a time for
 5   us to participate with the national accounts program.
 6        Q.   Okay.  So while you would consider
 7   participating, there's never an instance when a
 8   customer located in Texas wants to buy a Restonic
 9   mattress from the corporate under this account; is
10   that right?
11        A.   I don't understand the question, sir.
12        Q.   Let me rephrase it.
13             Has there ever been a time when you
14   participated in the national accounts program with
15   Restonics?
16        A.   I don't recall a time that there's been a
17   national account agreement customer available to
18   participate with.
19        Q.   All right.  Has Restonic ever paid you any
20   type of commissions for sales that you've made?
21        A.   Yes, sir.
22        Q.   Okay.  And what type of -- what was the
23   reason why you would be paid -- you were being paid a
24   commission from Restonics?
25        A.   Because there was a contract customer that
```

1    they had a contract representative sell merchandise to

2    that we manufactured.

3        Q.   And could you describe how this contract

4    customer works?

5        A.   Well, they don't works.  There's -- it

6    doesn't exist any longer, to my knowledge.

7        Q.   How long did this contract customer program

8    exist?

9        A.   I -- I don't recall.

10       Q.   Well, was it more than two years ago?  More

11   than five years ago?  Do you know?

12       A.   I really don't know.  It was two or five

13   years.  I don't recall.

14       Q.   And how did it work?  Would the customer pay

15   Restonic, and then Restonic would pay you for

16   delivering the product?

17       A.   Sometimes.

18       Q.   Okay.  How else would it work?

19       A.   The customer would pay us directly.

20       Q.   Was that customer always located in Texas?

21       A.   I don't know where the customers were

22   located.

23       Q.   The customers have been located in Illinois?

24       A.   I don't think so, but I -- I can't recall.

25                MR. SALKOWSKI:  I just want to go

Page 70

```
 1      THE STATE OF TEXAS :
        COUNTY  OF  HARRIS :
 2              I, DENYCE SANDERS, a Certified Shorthand
        Reporter and Notary Public in and for the State of
 3      Texas, do hereby certify that the facts as stated by
        me in the caption hereto are true; that the above and
 4      foregoing answers of the witness, DREW ROBINS, to the
        interrogatories as indicated were made before me by
 5      the said witness after being first duly sworn to
        testify the truth, and same were reduced to
 6      typewriting under my direction; that the above and
        foregoing deposition as set forth in typewriting is a
 7      full, true, and correct transcript of the proceedings
        had at the time of taking of said deposition.
 8              I further certify that I am not, in any
        capacity, a regular employee of the party in whose
 9      behalf this deposition is taken, nor in the regular
        employ of this attorney; and I certify that I am not
10      interested in the cause, nor of kin or counsel to
        either of the parties.
11
                GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
12      this, the 2nd day of June, 2008.

13

14              _Denyce Sanders_
                DENYCE SANDERS, CSR, RPR
15              Notary Public in and for
                Harris County, T E X A S
16

17
        My Commission Expires:  4-6-09
18      Certification No.:  4038
        Expiration Date:  12-31-09
19      U.S. LEGAL Support, Inc.
        363 N. Sam Houston Parkway, 9th Floor,
20      Houston, Texas  77060; 713.653.7100
        Firm No. 122
21

