1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2

3  ROYAL SLEEP PRODUCTS, INC.
    a Florida Corporation,      Case No:  1:07 CV 6588

4         Plaintiff,

5    v.                       **ORIGINAL**

6  RESTONIC CORPORATION,
    an Illinois Corporation,
7  RESTONIC MATTRESS CORPORATION,
    an Illinois Corporation,
8  SLEEP ALLIANCE, LLC,
    a Delaware Limited Liability Company,
9  ROYAL BEDDING COMPANY OF BUFFALO,
    a New York Corporation,
10  JACKSON MATTRESS CO., LLC,
    a North Carolina Limited Liability Company,
11  CONTINENTAL SILVERLINE PRODUCTS L.P.,
    a Texas Limited Partnership,
12  STEVENS MATTRESS MANUFACTURING CO.,
    a North Dakota Corporation,
13  TOM COMER, JR., an individual,
    DREW ROBINS, an individual, and
14  RICHARD STEVENS, an individual,

15         Defendants.

16  -----------------------------------------------

17    TELEPHONIC DEPOSITION OF RICHARD STEVENS

18             June 3, 2008

19

20  A p p e a r a n c e s:

21    For the Plaintiff (Telephonically):

22    ZARCO EINHORN SALKOWSKI & BRITO, P.A.
    Bank of America Tower
23    100 Southeast 2nd Street, Suite 2700
    Miami, Florida   33131
24       By:  MELISSA L. BERNHEIM, ATTORNEY AT LAW
                      AND
25          ROBERT F. SALKOWSKI, ATTORNEY AT LAW

EXHIBIT A

```
 1     A p p e a r a n c e s:  (Cont'd)

 2

 3     For the Defendants Restonic Corporation and
       Restonic Mattress Corporation
 4     (Telephonically):

 5     BURKE, WARREN, MacKAY & SERRITELLA, PC
       330 North Wabash Avenue, 22nd Floor
 6     Chicago, Illinois   60611
           By:  FREDERIC A. MENDELSOHN, ATTORNEY AT LAW
 7

 8     For the Defendants Continental Silverline
       Products, L.P., Jackson Mattress Co., LLC,
 9     Royal Bedding Company of Buffalo, Sleep
       Alliance, LLC, Drew Robins and Tom Comer,
10     Jr. (Telephonically):

11     SMITH & AMUNDSEN, L.L.C.
       150 North Michigan Avenue, Suite 3300
12     Chicago, Illinois   60601
           By:  THOMAS J. LYMAN, III, ATTORNEY AT LAW
13

14     For the Defendants Stevens Mattress
       Manufacturing Co. and Richard Stevens:
15
       PEARSON CHRISTENSEN & CLAPP, PLLP
16     P.O. Box 352
       Grafton, North Dakota   58237-0352
17         By:  DANIEL L. GAUSTAD, ATTORNEY AT LAW

18
       For the Defendants Continental Silverline
19     Products L.P. and Drew Robins  (Telephonically):

20     FULBRIGHT & JAWORSKI, LLP
       1301 McKinney
21     Suite 5100
       Houston, Texas   77010-3095
22         By:  ANDREW S. FRIEDBERG, ATTORNEY AT LAW

23

24     Also Present:  Christian Miller

25     Taken By:  Ruth Ann Johnson, RPR
```

1                      I N D E X

2    DEPONENT:                                    PAGE NO.

3      RICHARD STEVENS

4      Examination by . . . Ms. Bernheim          5
       Examination by . . . Mr. Gaustad           87
5

6

7    EXHIBITS

8    No. A -- Copy of Articles of
               Incorporation
9
     No. B -- Copy of Amended and Restated
10             Sublicense Agreement

11   No. C -- Copy of Restonic Mattress Corporation

12   No. D -- Copy of VISA statement

13   No. E -- Copy of Letter of Intent

14   No. F -- Copy of SFG invoices

15   No. G -- Copy of A. Lava & Son Co.

16   No. H -- Copy B & C International

17   No. I -- Copy of Restonic Upper Midwest Sleep,
               LLC invoices
18
     No. J -- Copy of Restonic Executive Bulletin
19

20

21

22

23

24

25

1        Q.    Okay.  So let's back up.  Stevens

2    Mattress Manufacturing Company, does Stevens

3    Mattress Manufacturing Company manufacture and

4    sell bedding products?

5        A.    Yes, it does.

6        Q.    Okay.  And does Stevens Mattress --

7    and Stevens Mattress Manufacturing Company has

8    a sublicense agreement with Restonic, correct?

9        A.    That's correct.

10       Q.    Does Stevens Mattress Manufacturing

11   Company have licenses with any other mattress

12   company or have sublicenses with any other

13   mattress company?

14       A.    No.

15       Q.    Okay.  Now Upper Midwest Sleep, LLC,

16   does that company also sell and manufacture

17   bedding products?

18       A.    No.  No.  It -- I really don't

19   understand the question, because it's confusing

20   there to me.