22

23

24

25
```

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2

 3   ROYAL SLEEP PRODUCTS, INC.    )
     a Florida Corporation,        )          ORIGINAL
 4                                 )
              Plaintiff,           )
 5                                 )      Case No. 1:07 CV 6588
     vs.                           )
 6                                 )
     RESTONIC CORPORATION, an      )
 7   Illinois Corporation,         )
     RESTONIC MATTRESS CORPORATION )
 8   an Illinois Corporation,      )
     SLEEP ALLIANCE, LLC, a        )
 9   Delaware Limited Liability    )
     Company, ROYAL BEDDING        )
10   COMPANY OF BUFFALO, a New     )
     York Corporation, JACKSON     )
11   MATTRESS CO., LLC, a North    )
     Carolina Limited Liability    )
12   Company, CONTINENTAL          )
     SILVERLINE PRODUCTS, L.P., a )
13   Texas Limited Partnership,    )
     STEVENS MATTRESS MANUFACTUR-  )
14   ING CO., a North Dakota       )
     Corporation, TOM COMER, JR.,  )
15   an individual, DREW ROBINS,   )
     an individual, and RICHARD    )
16   STEVENS, an individual,       )
                                   )
17        Defendants.              )

18

19   *******************************************
          ORAL TELEPHONIC DEPOSITION OF
20                  BRENT FORD
                   JULY 2, 2008
21   *******************************************

22

23           THE ORAL DEPOSITION OF BRENT FORD, produced

24   as a witness at the instance of the Plaintiff, and duly

25   sworn, was taken in the above-styled and -numbered cause
```

1    on the 2nd day of July, 2008, from 10:45 a.m. to 11:30

2    a.m., before Gwen M. Anderson, Notary Public in and for

3    the State of Texas, reported by machine shorthand, at

4    the offices of Fulbright & Jaworski, 1301 McKinney,

5    Suite 5100, Houston, Harris County, Texas, pursuant to

6    Notice, the Federal Rules of Civil Procedure, and the

7    provisions stated on the record or attached hereto.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4          Mr. Robert F. Salkowski   (Appearing by Telephone)
            Zarco Einhorn Salkowski & Brito, P.A.
 5          Bank of America Tower
            100 Southeast 2nd Street, Suite 2700
 6          Miami, Florida  33131
            305-374-5418
 7          305-374-5428 Fax

 8
       FOR THE DEFENDANT RESTONIC CORPORATION AND RESTONIC
 9     MATTRESS CORPORATION:

10          Mr. Frederic A. Mendelson
            (Appearing by Telephone)
11          Burke, Warren, MacKay & Serritella, P.C.
            330 North Wabash Avenue, 22nd Floor
12          Chicago, Illinois  60611
            312-840-7000
13          312-840-7900 Fax

14
       FOR THE DEFENDANT STEVENS MATTRESS MANUFACTURING CO. AND
15     RICHARD STEVENS:

16          Mr. Thomas R. Hill   (Appearing by Telephone)
            Dykema Gossett, P.L.L.C.
17          10 South Wacker Drive, Suite 2300
            Chicago, Illinois  60606
18          312-876-1700
            312-876-1155 Fax
19

20     FOR THE DEFENDANT CONTINENTAL SILVERLINE PRODUCTS, L.P.,
       JACKSON MATTRESS CO., L.L.C., ROYAL BEDDING COMPANY OF
21     BUFFALO SLEEP ALLIANCE, L.L.C., DREW ROBINS AND TOM
       COMER, JR.:
22
            Mr. Thomas J. Lyman, III
23          (Appearing by Telephone)
            Smith & Amundsen, L.L.C.
24          150 North Michigan Avenue, Suite 3300
            Chicago, Illinois  60601
25          312-894-3200
            312-894-3210 Fax
```

```
 1   FOR THE DEFENDANT CONTINENTAL SILVERLINE PRODUCTS L.P.
     AND DREW ROBINS:
 2
          Mr. Andrew Friedberg
 3        Fulbright & Jaworski, L.L.P.
          1301 McKinney, Suite 5100
 4        Houston, Texas  77010-3095
          713-651-5151
 5        713-651-5246 Fax

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   Appearances  . . . . . . . . . . . . . . . . .  3

 3   BRENT FORD
          Examination by Mr. Salkowski  . . . . . . .  7
 4        Examination by Mr. Friedberg  . . . . . . .  37
          Examination by Mr. Salkowski  . . . . . . .  40
 5
     Changes and Signature  . . . . . . . . . . . .  43
 6   Reporter's Certificate  . . . . . . . . . . . .  45