21       Q.    What does Upper Midwest Sleep, LLC

22   do, does it have a business function?

23       A.    The business function of -- it has

24   no -- if I'm not mistaken, you know, I'm not

25   totally clear on that yet, just let me think it

```
1    through here a minute.
2              I think the only one that
3    manufactures mattresses and box springs is
4    Stevens Mattress Manufacturing.
5         Q.   Okay.
6         A.   That has a license under that --
7    with Restonic.
8         Q.   So if Upper Midwest Sleep, LLC
9    doesn't manufacture bedding products, what does
10   it do?
11        A.   It was a holding company of some --
12   I would have to go and review that, what, what
13   the real function of that was.  Is.
14        Q.   Who are the officers and directors?
15   I'm sorry, who are the managers and members of
16   Upper Midwest Sleep, LLC?
17        A.   Richard Stevens.
18        Q.   That's you?
19        A.   Right.
20             John Stevens.
21        Q.   Uh-huh.
22        A.   And Brian Stevens.
23        Q.   Okay.  Now who's Don Stevens?
24        A.   Brian Stevens, I said.
25        Q.   All right.  Wasn't there one in the
```

1    and representing Sleep Alliance, aside from

2    that meeting, did you ever attend any meetings,

3    any other meetings in Illinois on behalf of

4    Sleep Alliance?

5        A.    There might have been some, but I, I

6    can't remember.

7        Q.    Any idea, any reason as to why Sleep

8    Alliance would conduct its meetings in

9    Illinois?

10        A.    Ease of getting to.  It's one of the

11    only places that we can fly direct from this

12    part of the country.

13        Q.    Are you aware of a, a meeting this

14    coming June 5, two days from now, that Sleep

15    Alliance is conducting in Illinois?

16        A.    No.

17        Q.    Are you aware of, of any meeting

18    that Restonic is conducting June 5 in Illinois?

19        A.    Not June 5, no.

20        Q.    Okay.  How about any time this

21    month, are there any upcoming meetings?

22        A.    June 4.

23        Q.    June 4.

24            Now the meeting on June 4, is that

25    Restonic or is that Sleep Alliance calling that

1    meeting?

2        A.    I do not know if it's a Sleep

3    Alliance meeting, but there is a Restonic

4    meeting.

5        Q.    Are you attending that meeting?

6        A.    Yes, I am.

7        Q.    How often do you attend meetings for

8    Restonic in Illinois?

9        A.    Oh, I would say probably maybe once

10   a year, sometimes more, sometimes less.  It, it

11   just depends.

12       Q.    But at least once a year?

13       A.    No, I did not say that, at least

14   once a year.  I said sometimes once a year,

15   sometimes less, you know.

16            I don't think, I don't think in 2006

17   I went to any meetings for Restonic in, in

18   Illinois.

19       Q.    Was that for any specific reason or

20   is it because they just didn't have one?

21       A.    They didn't have one.

22       Q.    Is that common not to have one?

23            MR. GAUSTAD:  I'm going to object.

24   You're asking him to speculate as to why

25   Restonic may or may not call a meeting, so I'll

```
 1    object to the form of the question.

 2         Q.    (By Ms. Bernheim) Let me rephrase.

 3              Does Restonic, aside from 2006, in

 4    your experience, as a Restonic sublicensee,

 5    does Restonic usually have a meeting yearly in

 6    Illinois, in Chicago, in Illinois, wherever it

 7    may be?

 8         A.    Not, not all the time in Illinois,

 9    no.

10         Q.    They have them other places?

11         A.    There could be other places.

12         Q.    Where, what other place, for

13    example, where else have they held meetings?

14         A.    I'm trying to think here.  I think

15    in Indianapolis a few years back.  Sometimes

16    they use them in conjunction with trade

17    shows, --

18         Q.    Okay.

19         A.    -- you know, for -- so that --

20    because everybody has to be at the trade shows,

21    so sometimes, then, they'll have a meeting in

22    conjunction with the trade show.  And the trade

23    shows usually are never in Chicago or Illinois.

24         Q.    Okay.  To the best of your

25    recollection, when did -- and when I say you in
```

1    this question, I'm either referring to you

2    personally as Richard Stevens, or you as either

3    Stevens Mattress Man -- well, as you testified,

4    Stevens Mattress Manufacturing Company, so when

5    did you personally, or through Stevens Mattress

6    Manufacturing Company, first become associated

7    with Restonic?

8        A.    I believe it was 19, the end of 18

9    -- the end of 1989 or the year 1990.

10       Q.    And you became a sublicensee during

11   that period of time?

12       A.    Correct.

13       Q.    Okay.

14       MR. GAUSTAD:  And I want to make --

15   Miss Bernheim I want to make sure I understand

16   the definition.  You've defined you to be both

17   Richard individually and Richard as a --

18       MS. BERNHEIM:  I just was about to

19   get into that, to clarify that.

20       MR. GAUSTAD:  Okay.  Because there's

21   a compound question in there, I believe.

22       MS. BERNHEIM:  Okay.  Well, let's,

23   let's, let's just establish the foundation

24   here.