 7
                    E X H I B I T S
 8
     NO./DESCRIPTION                              PAGE
 9
          (None Marked)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | | |
|---|---|---|---|
| 10 | :54 | 1 | Q.    That does what, if you know? |
| 10 | :54 | 2 | A.    It's just -- I just know it as a business |
| 10 | :54 | 3 | entity. |
| 10 | :54 | 4 | Q.    Have you ever had any contact with Sleep |
| 10 | :55 | 5 | Alliance? |
| 10 | :55 | 6 | A.    I don't think I understand your question, |
| 10 | :55 | 7 | sir. |
| 10 | :55 | 8 | Q.    I'll get back to that in a second.  Now, |
| 10 | :55 | 9 | other than the family trip you took to Illinois two |
| 10 | :55 | 10 | months ago, when was the time before that when you |
| 10 | :55 | 11 | traveled to Illinois? |
| 10 | :55 | 12 | A.    About two months ago and a couple of weeks I |
| 10 | :55 | 13 | was in Chicago. |
| 10 | :55 | 14 | Q.    Okay.  And were you there for the purposes |
| 10 | :55 | 15 | of Continental Silverline's business? |
| 10 | :55 | 16 | A.    Yes, sir. |
| 10 | :55 | 17 | Q.    And what was the reason why you were in |
| 10 | :55 | 18 | Chicago?  And just so we can put a time on the record, |
| 10 | :55 | 19 | are we saying somewhere in the neighborhood of March or |
| 10 | :55 | 20 | April of 2008 you were in Chicago? |
| 10 | :55 | 21 | A.    It could have been -- it could have been |
| 10 | :55 | 22 | May, sir, you know, to the best of my recollection. |
| 10 | :55 | 23 | Q.    Okay.  And what was the purpose for being in |
| 10 | :55 | 24 | the state of Illinois during -- during this period of |
| 10 | :55 | 25 | time? |

Deposition of Brent Ford                                    Royal Sleep Products, Inc. vs. Restonic Corporation

10   :55   1        A.    It was a marketing meeting.

10   :55   2        Q.    And before May of 2008, when you were in

10   :56   3    Illinois for this marketing meeting, do you recall the

10   :56   4    last time you were in Illinois on behalf of Continental

10   :56   5    Silverline?

10   :56   6        A.    To the best of my recollection, it would

10   :56   7    have been sometime in the November-December of last

10   :56   8    year.

10   :56   9        Q.    November-December of 2007?

10   :56   10       A.    Yes, sir.

10   :56   11       Q.    Okay.  And I'd like to go, you know, back

10   :56   12   before that time and see if you recall when you were in

10   :56   13   Chicago before November or December of 2007 on behalf of

10   :56   14   Continental Silverline.

10   :56   15       A.    I don't remember exactly, sir, but it would

10   :56   16   have been -- I don't remember the exact time before

10   :56   17   then.

10   :56   18       Q.    Was it sometime in 2007?

10   :57   19       A.    Yes, sir.

10   :57   20       Q.    Do you know how many -- do you know

10   :57   21   approximately how many visits you've made to the state

10   :57   22   of Illinois in 2007 on behalf of Continental Silverline?

10   :57   23       A.    I could only guess, sir.