25       Q.    (By Ms. Bernheim) Who, Mr. Stevens,

RUTH ANN JOHNSON  -  COURT REPORTER SERVICE
600 DeMERS, SUITE 300 GRAND FORKS, ND  58201  (701) 775-4092

1    who became the sublicensee, did you sign it

2    personally or was it Stevens Mattress?

3         A.    Stevens Mattress.

4         Q.    Okay.  And Stevens Mattress became a

5    sublicensee sometime in the end of 1989 or

6    early 1990?

7         A.    I believe that's the date, yeah.

8         Q.    Okay.  Now did, was there any

9    negotiation at all in reaching, in coming to

10   terms on a sublicense agreement?

11        A.    Explain what you mean by

12   negotiations.

13        Q.    Did you, how did it work, did

14   Restonic hand you a sublicense agreement and

15   you signed it, or did you take terms, negotiate

16   terms, or how did it work?

17        A.    They had a standard sublicense

18   agreement that we signed and that's what we

19   followed.

20        Q.    Okay.  Now when you signed that

21   agreement, where were you located, did you sign

22   it in Illinois?

23        A.    No.  I believe it was in Grand

24   Forks, North Dakota.

25        Q.    And how, how did those signatures --

1              MR. GAUSTAD:   And I want to make

2      sure I understand, when you use the word you,

3      who are you referring to?

4              MS. BERNHEIM:   I'm sorry.

5        Q.    (By Ms. Bernheim) Stevens Mattress

6      Manufacturing.

7              MR. GAUSTAD:   Thank you.

8        A.    I believe it is, yeah.

9              Okay.

10       Q.    (By Ms. Bernheim) Mr. Stevens,

11     recognizing that this is the most recent

12     sublicense agreement that Stevens Mattress

13     signed with Restonic Mattress Corporation --

14     and this document, for the record, is dated

15     June 1, 2007, correct?

16       A.    Yes.

17       Q.    Okay.  So then you would agree that

18     you've had an ongoing relationship with

19     Restonic Mat -- you being Stevens Mattress

20     Manufacturing Company, have had an ongoing

21     business relationship with Restonic Mattress

22     Corporation for at least about, or

23     approximately 17 years, correct?

24       A.    Yes.

25       Q.    And you understand that, that

1                  You, I'm sorry, from my views here,

2     I'm talking about Stevens Mattress

3     Manufacturing Company.  Does Stevens pay any

4     money to Restonic?

5          A.    For?

6          Q.    To just be a member of the program.

7          A.    No.

8          Q.    Okay.  Do you pay royalties under

9     that program?

10         A.    We pay royalties under our

11    sublicense agreement, but not under a national

12    account agreement.

13         Q.    Under the national account agreement

14    does Restonic pay any commissions to you?

15         A.    No.

16         Q.    Do you, does Stevens Mattress

17    Manufacturing purchase any items from Restonic?

18         A.    Some point of purchase, things that

19    they -- goes through their office.

20                What I mean by point of purchase

21    would be things like, you know, mattress sale

22    going on today or, you know, window type

23    banner, you know, miscellaneous things like

24    that.

25         Q.    Okay.  I'm going to ask your

1        A.    No, we do not.

2        Q.    Have you ever sold in the state of

3    Illinois?

4        A.    Not to the best of my knowledge.

5        Q.    Okay.  Now pursuant to the

6    sublicense agreement, which we've already

7    identified, you pay royalties, correct?

8        A.    Yes.

9        Q.    Okay.  And, and where, how do you

10   pay those royalty payments?

11       A.    By check.

12       Q.    Okay.  And where do you send the

13   checks?

14       A.    To Restonic corporate office.

15       Q.    And that's located in Illinois?

16       A.    That's correct.

17       Q.    And how often do you pay royalties?

18       A.    I believe it's once a month.

19       Q.    I'm sorry, was that once a month?

20       A.    I believe that's right.

21       Q.    So once a month you send a check to

22   Restonic in Illinois?

23       A.    Correct.

24       Q.    And when you joined, when Stevens

25   Mattress first became a licensee in 1990, or

```
 1      early 1990, were you paying royalties?

 2          A.   Yes.

 3          Q.   And how did you pay the royalties

 4      back then?

 5          A.   I believe it was to Restonic.

 6          Q.   By check?

 7          A.   By check, yes.

 8          Q.   That you mailed to Illinois?

 9          A.   Right.

10          Q.   So for at least the last 17 years

11      you've been sending checks to Restonic in

12      Illinois on a monthly basis.  Is that correct?

13          A.   Yes.

14          Q.   Now you stated a minute ago that you

15      can sell anywhere in the country, Stevens

16      Mattress Manufacturing can sell products

17      anywhere in the country including the state of

18      Illinois, correct?

19          A.   Um-hum.

20          Q.   Now do you have, does Stevens

21      Mattress have any contracts with any Illinois

22      residents for the sale of mattresses?

23          A.   No.

24          Q.   Do you have any contracts -- I'm

25      sorry, for the purpose of this depo I'm talking
```

1          A.    I can't recall the dates of it.

2          Q.    Can you recall, a ballpark, how many

3    times you may have attended a meeting, not the

4    dates, just how many times?