10   :57   24       Q.    Okay.  I'm not asking, Mr. Ford, for -- for

10   :57   25   your guess, and -- but if you have an estimate that you

```
10   :57   1   believe is reasonable, could you tell me what that is as

10   :57   2   to the number of times that you have been in the state

10   :57   3   of Illinois on behalf of Continental Silverline in 2007?

10   :57   4        A.   To the best of my ability, I'd say five to

10   :57   5   seven times, sir.

10   :57   6        Q.   Okay.  And -- and I understand that five to

10   :57   7   seven times is approximate for the number of visits you

10   :57   8   made in Illinois, but in the years previous to 2007, did

10   :57   9   you travel to Illinois about the same amount of time on

10   :57  10   behalf of Continental Silverline?

10   :57  11        A.   No, sir.

10   :57  12        Q.   Were you traveling less to Illinois or more

10   :58  13   to Illinois in the years before 2007 --

          14        A.   It was --

10   :58  15        Q.   -- in your role as vice president for

10   :58  16   Continental Silverline?

10   :58  17        A.   It would have been less, sir.

10   :58  18        Q.   What was the -- well, let me first ask you,

10   :58  19   in March -- or in March, April, or May of 2008, you

10   :58  20   indicated you attended a marketing meeting in Illinois;

10   :58  21   is that correct?

10   :58  22        A.   Yes, sir.

10   :58  23        Q.   And that was a marketing meeting sponsored

10   :58  24   by Restonic's?

10   :58  25        A.   Yes, sir.
```

```
11  :05  1        A.    Yes, sir.

11  :05  2        Q.    Were you there for marketing committee

11  :05  3    meetings?

11  :05  4        A.    Could be, yes, sir.

11  :05  5        Q.    Do you recall any licensee meetings that you

11  :05  6    attended in the state of Illinois?

11  :05  7        A.    No, sir.

11  :05  8        Q.    Have you ever attended a Restonic licensee

11  :05  9    meeting in the state of Illinois?

11  :05 10        A.    I cannot recall attending any licensee

11  :05 11    meeting Restonic in Illinois in the past five years.

11  :05 12        Q.    And other than the marketing committee and

11  :05 13    your participation on that committee, what would be some

11  :05 14    of the reasons why you would travel to Illinois on

11  :05 15    behalf of Continental Silverline?

11  :05 16        A.    Can you repeat that again, sir?

11  :05 17        Q.    Sure.  Other than your participation on the

11  :05 18    marketing committee, what would be some of the other

11  :05 19    reasons why you would travel to the state of Illinois on

11  :05 20    behalf of Continental Silverline?

11  :06 21        A.    Possibly, maybe, every once in a while to

11  :06 22    meet with a vendor where that would be at.

11  :06 23        Q.    And what type of vendor would you meet in

11  :06 24    the state of Illinois on behalf of your employer?

11  :06 25        A.    Vendors from other parts of the country.
```

Deposition of Brent Ford                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
11  :06  1        Q.   Do you recall any specific vendor that you
11  :06  2   met in Illinois?
11  :06  3        A.   I remember meeting with Blumenthal, which is
11  :06  4   based in New Orleans, is the only vendor I recall
11  :06  5   meeting with in Chicago.
11  :06  6        Q.   Other than your participation on the
11  :06  7   marketing committee meetings as well as having met
11  :06  8   possibly one or more vendors in Illinois, do you recall
11  :06  9   any other reasons why you may have traveled to the state
11  :06 10   of Illinois on behalf of Continental Silverline?
11  :06 11        A.   No, sir.
11  :06 12        Q.   Do you recall meeting with any other sales
11  :07 13   managers or employees of other Restonic licensees in
11  :07 14   Illinois outside of your role as a marketing committee
11  :07 15   member?
11  :07 16        A.   Not in the past three -- three or four
11  :07 17   years, sir.  No, sir, I can't remember a single time.
11  :07 18        Q.   Before the three or four years, do you
11  :07 19   recall having traveled to the state of Illinois for the
11  :07 20   purposes of meeting with other employees of Restonic
11  :07 21   licensees?
11  :07 22        A.   Approximately six or seven years ago, sir,
11  :07 23   we had a seminar for three days in Chicago, and sales
11  :07 24   managers from all over the country flew in for a seminar
11  :07 25   at the University of Chicago.  That's the only other
```

```
11   :14   1        Q.    (By Mr. Salkowski)    Mr. Ford, who was in

11   :14   2   attendance in these meetings in Houston and Dallas?

11   :14   3        A.    In Houston, sir, it was myself, Laurie

11   :14   4   Tokarz, Donna Fabia, John Robins, and then I believe

11   :14   5   there were three individuals from Mattress Giant.

11   :14   6        Q.    And in Dallas, who was in attendance at

11   :14   7   those meetings?

11   :14   8        A.    Myself, Laurie Tokarz, and John Robins, and

11   :15   9   Tom Comer.