5          A.    I real -- I really can't recall

6    that.

7          Q.    Have you ever, has Stevens Mattress

8    Manufacturing ever sent any of its employees to

9    a Restonic meeting in Illinois?

10         A.    Yes.

11         Q.    How often?

12         A.    There's a gentleman that works for

13   me that is on the marketing committee, which

14   goes -- I don't, I don't know how many times he

15   goes there, but, you know, it's probably, you

16   know, you know, maybe once or twice a year.

17   I'm not totally positive there how many times

18   he goes.

19         Q.    What is that gentleman's name?

20         A.    Ken Akers.

21         Q.    A-k-e-r-s?

22         A.    Right.

23         Q.    And, and where does Mr. Akers

24   reside?

25         A.    In Ankeny, Iowa.

1    Q.    And what is his job title?

2    A.    Sales manager.

3    Q.    Sales manager.

4          Do you have any sales managers

5    located in the state of Illinois?

6    A.    No.

7    Q.    Mr. Stevens, have you personally

8    ever attended a product development meeting for

9    Restonic in Illinois?

10   A.    Explain what you mean by product

11   development committee or meeting?

12   Q.    A meeting, a meeting where there's a

13   discussion with members of Restonic about

14   different products that the company's going to

15   offer.

16   A.    I've been to meetings with, with

17   flammability issues, but I don't recall of

18   specific products.

19   Q.    And when you went to the

20   flammability issue meeting, were you

21   representing Stevens Mattress?

22   A.    Yes.

23   Q.    Do you recall when you attended the

24   flammability issues meeting?

25   A.    There was some in 2006 and last year

1    in, last year in, probably, it was either, oh,

2    May, probably sometime in May.

3         Q.   Of '07?

4         A.   Of '07, yes.

5         Q.   And you said there was some in 2006.

6    What, were there more than one?

7         A.   I, I think there was only one.

8         Q.   Okay.  And do you recall what month

9    in '06 or --

10        A.   I think it was in, in the autumn

11   sometime.

12        Q.   Okay.  Have you ever attended on

13   behalf, as a representative of Stevens

14   Mattress, a design committee meeting in

15   Illinois for Restonic?

16        A.   I don't understand what you mean by

17   design.

18        Q.   A meeting where the discussion was

19   along the lines of the design of a product or,

20   or the direction the -- Restonic was going to

21   take, any kind of corporate decisions along

22   those lines?

23        A.   I would have attended meetings with

24   the development of a product, but not, not, you

25   know, of, of determining like the different

1    flammability issue or is that --

2            MR. GAUSTAD:  And I'm going to

3    object to the form of the question, because

4    this line of questioning, I believe, dealt with

5    these meetings that occurred in Illinois.  Is

6    that the -- and so I'm going to object to the

7    form of the question as to whether now you're

8    expanding this to include meeting --

9            MS. BERNHEIM:  We're not, we're not

10    expanding it.  I'm just -- you know, the client

11    has testified he didn't attend a product

12    development meeting, then he said he did.  I'm

13    trying to find out what meetings he's attended

14    in Illinois.

15            MR. GAUSTAD:  Okay.

16        Q.    (By Ms. Bernheim)  So --

17        A.    The meetings, the meetings I

18    attended, attend, that I'm part of, are how to

19    develop the product so that it meets the

20    federal flammability issues.

21            And that could be -- you could, I

22    mean, that's what, that's what -- you can call

23    it a product, you can call it, you know,

24    several different names.  I don't know what you

25    want to classify it as, but the meetings that I

50

1    would have attended would have been

2    specifically for the different flammability

3    issues.

4              And then I attended, you know, a

5    part of that, too, was attending the, the

6    actual, at the Underwriters Laboratory of

7    watching the mattresses being tested to see if

8    they passed the --

9        Q.    Where, where was that laboratory?

10       A.    It's in, in Chicago.  It's UL

11   laboratories.  Underwriters Laboratory.

12       Q.    And when did you do that, when did

13   you attend that laboratory?

14       A.    Probably last May.

15       Q.    How many times did you go there?

16       A.    It was for two days, two days, I

17   think it was.

18       Q.    So you went one time for two days?

19       A.    Right.

20       Q.    So let me just get to the --

21       A.    No, let me take that back.  There

22   might have been other times earlier, earlier

23   on, but -- (no further response.)

24       Q.    So let's just, let's just discuss a

25   little bit further.  Did you, as a

1    representative of Stevens Mattress

2    Manufacturing Company, ever attend a licensing

3    meeting?  And by that I mean a meeting where

4    all the licensees get together in Illinois to

5    discuss the company or to take care of

6    corporate business affairs?

7         A.    Have I ever attended one of those

8    meetings?

9         Q.    Yes.

10        A.    Yes, I have.

11        Q.    Okay.  Do you recall how many of

12   those meetings you attended?