11   :15  10        Q.    Was Ms. Slavia -- Slavia -- how do you --

11   :15  11   Fabia -- I'm sorry -- was Ms. Fabia at that meeting in

11   :15  12   Dallas as well?

11   :15  13        A.    No, sir.

11   :15  14        Q.    Do you know why she wasn't there?

11   :15  15        A.    No, sir.  You'd have to ask her.

11   :15  16        Q.    Now, with respect to the company I had

11   :15  17   mentioned earlier, Sleep Alliance, had you ever attended

11   :15  18   any meetings that was conducted by Sleep Alliance?

11   :15  19        A.    I'm not sure I understand the question.

11   :15  20        Q.    To your knowledge, has Sleep Alliance ever

11   :15  21   called a meeting or had any type of conference in which

11   :15  22   you were invited?

11   :15  23        A.    I've -- I've been in meetings with some

11   :15  24   other factories involved with Sleep Alliance, if that's

11   :15  25   what your question is, sir.
```

Deposition of Brent Ford                                    Royal Sleep Products, Inc. vs. Restonic Corporation

| | | | |
|---|---|---|---|
| 11 | :16 | 1 | Q.    And where were those meetings, sir? |
| 11 | :16 | 2 | A.    Various places, sir. |
| 11 | :16 | 3 | Q.    Were any of those places in the state of |
| 11 | :16 | 4 | Illinois? |
| 11 | :16 | 5 | A.    I can only recall maybe one time, sir. |
| 11 | :16 | 6 | Q.    And when was that one time that you recall a |
| 11 | :16 | 7 | meeting with the Sleep Alliance being in the state of |
| 11 | :16 | 8 | Illinois? |
| 11 | :16 | 9 | A.    It would have been in the fall of last year, |
| 11 | :16 | 10 | sir. |
| 11 | :16 | 11 | Q.    Fall of 2007? |
| 11 | :16 | 12 | A.    Yes, sir.  That's to the best of my |
| 11 | :16 | 13 | recollection. |
| 11 | :16 | 14 | Q.    And who was in attendance at that meeting in |
| 11 | :16 | 15 | the fall of '07? |
| 11 | :16 | 16 | A.    I believe I was there, Mr. Robins, Laurie |
| 11 | :16 | 17 | Tokarz, Tom Comer, Ken Akers, and I believe two -- two |
| 11 | :17 | 18 | investment bankers. |
| 11 | :17 | 19 | Q.    And I don't want to get into detail right |
| 11 | :17 | 20 | now, but the investment bankers, were they from |
| 11 | :17 | 21 | Illinois, to your knowledge? |
| 11 | :17 | 22 | A.    No, sir, they're not. |
| 11 | :17 | 23 | Q.    What was the nature of this meeting that you |
| 11 | :17 | 24 | had with the Sleep Alliance in Illinois in the fall of |
| 11 | :17 | 25 | '07?  What was the purpose why you were there? |

11  :17  1        A.    It was just a business meeting, sir.

11  :17  2        Q.    Okay.  And what was discussed at the

11  :17  3  business meeting, generally?

11  :17  4        A.    It was just different business issues.  I

11  :17  5  don't recall specifically.

11  :17  6        Q.    Do you recall generally what business issues

11  :17  7  were discussed during this meeting?

11  :17  8        A.    We were just going over our operations.

11  :17  9        Q.    You were discussing operations for the Sleep

11  :18 10  Alliance?

11  :18 11        A.    Yes, sir.

11  :18 12        Q.    Were you also discussing operations for the

11  :18 13  various Restonic licensees?

11  :18 14        A.    Only our -- only the people that were in

11  :18 15  that room, sir, nobody else.

11  :18 16        Q.    And what generally were you talking about

11  :18 17  with respect to business operations during this fall of

11  :18 18  '07 meeting?

11  :18 19        A.    Operational efficiencies.

11  :18 20        Q.    I'm sorry, sir?

11  :18 21        A.    Operational efficiencies.

11  :18 22        Q.    What do you mean by operational

11  :18 23  efficiencies?

11  :18 24        A.    We were going over our numbers, just sales

11  :18 25  numbers, operations.