13        A.    No.

14        Q.    More than five?

15        A.    I just said I don't recall.

16        Q.    Do you recall the last time you

17   attended one of those meetings?

18        A.    No, I do not specifically.

19        Q.    Have you ever attended any of the

20   Sleep Alliance meetings on behalf of -- well,

21   strike that.

22             Have you ever attended any of the

23   Sleep Alliance meetings on behalf of Upper

24   Midwest Sleep, LLC?

25        A.    In the state of Illinois?

1          Q.    Yes, in the state of Illinois.

2          A.    I, I don't think so.

3          Q.    Has Sleep Alliance ever held any

4     meetings in the state of Illinois?

5               MR. GAUSTAD:  I'm going to object.

6     I think it's been asked and answered, but --

7          Q.    (By Ms. Bernheim) You can still

8     answer.

9               MR. GAUSTAD:  Yeah.

10              MS. BERNHEIM:  And I apologize if

11    it's been asked.

12              MR. GAUSTAD:  No, I understand.

13         A.    I don't believe there has been.

14              Now remember, I'm not a member of

15    Sleep Alliance for the last six months, so --

16    (no further response.)

17         Q.    (By Ms. Bernheim) All right.  So

18    obviously I limit that question to up until the

19    time that you were no longer involved.

20              Okay.  Did you ever receive, on

21    behalf of Stevens Mattress, any training in the

22    state of Illinois as an RMC licensee?

23         A.    What do you mean by training?

24         Q.    Training on products, training on

25    manufacturing, flammability training.

1          A.    Yes, I'm sure.

2          Q.    You recall how often you received

3    that training?

4          A.    No.

5          Q.    Do you recall the last time you

6    would have gone to Illinois to receive

7    training?

8          A.    I, I don't recall.

9          Q.    Have you ever sent, has Stevens

10   Mattress ever sent any of its employees to

11   attend training with Restonic in Illinois?

12         A.    I'm sure I have.

13         Q.    I'm going to ask you, Mr. Stevens,

14   to please look at what plaintiffs have marked

15   as Exhibit D.

16              MS. BERNHEIM:  I'm just going to

17   ask, it looks like -- do you all have Bates

18   document, Bates stamp number SMND 0362, did I

19   send that?  Because I know I marked, I marked D

20   starting on SMND 0363, but I meant to do that

21   on two, so I'm wondering if you have it?

22              MR. GAUSTAD:  It wasn't, it wasn't

23   e-mailed to us.

24              MS. BERNHEIM:  So you start at 0363?

25              MR. GAUSTAD:  Your Exhibit D that

RUTH ANN JOHNSON  -  COURT REPORTER SERVICE
600 DeMERS, SUITE 300 GRAND FORKS, ND  58201  (701) 775-4092

1     was e-mailed to me, that I have, starts at SMND

2     0363.

3            MS. BERNHEIM:  Can I ask you just to

4     look at the last page of Exhibit C and see what

5     that is?  Is that, by chance, the VISA account

6     summary?

7            MR. GAUSTAD:  The last Exhibit C

8     that, that you e-mailed to me is SMND 0146.

9            MS. BERNHEIM:  Okay.  Then that's my

10     mistake.

11       Q.   (By Ms. Bernheim) Okay.  So let's

12     just look at 0363.

13            Mr. Stevens, I am looking at, and

14     correct me if I'm wrong, a business card

15     statement for a Chase VISA, the date of the

16     account, of the invoice is 10 -- or the

17     statement is 10-29-07 to 11-28-07.  Is that

18     correct?

19       A.   Yeah.

20       Q.   Okay.  And I'm looking at the top,

21     is this for a Ken Lakes?

22       A.   Akers.

23       Q.   Akers, okay.

24            So that's the same Akers, Mr. Akers

25     we were talking about before?

1      A.    Yes.

2      Q.    Okay.  So on 11 -- if you look down

3  towards the bottom, on November 17 there's a

4  charge, Doubletree Hotel O'Hare, Rosemont,

5  Illinois.  Do you see that?

6      A.    Um-hum.

7      Q.    Now do you recall what that was for,

8  besides a hotel in Chicago?  Is that Mr. Akers

9  going to Chicago?

10     A.    Yes.

11     Q.    Okay.  And what would be the purpose

12  of that?

13          MR. GAUSTAD:  If, if he knows.  I

14  mean, I object --

15     A.    I don't know what it, --

16     Q.    (By Ms. Bernheim) If you know.

17     A.    -- what specifically it would be

18  for, no.

19     Q.    Can you give me a reason why Mr.

20  Akers would be traveling to Chicago?

21          MR. GAUSTAD:  Well, I'm going to

22  object to the form of the question, because

23  you're asking him to speculate.

24          MS. BERNHEIM:  Okay.  Strike that.

25     Q.    (By Ms. Bernheim) How often, to the

1   best of your knowledge, does Mr. Akers go to

2   Illinois?

3           A.    I would have to look that up.

4           Q.    To the best of your knowledge --

5                 Okay.  If you were going to look

6   that up, what, what would you consult to find

7   out that information?