```
11  :23  1        A.    No, sir.

11  :23  2        Q.    Did you read any transcripts of any person

11  :23  3   -- person's deposition that was taken?

11  :23  4        A.    No, sir.

11  :23  5        Q.    Did you look at any documents?

11  :23  6        A.    I was shown some expenses.  That was it.

11  :23  7   Some documents.

11  :23  8        Q.    And those expenses were the expense reports

11  :23  9   you presented to Continental Silverline for these

11  :23 10   meetings?

11  :23 11        A.    Yes, sir.

11  :23 12        Q.    And who reimbursed you for your travel to

11  :23 13   Illinois?  Was it Continental Silverline?

11  :23 14        A.    No, sir.

11  :23 15        Q.    Who -- who reimbursed you?

11  :23 16        A.    If it was a marketing committee meeting, any

11  :23 17   person on the marketing committee got reimbursed only

11  :23 18   their out-of-pocket expenses.

11  :23 19        Q.    Okay.  And you got reimbursed by who?

11  :23 20   Restonic?

11  :23 21        A.    Restonic Corp.

11  :24 22        Q.    All right.  And when you say out-of-pocket

11  :24 23   expenses, you're meaning travel, airline, hotels, and

11  :24 24   that sort of thing?

11  :24 25        A.    Yes, sir.
```

```
11   :24  1        Q.    Sir, do you ever purchase products from

11   :24  2    Restonic in Illinois?

11   :24  3        A.    I'm not sure what you mean by that question.

11   :24  4        Q.    Do you ever -- does Continental Silverline

11   :24  5    purchase any products or materials from Restonic in

11   :24  6    Illinois?

11   :24  7        A.    We, on occasion, sir -- the only thing I

11   :24  8    could think of, we buy point-of-purchase materials.  And

11   :24  9    I'm not sure.  It may be billed out of Chicago, but I

11   :24  10   believe the clearing house for those point-of-purchase

11   :24  11   materials are somewhere else in Ohio or somewhere.  But,

11   :24  12   you know, it's billed out of the corporate office for

11   :24  13   any point-of-purchase materials that you would purchase

11   :25  14   off the website for retail consumers floors.

11   :25  15       Q.    Well, sir, prior to today's deposition, did

11   :25  16   you speak with any person regarding this deposition

11   :25  17   besides Mr. Friedberg?

11   :25  18       A.    No, sir.

11   :25  19       Q.    Did you speak to Mister -- Mr. Robins?

11   :25  20       A.    Yes, sir.

11   :25  21       Q.    And what -- when did that meeting take

11   :25  22   place?

11   :25  23       A.    It wasn't.  He just told me -- he sent me an

11   :25  24   e-mail and told me that I needed to contact

11   :25  25   Mr. Friedberg for a deposition.
```

1  THE STATE OF TEXAS    :

2  COUNTY  OF  HARRIS    :

3          I, Gwen M. Anderson, a Certified Shorthand

4  Reporter in and for the State of Texas, do hereby

5  certify that the matters set forth in the caption to the

6  foregoing deposition are true and correct; that the

7  witness appeared before me at the time and place set

8  forth; that said witness was first duly sworn to tell

9  the truth, and thereupon proceeded to testify in said

10 cause; that the questions of counsel and the answers of

11 the said witness were taken down in shorthand by me and

12 thereafter reduced to typewriting under my direction;

13 and that the foregoing pages comprise a true, correct,

14 and complete transcript of the testimony given and the

15 proceedings had during the taking of said deposition.

16          I further certify that I am not counsel,

17 attorney or relative of either party, or otherwise

18 interested in the events of this suit.

19          Given under my hand and seal of office on

20 the 7th day of July, 2008.

21

22

23          Gwen M. Anderson
            Reporter and Notary Public in
24          and for the State of Texas
            My Commission Expires: 10/29/10

25