8           A.    Well, I would talk to him.

9           Q.    Are you aware whether -- if Mr.

10  Akers was going to travel to Illinois, would he

11  tell you first, normally?

12          A.    No.

13          Q.    And are you aware of Mr. Akers

14  having traveled to Illinois in the past?

15          A.    Yes.

16          Q.    And do you recall what he traveled

17  to Illinois for?

18          A.    He's, he would be on the, he's on

19  some of the marketing arms of the Restonic.

20          Q.    Would he be going for, he has gone

21  for marketing meetings?

22          A.    Uh-huh.

23          Q.    If you would please turn to page

24  Bates stamp number SMND 0365, that's still a

25  part of Exhibit D.

57

1      A.    Okay.

2      Q.    And I'm looking at an e-mail dated

3    May 7, 2008 -- I'm sorry, yes, which has a

4    forwarded message attached to it dated

5    February 11, 2008.  Do you see that?

6      A.    Yes.

7      Q.    And if we look over at the next

8    page, which is Bates stamp SMND 0366, indicates

9    a flight reservation for you, Mr. Stevens,

10   traveling to Chicago O'Hare on February 12,

11   2008.  Do you see that?

12     A.    Um-hum.

13     Q.    Do you recall -- well, first of all,

14   did you, did you travel to Chicago on February

15   12, 2008?

16     A.    Yes.

17     Q.    Okay.  And do you recall why you

18   went to Chicago on February 12, 2008?

19     A.    The purpose of the meeting was to

20   meet with Stylution.

21     Q.    Stylution.

22           And what is Stylution?

23     A.    It's a, it's a mattress company that

24   imports and sells from China and we do some

25   work for them.

1      Q.    Who's we?

2      A.    My -- Stevens Mattress.

3      Q.    And who attended that meeting?

4      A.    Myself and Ken Akers and Ed Scott.

5      Q.    Who is Ed Scott?

6      A.    Stylution.

7      Q.    He works for Stylution?

8      A.    Right.

9      Q.    Okay.  What kind of work does

10     Stevens Mattress do for Stylution?

11         A.    They would, they would sell people

12     contain -- you know, containers of mattresses

13     and they would ask us to make box springs for

14     them.

15         Q.    Now is that something that, did you

16     work in, in conglomeration with Sleep Alliance

17     or is that just Stevens Mattress that did that?

18         A.    That's Stevens Mattress.

19         Q.    Now when you made the, when Stevens

20     Mattress produced the box springs, would those

21     be shipped to Illinois?

22         A.    No.

23         Q.    Where would they go?

24         A.    I believe there was orders to, one

25     order to Kansas and maybe like three to four

1   orders in Minnesota.

2       Q.   So you were contracting with an

3   Illinois company, Stylution, and then having it

4   shipped somewhere else.  Is that correct?

5       MR. GAUSTAD:  I'm going to object to

6   the foundation.  I don't know that there's been

7   any foundation as to where Stylution exists.

8       Q.   (By Ms. Bernheim) Okay.  Can I, I'm

9   going to go a little bit out of turn, can I

10  have you please, Mr. Stevens, look at Exhibit

11  I, and that's Bates stamped SMND 0491 through

12  SMND 0494.

13      MR. GAUSTAD:  You said 0491 through?

14      MS. BERNHEIM:  494.

15      Q.   (By Ms. Bernheim) And correct me if

16  I'm wrong, Mr. Stevens, but I'm looking at what

17  appears to be an invoice from Upper Midwest

18  Sleep, LLC, to Stylution USA.  Is that correct?

19      A.   Yes.

20      Q.   Now just for clarification purposes,

21  you testified just a few minutes ago that it

22  was Stevens Mattress that conducted business

23  with Stylution, yet, according to this invoice,

24  it appears it's Upper Midwest Sleep, LLC.

25      So can you clarify that for me,

1    please?  Why would Upper Midwest Sleep, LLC's

2    name be on the invoice if it was Stevens

3    Mattress?

4         A.   I would have to think that through.

5         Q.   Is there anything that you have to

6    consult to help you refresh your recollection

7    on that?

8         A.   Well, that's the name of, that's the

9    name of the company that, you know, Upper

10   Midwest Sleep is the name of the company that,

11   you know, Steven -- I really don't have an

12   explanation for it.

13        Q.   Okay.  Now underneath the section of

14   the invoice where it says Sold To, it says

15   Stylution USA, 1142 Rose Road, Lake Zurich,

16   Illinois, 60047.  Is that correct?

17        A.   Yeah.

18        Q.   Now is it your understanding that

19   Stylution USA is located in Illinois?

20        A.   Yes.

21        Q.   Okay.  Now when you testified just a

22   few minutes ago that you conducted business

23   with Stylution in that they brought mattresses

24   over and Stevens Mattress made box springs for

25   those mattresses.  Is that correct?

1    A.    Um-hum.

2    Q.    So did you enter into a contract for

3    the manufacturing of the box springs, did

4    Stevens Mattress enter into a contract for the

5    manufacture of the box springs with Stylution

6    USA?

7    A.    Not a contract, no..

8    Q.    What, what kind of an agreement did

9    you have?

10    A.    They asked if we would do the, do

11    the work and ship them to these places in

12    Minnesota and, around there, and we agreed to

13    do it.

14    Q.    You had no written agreement --

15    A.    No.

16    Q.    -- with Stylution USA?

17    A.    No.

18    Q.    Are there any e-mails between you

19    and Stylution USA that discuss the terms of

20    this agreement?

21    A.    Not that I'm aware of.  There

22    probably is someplace.  I'm not aware of any,

23    though.

24    Q.    So, in other words, whatever

25    agreement you had would just be reflected by

1    the invoices you provided to us?

2        A.    I'm sure we had, we had someplace

3    along the line of a, of a price and all that

4    there, you know, and -- but I don't recall

5    where any of it is.

6        Q.    I'm going to ask you, please, now to

7    look at Exhibit E, which plaintiffs have marked

8    as Bates stamp number SMND 0061.

9        A.    Okay.

10       Q.    Mr. Stevens, do you have that?

11       A.    Yes.

12       Q.    Okay.  And it looks to me that this

13   is a Letter of Intent dated April 28, 2008,

14   between, I apologize if I mispronounce, Evenson

15   or Evenson Peterson Consulting --

16       A.    Okay.

17       Q.    -- and Upper Midwest Sleep.

18            And according to this Letter of

19   Intent, the Description of Services is, is that

20   the consultant will provide client with

21   engineered labor standards that reflect the

22   actual time required to produce a mattress or

23   foundation unit.

24            Mr. Stevens, can you explain a

25   little bit about the purpose of this Letter of

1    Intent?

2        A.    What, what the purpose of this is

3    that we're trying to upgrade our software

4    system and this lady is an industrial engineer,

5    which can help specifically get our time, or

6    cost of direct labor and indirect labor in the

7    products.

8        Q.    And is it, is it Evenson or Evenson?

9        A.    Evenson.

10        Q.    And so, and Evenson Peterson

11    Consulting, according to this Letter of Intent,

12    is located in Illinois, correct?

13        A.    Correct.

14        Q.    And how did it come to be that you

15    began a relationship or were put in touch with

16    Evenson Peterson Consulting?

17        A.    She used to be, work with Restonic

18    as an industrial engineer, and then she was an

19    interim president for Restonic.

20        Q.    Now did you approach Miss Evenson

21    about hiring her as a consultant?

22        A.    It was through the software people

23    that we, that we use and, and she does some

24    work for them and, you know, through those

25    people.  And that was in, I believe I talked to

1    that may provide checks to Stevens Mattress

2    Manufacturing?

3          A.    Probably just our local bank.

4          Q.    Do you recall how long Upper Midwest

5    Sleep has been receiving checks from SFG?

6          A.    I, I do not know.

7          Q.    I'm going to ask you now, please, to

8    turn to what plaintiffs have marked as Exhibit

9    G, and those are documents Bates stamp numbers

10   SMND 0068 through SMND 0071.

11         A.    Okay.  I have those.

12         Q.    And there's an invoice from A. Lava

13   & Son Company, located at 4800 South Kilbourn

14   Avenue in Chicago, Illinois, and it's sent to,

15   it indicates sold to Upper Midwest Sleep

16   Alliance -- I'm sorry, Upper Midwest Sleep,

17   LLC, Restonic, and shipped to Restonic.  Is

18   that correct?

19         A.    Yeah.

20         Q.    What services does -- strike that.

21               Is it your understanding, Mr.

22   Stevens, A. Lava & Son Company --

23         A.    Could you repeat that?  You were

24   cutting out.

25         Q.    Sorry.

1           Is it your understanding, Mr.

2    Stevens, that A. Lava & Son Company is located

3    in Chicago, Illinois?

4           A.    Yes.

5           Q.    Okay.  And what services does A.

6    Lava & Son Company provide to Upper Midwest

7    Sleep, LLC and/or Restonic, located in Grand

8    Forks, North Dakota?

9           A.    They supply us with, you know, with

10   foam, some types of foam, you know, time to

11   time we buy thread from them.

12          Q.    What was the last thing, from time

13   to time you buy what from them?

14          A.    Thread.

15          Q.    Thread, okay.

16          A.    You know, different components.

17   They specialize in certain types of components

18   that are, you know, like not easy for us to

19   get, but they have them and, you know, that's

20   why we buy from them from time -- you know,

21   different items.

22          Q.    Do you recall how long you've been

23   buying from A. Lava & Son Company?

24          A.    Oh, I'm sure that our -- you know,

25   all of my life.  You know, you know, as far as,

1    that, for whatever reason, it didn't get a

2    Bates stamp number on.

3         MR. GAUSTAD:  Yeah.  And mine

4    doesn't really have a Bates number either.

5         MS. BERNHEIM:  Well, we don't really

6    need that specific page anyway, so . . .

7         Q.   (By Ms. Bernheim) And for the

8    record, Mr. Stevens, again, please correct me

9    if I'm wrong or if you're looking at something

10   different, I'm looking at what appears to be an

11   invoice from B & C International located at

12   6624 Weather Hill Drive, Willowbrook, Illinois,

13   60527, and this is directed to customer Stevens

14   Mattress Manufacturing, Inc.  Is that correct?

15        A.   Yeah.

16        Q.   Okay.  So is it your understanding,

17   Mr. Stevens, that B & C International is in

18   fact located in Willowbrook, Illinois?

19        A.   Yes.

20        Q.   Okay.  And what services does, or

21   did B & C International provide to Stevens

22   Mattress Manufacturing?

23        A.   What Ben does is that he is, he

24   lines up product in China that we import.

25        Q.   Okay.  So we meaning Stevens

RUTH ANN JOHNSON  -  COURT REPORTER SERVICE
600 DeMERS, SUITE 300 GRAND FORKS, ND  58201  (701) 775-4092

1    Mattress Manufacturing imports product from

2    China?

3        A.    Right.

4        Q.    And B & C International is, for all

5    intents and purposes, like the identifier, the

6    bill man type --

7        A.    Could you repeat that again, please?

8        Q.    Okay.  Is, is -- I'm trying to

9    understand exactly what B & C International's

10   purpose is.

11           Do they act as your agent, as

12   Stevens Mattress Manufacturing's agent in

13   China?

14       A.    No.  He's an independent and we buy

15   it from him.

16       Q.    Okay.  So he locates products in

17   China and you buy through, and Stevens buys

18   through him?

19       A.    Right.

20       Q.    And how long has B & C International

21   been providing Stevens with product from China?

22       A.    Probably, I'm just trying to think

23   here, probably two years.

24       Q.    Two years.

25           And has B & C, in that two-year

RUTH ANN JOHNSON  -  COURT REPORTER SERVICE
600 DeMERS, SUITE 300 GRAND FORKS, ND  58201  (701) 775-4092

1          A.    No.

2          Q.    Have you ever conducted any

3     flammability testing or participated in any

4     flammability testing on behalf of Restonic?

5          A.    Yes.

6          Q.    When was that?

7          A.    Prob -- you know, probably some --

8     you know, I don't remember the dates offhand,

9     but it was, let's see, 2005 or something like

10    that.

11              It might have even --

12         Q.    How -- I'm sorry.

13         A.    It might have, even have started in

14    2004, because the government started it and

15    then they held -- then they put a moratorium on

16    it for a year or so, and so, you know, I

17    forget, I kind of forget the chain of events

18    there.

19         Q.    Now how did it come to be, to the

20    best of your recollection, that you

21    participated in the flammability testing on

22    behalf of Restonic?

23         A.    Because I was on the, the, the

24    committee to research the different

25    flammability products.

1        Q.    Does that committee have a name?

2        A.    Probably the product development --

3   not the product development committee, probably

4   the -- maybe it was the product development

5   committee, I guess that would probably be the

6   -- and our sole purpose at that time was just,

7   basically, to get through the flammability

8   program.

9        Q.    Do you recall your, your, your dates

10  of service on that committee?

11       A.    I'm still involved on that

12  committee.  And I probably started -- I, I

13  don't recall when I started, to be honest with

14  you.

15       Q.    You're still on the committee you

16  said?  I'm sorry.

17       A.    Yes.

18       Q.    Okay.  And, and I don't, you know, I

19  don't want to get -- I don't want to go to an

20  area that I've asked and answered yet, but can

21  you tell me the last time, to the best of your

22  recollection, that that product development

23  committee met?

24       A.    You mean in person?

25       Q.    I suppose.

```
1                NOTARY-REPORTER'S CERTIFICATE

2    STATE OF NORTH DAKOTA   )
                             ) ss
3    COUNTY OF GRAND FORKS   )

4            I, RUTH ANN JOHNSON, a Notary Public

5    within and for the County of Grand Forks and

6    State of North Dakota, do hereby certify:

7            That prior to being examined the

8    afore-named witness was by me sworn to testify

9    the truth, the whole truth, and nothing but the

10   truth;

11           That said telephonic deposition,

12   consisting of 89 pages of typewritten

13   materials, was taken down by me in Stenotype at

14   the time and place therein named, and was

15   thereafter reduced to typewriting under my

16   direction.

17           I further certify that I am neither

18   related to any of the parties or counsel nor

19   interested in this matter directly or indirectly.

20           WITNESS my hand and seal this 10th day of June, 2008

21

22

23                           Ruth Ann Johnson
                             Notary Public
24                           Grand Forks County, North Dakota

25   My Commission expires October 5, 2008.
```

            RUTH ANN JOHNSON  -  COURT REPORTER SERVICE
600 DeMERS, SUITE 300 GRAND FORKS, ND  58201  (701) 775-4092