1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2
     ROYAL SLEEP PRODUCTS, INC.
 3   a Florida Corporation,          Case No:  1:07 CV 6588

 4           Plaintiff,

 5   v.

 6   RESTONIC CORPORATION,
     an Illinois Corporation,
 7   RESTONIC MATTRESS CORPORATION,
     an Illinois Corporation,
 8   SLEEP ALLIANCE, LLC,
     a Delaware Limited Liability Company,
 9   ROYAL BEDDING COMPANY OF BUFFALO,
     a New York Corporation,
10   JACKSON MATTRESS CO., LLC,
     a North Carolina Limited Liability Company,
11   CONTINENTAL SILVERLINE PRODUCTS L.P.,
     a Texas Limited Partnership,
12   STEVENS MATTRESS MANUFACTURING CO.,
     a North Dakota Corporation,
13   TOM COMER, JR., an individual,
     DREW ROBINS, an individual, and
14   RICHARD STEVENS, an individual,

15           Defendants.

16   ------------------------------------------------

17      TELEPHONIC DEPOSITION OF RICHARD STEVENS

18                 June 3, 2008

19

20   A p p e a r a n c e s :

21      For the Plaintiff (Telephonically):

22   ZARCO EINHORN SALKOWSKI & BRITO, P.A.
     Bank of America Tower
23   100 Southeast 2nd Street, Suite 2700
     Miami, Florida   33131
24        By:  MELISSA L. BERNHEIM, ATTORNEY AT LAW
                        AND
25             ROBERT F. SALKOWSKI, ATTORNEY AT LAW
```

COPY

**EXHIBIT A**

RICHARD STEVENS

**2**

```
1   A p p e a r a n c e s :   (Cont'd)

2

3   For the Defendants Restonic Corporation and
    Restonic Mattress Corporation
4   (Telephonically):

5   BURKE, WARREN, MacKAY & SERRITELLA, PC
    330 North Wabash Avenue, 22nd Floor
6   Chicago, Illinois   60611
      By:  FREDERIC A. MENDELSOHN, ATTORNEY AT LAW
7

8   For the Defendants Continental Silverline
    Products, L.P., Jackson Mattress Co., LLC,
9   Royal Bedding Company of Buffalo, Sleep
    Alliance, LLC, Drew Robins and Tom Comer,
10  Jr. (Telephonically):

11  SMITH & AMUNDSEN, L.L.C.
    150 North Michigan Avenue, Suite 3300
12  Chicago, Illinois   60601
      By:  THOMAS J. LYMAN, III, ATTORNEY AT LAW
13

14  For the Defendants Stevens Mattress
    Manufacturing Co. and Richard Stevens:
15
    PEARSON CHRISTENSEN & CLAPP, PLLP
16  P.O. Box 352
    Grafton, North Dakota   58237-0352
17    By:  DANIEL L. GAUSTAD, ATTORNEY AT LAW

18
    For the Defendants Continental Silverline
19  Products L.P. and Drew Robins (Telephonically):

20  FULBRIGHT & JAWORSKI, LLP
    1301 McKinney
21  Suite 5100
    Houston, Texas   77010-3095
22    By:  ANDREW S. FRIEDBERG, ATTORNEY AT LAW

23

24  Also Present:  Christian Miller

25  Taken By:  Ruth Ann Johnson, RPR
```

**4**

```
1          . . . The following is the Telephonic

2   Deposition of RICHARD STEVENS, taken at the

3   request of the Plaintiff in the above-entitled

4   cause, pending in the United States District

5   Court, Northern District of Illinois, pursuant

6   to Notice and the Federal Rules of Civil

7   Procedure, before Ruth Ann Johnson, RPR, a

8   Notary Public within and for the State of North

9   Dakota, at the office of RUTH ANN JOHNSON -

10  COURT REPORTER SERVICE, 600 DeMers Avenue,

11  Suite 300, Grand Forks, North Dakota, on

12  Tuesday, June 3, 2008, at 12:30 o'clock p.m.,

13  at which time counsel appeared as hereinbefore

14  set forth . . . .

15

16

17

18

19

20

21

22

23

24

25
```

**3**

```
1            I N D E X

2   DEPONENT:                              PAGE NO.

3   RICHARD STEVENS

4   Examination by . . . Ms. Bernheim          5
    Examination by . . . Mr. Gaustad          87
5

6
7   EXHIBITS
8   No. A -- Copy of Articles of
             Incorporation
9
    No. B -- Copy of Amended and Restated
10           Sublicense Agreement

11  No. C -- Copy of Restonic Mattress Corporation

12  No. D -- Copy of VISA statement

13  No. E -- Copy of Letter of Intent

14  No. F -- Copy of SFG invoices

15  No. G -- Copy of A. Lava & Son Co.

16  No. H -- Copy B & C International

17  No. I -- Copy of Restonic Upper Midwest Sleep,
             LLC invoices
18
    No. J -- Copy of Restonic Executive Bulletin
19

20
21
22
23
24
25
```

**5**

```
1          R I C H A R D   S T E V E N S,

2   a Defendant, of Grand Forks, North Dakota,

3   called as a witness by the Plaintiff, being

4   first duly sworn by Ruth Ann Johnson, RPR, a

5   Notary Public within and for the State of North

6   Dakota, was examined and deposed on his oath as

7   follows:

8

9            EXAMINATION

10  BY MS. BERNHEIM:

11     Q.  Good afternoon, Mr. Stevens, my name

12  is Melissa Bernheim, I'm joined with my

13  colleague, Robert Salkowski, we're attorneys

14  with Zarco, Einhorn, Salkowski & Brito, and we

15  represent the plaintiff in this matter.

16         I'm just going to ask you, and I

17  recognize that this is kind of difficult,

18  because we are doing this telephonically,

19  obviously face to face is always easier, and

20  also, because we're on a conference call,

21  there's a little bit of a delay, so I'm going

22  to do my best not to talk over you, and I'm

23  sure you'll do the same, so that the court

24  reporter can accurately record the testimony

25  that, that you're about to give.
```

RICHARD STEVENS June 3, 2008

**6**

1 The first question I'm going to ask
2 you is whether or not you've ever had your
3 deposition taken before?
4 A. No.
5 Q. Okay. So let me just give you a
6 little bit of a, guidelines on how this works.
7 I'm going to ask you a series of
8 questions to which you'll give answers to the
9 best of your ability. And really important,
10 because it's telephonic, I need your answers to
11 be audible. That's two-fold, one so that I can
12 hear what you're saying and, two, so that the
13 court reporter can accurately record the
14 testimony you're giving. It's very difficult
15 for her to record uh-huh, huh-uh, nods of the
16 head, etcetera, and because I can't see you,
17 it's obviously more difficult for me.
18 When I ask you a question, I'm going
19 to assume that unless you ask me to rephrase or
20 explain better, that you understand the
21 question.
22 At any point in time, if you don't
23 understand the question, please feel free to
24 let me know and I'll be happy to rephrase it.
25 In addition, for any reason, if you

**7**

1 should need a break or something, just let us
2 know and we can certainly accommodate that.
3 Other than that, the only other
4 question I would ask is if you're feeling well
5 today and if you're on any medications that
6 might interfere with your ability to testify?
7 A. I'm feeling fine and -- (no further
8 response.)
9 Q. Okay. Excellent. So then we're
10 ready to start.
11 Mr. Stevens, did you, in preparation
12 for your deposition today, did you, did you do
13 anything in particular?
14 A. I looked over the questions and the
15 responses.
16 Q. When you say questions and
17 responses, are you referring to the request for
18 production?
19 A. Yes.
20 Q. Did you, besides your lawyer,
21 because I don't want to know about that, did
22 you speak with anyone in preparation for this
23 deposition?
24 A. No.
25 Q. And aside from the documents that

**8**

1 you provided to us in response to the request
2 for production, did you review any other
3 documents?
4 A. I'm not really sure what you mean by
5 that.
6 Q. Well, a moment ago we spoke about a
7 request for production that you reviewed,
8 correct?
9 A. Right.
10 Q. Okay. And in, in conjunction with
11 that request for production you, I assume,
12 provided to your attorney certain documents
13 which were then provided to us. Is that true?
14 A. Correct.
15 Q. Okay. Aside from the documents that
16 you provided to us, did you look at any other
17 documents today in preparation for this
18 deposition?
19 A. I -- to the best of my ability, no.
20 Q. Okay. Did you review any -- do you
21 have -- I'm sorry, strike that.
22 Do you have a computer?
23 A. Yes.
24 Q. Do you use that computer to conduct
25 your business?

**9**

1 A. Yes.
2 Q. Did you review any files on your
3 computer in preparation for today?
4 A. In regard to?
5 Q. In regards to this deposition or
6 this case.
7 A. No.
8 Q. Okay. Did you review any e-mails?
9 MR. GAUSTAD: Are you asking about
10 just in preparation for today's deposition?
11 MS. BERNHEIM: Yes.
12 Q. (By Ms. Bernheim) All I'm
13 questioning is in respect to preparing for
14 today, did you review any e-mails to prepare
15 for today's deposition?
16 A. No.
17 Q. Okay. Mr. Stevens, the name of one
18 of your corporate entities is Stevens Mattress
19 Manufacturing Company. Is that correct?
20 A. That's correct.
21 Q. Okay. And where is Stevens Mattress
22 Manufacturing Company incorporated?
23 A. North Dakota.
24 Q. And when did you -- or when was
25 Stevens Mattress Manufacturing Company

RICHARD STEVENS                                                          June 3, 2008

## 10

1  incorporated, what date?
2      A.  I do not know.  I'd have to look it
3  up, I don't know offhand.
4      Q.  Ballpark it?
5      A.  Pardon?
6      Q.  Can you give me an approximate year?
7      A.  Well, originally, probably in 1968,
8  '69.  I'm not sure, though.
9      Q.  That's okay.
10         And who are the officers or
11  directors, and directors, I apologize, of
12  Stevens Mattress Manufacturing Company?
13     A.  Myself, John Stevens and Brian
14  Stevens.
15     Q.  Okay.  Is John Stevens related to
16  you?
17     A.  He is my nephew.
18     Q.  And Brian Stevens?
19     A.  Also my nephew.
20     Q.  Does Stevens Mattress Manufacturing
21  Company have any offices in the state of
22  Illinois?
23     A.  No.
24     Q.  Did it ever?
25     A.  No.

## 11

1      Q.  What about any employees, does
2  Stevens Mattress Manufacturing Company have any
3  employees in Illinois?
4      A.  No.
5      Q.  Did it, at any point in time did it
6  ever have employees in Illinois?
7      A.  No.
8      Q.  Does Stevens Mattress Manufacturing
9  Company own any realty in Illinois?
10     A.  No.
11     Q.  Did it ever?
12     A.  No.
13     Q.  Do you personally, Mr. Stevens, own
14  any real estate in Illinois?
15     A.  No.
16     Q.  Did you ever own any real estate in
17  Illinois?
18     A.  No.
19     Q.  With respect to bank accounts, did
20  Stevens Mattress Manufacturing Company ever
21  have any bank accounts in Illinois?
22     A.  No.
23     Q.  And it doesn't currently either?
24     A.  No.
25     Q.  Does Stevens Mattress Manufacturing

## 12

1  Company have a Website?
2      A.  Yes.
3      Q.  And what is the address of that
4  Website?
5      A.  Restonic dot net.
6      Q.  www dot restonic dot net?
7      A.  Right.
8      Q.  And on the Stevens Mattress
9  Manufacturing Company Website, what types of
10  things are on there?  Could I -- strike that.
11         Do you conduct any point of sales
12  over that Website?
13     A.  No.  There's -- it was activated a
14  few years ago and never really been used.
15     Q.  So you don't sell anything on that,
16  Stevens Mattress Manufacturing Company doesn't
17  sell any product using its Website?
18     A.  No.
19     Q.  Does Stevens Mattress Manufacturing
20  Company do any advertising?
21     A.  No.
22     Q.  So the Website itself doesn't
23  advertise the company at all?
24     A.  No.
25     Q.  I'm now going to ask, and hopefully

## 13

1  your attorney has in front of him what we've
2  marked as Plaintiff's Exhibit A, which should
3  be a copy of the Secretary of State's
4  documents, incorporation document for Upper
5  Midwest Sleep LLC?
6      MR. GAUSTAD:  Yes.
7      Q.  (By Ms. Bernheim) If you could just
8  take a second to familiarize yourself with that
9  exhibit, please.
10     MR. GAUSTAD:  Well -- that was Dan
11  Gaustad.
12         Exhibit A is several pages in
13  length, can you make sure that we all have the
14  same document in front of us?
15     MS. BERNHEIM:  It's Bates stamp
16  numbers SMND 0485 through SMND 0490.
17     MR. GAUSTAD:  Thank you.
18     MS. BERNHEIM:  Uh-huh.
19     Q.  (By Ms. Bernheim) Mr. Stevens, when
20  you're ready, just let me know.
21     A.  Okay.
22     Q.  Great.
23         So based on your view of these
24  documents, Upper Midwest Sleep is a limited
25  liability company.  Is that correct?

RICHARD STEVENS                                                    June 3, 2008

**14**

1    A.   Yes.
2    Q.   And that was organized under, in the
3 state of North Dakota, correct?
4    A.   Correct.
5    Q.   And pursuant to page -- I'm sorry,
6 document, it's Bates stamp number, it's page
7 one of Exhibit A, Bates stamp SMND 0485, it
8 states that Upper Midwest Sleep, LLC was
9 organized in, on August 28, 2006.  Is that
10 correct?
11   A.   That's what it says.
12   Q.   Okay.  What is the purpose of Upper
13 Midwest Sleep, LLC?
14   A.   The purpose of Up -- the purpose of
15 Upper Midwest LL -- Sleep, LLC was to
16 consolidate and to look for an equity partner
17 in the business.
18   Q.   An equity, when you say equity
19 partner in the business, can you explain what
20 you mean by that?
21   A.   An equity partner, a person that's
22 willing to invest money.
23   Q.   I understand that, but when you say
24 in the business, are you talking about
25 investing in Stevens Mattress Manufacturing

**15**

1 Company?
2    A.   Upper Midwest Sleep, LLC.
3    Q.   Okay.  Let me back up a little to
4 help try to make things a little bit more
5 clear.
6         What is the relationship, if you
7 will, between Stevens Mattress Manufacturing
8 Company and Upper Midwest Sleep, LLC?
9    A.   Stevens Mattress owns Upper Midwest
10 Sleep.
11   Q.   And which entity of the two conducts
12 the business as Restonic?
13   A.   No.  That's -- I would not say we
14 conduct business as Restonic.  We sell under a
15 licensing agreement to sell Restonic products,
16 but our business is not Restonic.
17   Q.   Does Upper Midwest Sleep, LLC have a
18 license agreement or sublicense agreement with
19 Restonic?
20   A.   No.  It's -- no, it does not.
21   Q.   So --
22   A.   To the best of my knowledge.  I
23 mean, there's a lot of companies here and they,
24 they change and, you know, you know, I do not
25 believe that Upper Midwest does, though.

**16**

1    Q.   Okay.  So let's back up.  Stevens
2 Mattress Manufacturing Company, does Stevens
3 Mattress Manufacturing Company manufacture and
4 sell bedding products?
5    A.   Yes, it does.
6    Q.   Okay.  And does Stevens Mattress --
7 and Stevens Mattress Manufacturing Company has
8 a sublicense agreement with Restonic, correct?
9    A.   That's correct.
10   Q.   Does Stevens Mattress Manufacturing
11 Company have licenses with any other mattress
12 company or have sublicenses with any other
13 mattress company?
14   A.   No.
15   Q.   Okay.  Now Upper Midwest Sleep, LLC,
16 does that company also sell and manufacture
17 bedding products?
18   A.   No.  No.  It -- I really don't
19 understand the question, because it's confusing
20 there to me.
21   Q.   What does Upper Midwest Sleep, LLC
22 do, does it have a business function?
23   A.   The business function of -- it has
24 no -- if I'm not mistaken, you know, I'm not
25 totally clear on that yet, just let me think it

**17**

1 through here a minute.
2         I think the only one that
3 manufactures mattresses and box springs is
4 Stevens Mattress Manufacturing.
5    Q.   Okay.
6    A.   That has a license under that --
7 with Restonic.
8    Q.   So if Upper Midwest Sleep, LLC
9 doesn't manufacture bedding products, what does
10 it do?
11   A.   It was a holding company of some --
12 I would have to go and review that, what, what
13 the real function of that was.  Is.
14   Q.   Who are the officers and directors?
15 I'm sorry, who are the managers and members of
16 Upper Midwest Sleep, LLC?
17   A.   Richard Stevens.
18   Q.   That's you?
19   A.   Right.
20        John Stevens.
21   Q.   Uh-huh.
22   A.   And Brian Stevens.
23   Q.   Okay.  Now who's Don Stevens?
24   A.   Brian Stevens, I said.
25   Q.   All right.  Wasn't there one in the

RICHARD STEVENS                                                June 3, 2008

**18**

1  middle? There was a -- oh, John Stevens, I
2  apologize, sir.
3        Okay. Both your nephews?
4    A.  Correct.
5    Q.  Okay. Now I just need to try to
6  understand things. Are you, are you all
7  members, is someone, is one party the manager?
8    A.  We're all members.
9    Q.  You're all members.
10        And so you're a member of the LLC,
11  but you're not quite clear what the LLC is
12  organized to do?
13    A.  I'd have to look at and see what it
14  was really organized to do, yes.
15    Q.  Okay. But you do recall organizing
16  in August 2006?
17    A.  Right.
18    Q.  Okay.
19    A.  It's all really part of a, of, you
20  know, a consolidation to get an equity partner
21  in the business.
22    Q.  All right. Now did you ever get an
23  equity partner for the business?
24    A.  No, we did not.
25    Q.  Are you still looking?

**19**

1    A.  Upper Midwest Sleep, LLC is not
2  looking for an equity partner at this time.
3    Q.  Does Upper Midwest Sleep, LLC have
4  any offices in Illinois?
5    A.  No.
6    Q.  Has it ever, since 2006?
7    A.  No.
8    Q.  And let me just back up a second.
9        John Stevens and Brian Stevens,
10  where do they reside?
11    A.  In North Dakota. In Grand Forks,
12  North Dakota. Well, Brian maybe does not,
13  Grand Forks, he lives in Thompson, but it's in
14  the metro area.
15    Q.  Okay. And does Upper Midwest Sleep,
16  LLC have any employees in Illinois?
17    A.  No.
18    Q.  And did it ever?
19    A.  No.
20    Q.  What about any real estate, does it
21  own any real estate in Illinois?
22    A.  No.
23    Q.  And it never did?
24    A.  No.
25    Q.  And what about any bank accounts?

**20**

1    A.  No.
2    Q.  And how about Website, does Upper
3  Midwest have a Website?
4    A.  No.
5    Q.  And does Upper Midwest do any kind
6  of advertising?
7    A.  No.
8    Q.  Okay. Let's talk a little bit about
9  Sleep Alliance. Mr. Stevens, are you
10  personally a member of Sleep -- well, first of
11  all, are you familiar with Sleep Alliance, LLC?
12    A.  Yes.
13    Q.  Okay. And are you personally
14  involved in Sleep Alliance, LLC?
15    A.  As of today, no.
16    Q.  Okay. Were you ever?
17    A.  I was until the end of last year.
18    Q.  Okay. Now when you say I was, was
19  it you as Richard Stevens or you as Richard
20  Stevens, officer of Stevens Mattress
21  Manufacturing Company, how does that work?
22    A.  As Stevens Manufacturing.
23    Q.  Was Upper Midwest Sleep, LLC ever
24  part of that as well?
25    A.  No.

**21**

1    Q.  And what happened at the end of last
2  year that you were no longer a member?
3    A.  Because I was no -- I, I saw no
4  future of looking for an equity partner in the
5  business, and that was the whole reason for
6  that to be formed, and nothing happened, so I
7  withdrew from that.
8    Q.  Okay. I'm going to stop you,
9  because I, forgive me if I'm a little confused.
10        You mentioned just the fact that
11  Stevens Manufacturing Company was the entity
12  involved with Sleep Alliance. Is that correct?
13    A.  Could you repeat that?
14    Q.  Okay. You stated that it was
15  Stevens Mattress Manufacturing Company that was
16  the entity that was involved with Sleep
17  Alliance, LLC. Is that correct?
18    A.  No. It was -- no, that was not
19  correct, if that's what I said. It's Upper
20  Midwest Sleep, LLC that was Sleep Alliance.
21    Q.  Okay. Now that makes sense.
22        Okay. So with respect to Sleep
23  Alliance, LLC, do you know where that entity is
24  organized, what state?
25    A.  I believe that was Delaware.

RICHARD STEVENS                                                June 3, 2008

---

**22**

1    Q.  Delaware.
2        And do you know when that was
3  formed?
4    A.  August 28, 2006.
5        MR. GAUSTAD:  You're talking about
6  Sleep Alliance or --
7        MS. BERNHEIM:  I'm talking about
8  Sleep Alliance, LLC.
9    Q.  (By Ms. Bernheim) Is that answer the
10  same or do you want to change that?
11    A.  No, I think that's the date.
12        Yeah, I believe that's the date.
13    Q.  So according to, if you look back at
14  Exhibit A, Sleep Alliance, LLC was formed the
15  same date as Upper Midwest Sleep, LLC, correct?
16    A.  I believe that's correct.
17        I'd have to really, you know, you
18  know, check documents to, you know, to triple
19  check it or whatever, but I believe that was
20  the dates everything was signed at that time.
21    Q.  Okay.  What was the purpose of Sleep
22  Alliance?
23    A.  It was to consolidate the businesses
24  and look for an equity partner.
25    Q.  And when you say businesses, which

---

**23**

1  businesses are you referring to?
2    A.  There was three businesses involved
3  in, you know, three principals involved in
4  Sleep Alliance.
5    Q.  And who were they?
6    A.  Myself, Tom Comer and Drew
7  Robins.
8    Q.  Now did, did Sleep Alliance, LLC
9  have an office in Illinois?
10    A.  No.
11    Q.  Did it ever have any kind of office
12  or, or anything in Ill -- I'm sorry, strike
13  that.
14        Did it ever have an office in
15  Illinois?
16    A.  No.
17    Q.  Did it have any employees located in
18  the state of Illinois?
19    A.  No.
20    Q.  And it, and at any time since its
21  formation it never did?
22    A.  No.
23    Q.  Did Sleep Alliance own any real
24  estate in Illinois?
25    A.  No.

---

**24**

1    Q.  And I assume that the answer is that
2  it never did, correct?
3    A.  Correct.
4    Q.  Did Sleep Alliance have any bank
5  accounts in Illinois?
6    A.  No.
7    Q.  Did Sleep Alliance or does Sleep
8  Alliance have a Website?
9    A.  No.
10    Q.  Does Sleep Alliance do any
11  advertising?
12    A.  No.
13    Q.  What about meetings, Sleep Alliance
14  conduct any meetings in Illinois?
15    A.  Not to the best of my recollection.
16  There might, there might have been one last
17  year that I was not able to attend.
18    Q.  And do you know where that would
19  have occurred, where in Illinois?
20    A.  In Chicago.
21    Q.  Any particular reason why you didn't
22  attend?
23    A.  I couldn't walk.  I had a health
24  issue.
25    Q.  Okay.  As a member of Sleep Alliance

---

**25**

1  and representing Sleep Alliance, aside from
2  that meeting, did you ever attend any meetings,
3  any other meetings in Illinois on behalf of
4  Sleep Alliance?
5    A.  There might have been some, but I, I
6  can't remember.
7    Q.  Any idea, any reason as to why Sleep
8  Alliance would conduct its meetings in
9  Illinois?
10    A.  Ease of getting to.  It's one of the
11  only places that we can fly direct from this
12  part of the country.
13    Q.  Are you aware of a, a meeting this
14  coming June 5, two days from now, that Sleep
15  Alliance is conducting in Illinois?
16    A.  No.
17    Q.  Are you aware of, of any meeting
18  that Restonic is conducting June 5 in Illinois?
19    A.  Not June 5, no.
20    Q.  Okay.  How about any time this
21  month, are there any upcoming meetings?
22    A.  June 4.
23    Q.  June 4.
24        Now the meeting on June 4, is that
25  Restonic or is that Sleep Alliance calling that

---

26

1  meeting?
2      A.  I do not know if it's a Sleep
3  Alliance meeting, but there is a Restonic
4  meeting.
5      Q.  Are you attending that meeting?
6      A.  Yes, I am.
7      Q.  How often do you attend meetings for
8  Restonic in Illinois?
9      A.  Oh, I would say probably maybe once
10 a year, sometimes more, sometimes less.  It, it
11 just depends.
12     Q.  But at least once a year?
13     A.  No, I did not say that, at least
14 once a year.  I said sometimes once a year,
15 sometimes less, you know.
16         I don't think, I don't think in 2006
17 I went to any meetings for Restonic in, in
18 Illinois.
19     Q.  Was that for any specific reason or
20 is it because they just didn't have one?
21     A.  They didn't have one.
22     Q.  Is that common not to have one?
23         MR. GAUSTAD:  I'm going to object.
24 You're asking him to speculate as to why
25 Restonic may or may not call a meeting, so I'll

27

1  object to the form of the question.
2      Q.  (By Ms. Bernheim)  Let me rephrase.
3         Does Restonic, aside from 2006, in
4  your experience, as a Restonic sublicensee,
5  does Restonic usually have a meeting yearly in
6  Illinois, in Chicago, in Illinois, wherever it
7  may be?
8      A.  Not, not all the time in Illinois,
9  no.
10     Q.  They have them other places?
11     A.  There could be other places.
12     Q.  Where, what other place, for
13 example, where else have they held meetings?
14     A.  I'm trying to think here.  I think
15 in Indianapolis a few years back.  Sometimes
16 they use them in conjunction with trade
17 shows, --
18     Q.  Okay.
19     A.  -- you know, for -- so that --
20 because everybody has to be at the trade shows,
21 so sometimes, then, they'll have a meeting in
22 conjunction with the trade show.  And the trade
23 shows usually are never in Chicago or Illinois.
24     Q.  Okay.  To the best of your
25 recollection, when did -- and when I say you in

28

1  this question, I'm either referring to you
2  personally as Richard Stevens, or you as either
3  Stevens Mattress Man -- well, as you testified,
4  Stevens Mattress Manufacturing Company, so when
5  did you personally, or through Stevens Mattress
6  Manufacturing Company, first become associated
7  with Restonic?
8      A.  I believe it was 19, the end of 18
9  -- the end of 1989 or the year 1990.
10     Q.  And you became a sublicensee during
11 that period of time?
12     A.  Correct.
13     Q.  Okay.
14         MR. GAUSTAD:  And I want to make --
15 Miss Bernheim I want to make sure I understand
16 the definition.  You've defined you to be both
17 Richard individually and Richard as a --
18         MS. BERNHEIM:  I just was about to
19 get into that, to clarify that.
20         MR. GAUSTAD:  Okay.  Because there's
21 a compound question in there, I believe.
22         MS. BERNHEIM:  Okay.  Well, let's,
23 let's, let's just establish the foundation
24 here.
25     Q.  (By Ms. Bernheim)  Who, Mr. Stevens,

29

1  who became the sublicensee, did you sign it
2  personally or was it Stevens Mattress?
3      A.  Stevens Mattress.
4      Q.  Okay.  And Stevens Mattress became a
5  sublicensee sometime in the end of 1989 or
6  early 1990?
7      A.  I believe that's the date, yeah.
8      Q.  Okay.  Now did, was there any
9  negotiation at all in reaching, in coming to
10 terms on a sublicense agreement?
11     A.  Explain what you mean by
12 negotiations.
13     Q.  Did you, how did it work, did
14 Restonic hand you a sublicense agreement and
15 you signed it, or did you take terms, negotiate
16 terms, or how did it work?
17     A.  They had a standard sublicense
18 agreement that we signed and that's what we
19 followed.
20     Q.  Okay.  Now when you signed that
21 agreement, where were you located, did you sign
22 it in Illinois?
23     A.  No.  I believe it was in Grand
24 Forks, North Dakota.
25     Q.  And how, how did those signatures --

RICHARD STEVENS

**30**

1  how did that happen?  Did you fax your
2  signature back to Illinois, did you mail it?
3      A.  It might have been before faxes
4  existed.
5      Q.  Okay.  Did you mail it?
6      A.  I do not recall.
7      Q.  Okay.  I'm going to ask you to look
8  at what Plaintiff has marked as Exhibit B, and
9  I'll give you the Bates stamp numbers now.
10          Okay.  That would be Bates stamp
11  numbers SMND 0001 through Bates numbers SMND
12  0018.
13          Mr. Stevens, just let me know when
14  you have it and you've looked at it.
15      A.  Okay.  I have it.
16      Q.  Mr. Stevens, what, can you please
17  identify for me Plaintiff's Exhibit B?
18      A.  Amended and Restated Sublicense
19  Agreement.
20      Q.  Okay.  Have you seen this document
21  before?
22      A.  Yes.
23      Q.  Okay.  And does this reflect the
24  most recent sublicense agreement you've
25  executed with Restonic Mattress Corporation?

**31**

1          MR. GAUSTAD:  And I want to make
2  sure I understand, when you use the word you,
3  who are you referring to?
4          MS. BERNHEIM:  I'm sorry.
5      Q.  (By Ms. Bernheim) Stevens Mattress
6  Manufacturing.
7          MR. GAUSTAD:  Thank you.
8      A.  I believe it is, yeah.
9          Okay.
10     Q.  (By Ms. Bernheim) Mr. Stevens,
11 recognizing that this is the most recent
12 sublicense agreement that Stevens Mattress
13 signed with Restonic Mattress Corporation --
14 and this document, for the record, is dated
15 June 1, 2007, correct?
16     A.  Yes.
17     Q.  Okay.  So then you would agree that
18 you've had an ongoing relationship with
19 Restonic Mat -- you being Stevens Mattress
20 Manufacturing Company, have had an ongoing
21 business relationship with Restonic Mattress
22 Corporation for at least about, or
23 approximately 17 years, correct?
24     A.  Yes.
25     Q.  And you understand that, that

**32**

1  Restonic Mattress Corporation is an Illinois
2  corporation, correct?
3      A.  Yes.
4      Q.  Okay.  Mr. Stevens, besides the
5  execution of the sublicense agreement between
6  Restonic Mattress Corporation and Stevens
7  Mattress, are there any other agreements that
8  you've entered into with Restonic?
9      A.  I think at one time there was some
10 national account agreement.
11     Q.  Okay.
12     A.  I'm not sure how current, where --
13 what the status is on that, though, because
14 there is, there are no national accounts.
15     Q.  Can you -- can we, can we just stop,
16 the national accounts program, for a minute,
17 could you tell me what your understanding of
18 the national accounts program is?
19     A.  What it is?
20     Q.  Yes.
21     A.  The purpose of it was is that if a
22 Restonic Corporation had an account that would
23 cover over several geographical, you know,
24 parts of the country, you know, then certain
25 factories in certain areas would be, you know,

**33**

1  have the opportunity to service that account.
2      Q.  When you say certain factories,
3  would you say, are you talking about factories
4  that are located close to the account?
5      A.  No, not necessarily.
6      Q.  So how would something like that be
7  determined?
8      A.  Their capability, profitability,
9  ability to do it, capacity.  There's several,
10 several factors involved in that.
11     Q.  Who, what -- who makes the
12 determinations that the factory has the
13 capacity or the capability?
14     A.  I could only speak for my own
15 factory and I would make that determination.
16     Q.  And who would you communicate that
17 to?
18     A.  Whoever the president of Restonic
19 would be.
20     Q.  And assuming, just as an example, in
21 your experience with Stevens Mattress
22 Manufacturing, if you were approached -- let me
23 strike that, let's step back.
24         Did you ever, as part of Stevens
25 Mattress Manufacturing, ever have the

RICHARD STEVENS                                                  June 3, 2008

34

1  opportunity to serve as a national account?
2      A.  Under, under the national account
3  agreement or, --
4      Q.  Yes.
5      A.  -- or at any time?
6      Q.  Well, I mean, let's start with the
7  national account agreement.
8      A.  I don't believe under that, under
9  the national account agreement, no.
10     Q.  What about at any time?
11     A.  Probably in the mid-'90s or so,
12 there was, there was a department -- or Levitz,
13 which was a, you know, a national chain that,
14 that we serviced out of North Dakota.
15     Q.  Now was that before there was a
16 national accounts program, to the best of your
17 recollection?
18     A.  I think it was.
19     Q.  Okay.  And when, when Stevens
20 Mattress got the Levitz account, was that the
21 result of you communicating with the Restonic
22 president?
23     A.  Right.
24     Q.  And so can you just describe how
25 that took place?

36

1      You, I'm sorry, from my views here,
2  I'm talking about Stevens Mattress
3  Manufacturing Company.  Does Stevens pay any
4  money to Restonic?
5      A.  For?
6      Q.  To just be a member of the program.
7      A.  No.
8      Q.  Okay.  Do you pay royalties under
9  that program?
10     A.  We pay royalties under our
11 sublicense agreement, but not under a national
12 account agreement.
13     Q.  Under the national account agreement
14 does Restonic pay any commissions to you?
15     A.  No.
16     Q.  Do you, does Stevens Mattress
17 Manufacturing purchase any items from Restonic?
18     A.  Some point of purchase, things that
19 they -- goes through their office.
20     What I mean by point of purchase
21 would be things like, you know, mattress sale
22 going on today or, you know, window type
23 banner, you know, miscellaneous things like
24 that.
25     Q.  Okay.  I'm going to ask your

35

1      A.  Well, they, they asked if we were,
2  you know, first of all, capable of servicing
3  that account and we're able to and --
4      Q.  Can I interrupt and ask who they is?
5  Who do you mean by they?
6      A.  Restonic, you know, the president of
7  Restonic.
8      Q.  So you were contacted to ask if you
9  could service Levitz?
10     A.  I don't recall being actually
11 contacted like that there, but it was something
12 to that effect.
13     Q.  And did you sign, was there any kind
14 of paperwork that you had to sign in order to
15 service Levitz?
16     A.  I don't recall.
17     Q.  You don't recall if Res -- if you
18 did any separate agreement with Restonic
19 regarding Stevens Mattress Manufacturing taking
20 the Levitz account?
21     A.  I, I don't recall any paperwork
22 being signed.
23     Q.  Okay.  Under the national accounts
24 program, as it exists, are you required to pay
25 any money to Restonic under this program?

37

1  attorney to please turn to what plaintiffs have
2  marked as Exhibit C.  And for reference, those
3  are Bates stamp numbers SMND 0141 through SMND
4  0146.
5      MR. GAUSTAD:  You're asking me to do
6  that?
7      MS. BERNHEIM:  Well, to show Mr.
8  Stevens, to see it.  I don't know who's holding
9  the exhibits over there.
10     MR. GAUSTAD:  Okay.  Thank you.
11     A.  Okay.  I have it in front of me.
12     Q.  (By Ms. Bernheim) Okay.  So, and I'm
13 just going to represent that this is just a
14 selection, we received a stack of invoices, we
15 just took a sampling of them, and I just want
16 to, Mr. Stevens, if you could just identify
17 what these invoices are?
18     A.  Okay.
19     Q.  On the -- go ahead.  Sorry.
20     A.  If you look at SMND 0141.  Okay?
21     Q.  Sure.
22     A.  That's a banner, I believe that's, I
23 believe that's what hangs outside of a
24 building.
25     Q.  Okay.  So these are the types of

RICHARD STEVENS                                                     June 3, 2008

### 38

1  point of purchase items you're referring to?
2      A.  Yes.
3      Q.  Now if you could look at 0142.
4      A.  Okay.
5      Q.  And that is an invoice that says
6  it's for November -- well, let me not say that,
7  11 dash 06, which I'm assuming is November '06,
8  licensing fees.  Is that correct?
9      A.  Uh-huh.
10     Q.  Okay.  So these are the types of
11 invoices that Restonic would send to you.  Is
12 that correct?
13     A.  Uh-huh.
14     Q.  Now if we look back really fast on
15 0141, --
16     A.  Okay.
17     Q.  -- that invoice indicates that it
18 was sold to Restonic Grand Forks, North
19 Dakota.  That is Stevens Mattress.  Is that
20 correct?
21     A.  Right.
22     Q.  And it was shipped to a Ralph Rezac
23 in Eden Prairie, Minnesota?
24     A.  Yes.
25     Q.  Do you know who that is?

### 39

1      A.  He works for me.
2      Q.  Okay.  And he works for you in
3  Minnesota?
4      A.  Yes.
5      Q.  Okay.  And do you have manufacturing
6  facilities in Minnesota, or what does he do
7  exactly?
8      A.  He's a sales representative that's
9  based out of Minneapolis.  Eden Prairie is a
10 suburb of Minneapolis.
11     Q.  What areas, what --
12     A.  We have no areas, we have no areas
13 at all.
14     Q.  So there's no particular area that
15 you focus your sales in?
16     A.  We have no areas.  We sell anyplace,
17 you know.
18     Q.  So are you free to sell anywhere in
19 the country?
20     A.  Yes.
21     Q.  Do you sell in Illinois?
22     A.  We can sell anyplace in the U.S.,
23 yes.
24     Q.  But do you, do you actively sell in
25 the state of Illinois?

### 40

1      A.  No, we do not.
2      Q.  Have you ever sold in the state of
3  Illinois?
4      A.  Not to the best of my knowledge.
5      Q.  Okay.  Now pursuant to the
6  sublicense agreement, which we've already
7  identified, you pay royalties, correct?
8      A.  Yes.
9      Q.  Okay.  And, and where, how do you
10 pay those royalty payments?
11     A.  By check.
12     Q.  Okay.  And where do you send the
13 checks?
14     A.  To Restonic corporate office.
15     Q.  And that's located in Illinois?
16     A.  That's correct.
17     Q.  And how often do you pay royalties?
18     A.  I believe it's once a month.
19     Q.  I'm sorry, was that once a month?
20     A.  I believe that's right.
21     Q.  So once a month you send a check to
22 Restonic in Illinois?
23     A.  Correct.
24     Q.  And when you joined, when Stevens
25 Mattress first became a licensee in 1990, or

### 41

1  early 1990, were you paying royalties?
2      A.  Yes.
3      Q.  And how did you pay the royalties
4  back then?
5      A.  I believe it was to Restonic.
6      Q.  By check?
7      A.  By check, yes.
8      Q.  That you mailed to Illinois?
9      A.  Right.
10     Q.  So for at least the last 17 years
11 you've been sending checks to Restonic in
12 Illinois on a monthly basis.  Is that correct?
13     A.  Yes.
14     Q.  Now you stated a minute ago that you
15 can sell anywhere in the country, Stevens
16 Mattress Manufacturing can sell products
17 anywhere in the country including the state of
18 Illinois, correct?
19     A.  Um-hum.
20     Q.  Now do you have, does Stevens
21 Mattress have any contracts with any Illinois
22 residents for the sale of mattresses?
23     A.  No.
24     Q.  Do you have any contracts -- I'm
25 sorry, for the purpose of this depo I'm talking

## 42

1  about Stevens Mattress, unless I specifically
2  refer to you individually, Mr. Stevens, so
3  we'll avoid the issue of who the you is.
4       Does Stevens Mattress have any
5  contracts with any Illinois residents for the
6  sale of any other product?
7       A.  No.
8       Q.  Now, Mr. Stevens, personally, have
9  you ever traveled to the state of Illinois to
10 sign a contract?
11      A.  No.
12      Q.  Okay.  Mr. Stevens, have you ever,
13 on behalf of yourself personally, or on behalf
14 Stevens Mattress Manufacturing, attended any
15 meetings in Illinois?
16      MR. GAUSTAD:  Well, I'm going to
17 object, because -- to the form of the question,
18 because you've got two, I mean, you just
19 defined what you was.  I mean, I think it might
20 be easier, for clarity for Mr. Stevens, to
21 understand who you're referring to.
22      MS. BERNHEIM:  Point taken.  I'll
23 break it into two.
24      MR. GAUSTAD:  Thank you.
25      Q.  (By Ms. Bernheim)  Mr. Stevens, have

## 43

1  you personally ever attended any meetings in
2  the state of Illinois?
3       MR. GAUSTAD:  Are you --
4       A.  I really don't, I don't even know
5  how to answer that.
6       Q.  (By Ms. Bernheim)  Well, I
7  respectfully -- I believe a yes or no would
8  probably be a start.
9       MR. GAUSTAD:  I'm going to object to
10 the form of the question.  One, it -- are you
11 referring, as I understand it, you're referring
12 to him personally?
13      MS. BERNHEIM:  I'm referring to him
14 personally as ever attending a meeting.
15      MR. GAUSTAD:  Then are you
16 referring -- then I'm going to object to the
17 form of the question, because a meeting, I
18 mean, are you talking social meeting, business
19 meetings, what are you referring to?
20      Q.  (By Ms. Bernheim)  Ever attended a
21 meeting with a member of, first, let's start
22 with a member of Restonic in the state of
23 Illinois, meaning an officer, a director,
24 another licensee?
25      A.  I don't, I do not recall doing that.

## 44

1  Personally I --
2       Q.  So you don't recall ever having
3  attended a meeting for Restonic in the state of
4  Illinois?
5       A.  Personally.
6       Q.  Have you attended a meeting in the
7  state of Illinois on behalf, representing
8  Stevens Mattress Manufacturing with -- I'm
9  sorry, that's an awkward question.
10      Have you attended an official
11 Restonic meeting, be it with other licensees,
12 with members of the board, presidents,
13 etcetera, as a representative of Stevens
14 Mattress, in the state of Illinois?
15      A.  Well, yes.
16      Q.  When is the, do you recall when you
17 attended these meetings, this meeting or
18 meetings?
19      A.  I, I don't recall the dates.
20      Q.  Do you recall the most recent one
21 you attended?
22      A.  I, I can't remember them.  I really
23 can't recall the dates of that.
24      Q.  Have you attended a meeting in the
25 last five years?

## 45

1       A.  I can't recall the dates of it.
2       Q.  Can you recall, a ballpark, how many
3  times you may have attended a meeting, not the
4  dates, just how many times?
5       A.  I real -- I really can't recall
6  that.
7       Q.  Have you ever, has Stevens Mattress
8  Manufacturing ever sent any of its employees to
9  a Restonic meeting in Illinois?
10      A.  Yes.
11      Q.  How often?
12      A.  There's a gentleman that works for
13 me that is on the marketing committee, which
14 goes -- I don't, I don't know how many times he
15 goes there, but, you know, it's probably, you
16 know, you know, maybe once or twice a year.
17 I'm not totally positive there how many times
18 he goes.
19      Q.  What is that gentleman's name?
20      A.  Ken Akers.
21      Q.  A-k-e-r-s?
22      A.  Right.
23      Q.  And, and where does Mr. Akers
24 reside?
25      A.  In Ankeny, Iowa.

RICHARD STEVENS                                                      June 3, 2008

---

**46**

1    Q.   And what is his job title?
2    A.   Sales manager.
3    Q.   Sales manager.
4         Do you have any sales managers
5    located in the state of Illinois?
6    A.   No.
7    Q.   Mr. Stevens, have you personally
8    ever attended a product development meeting for
9    Restonic in Illinois?
10   A.   Explain what you mean by product
11   development committee or meeting?
12   Q.   A meeting, a meeting where there's a
13   discussion with members of Restonic about
14   different products that the company's going to
15   offer.
16   A.   I've been to meetings with, with
17   flammability issues, but I don't recall of
18   specific products.
19   Q.   And when you went to the
20   flammability issue meeting, were you
21   representing Stevens Mattress?
22   A.   Yes.
23   Q.   Do you recall when you attended the
24   flammability issues meeting?
25   A.   There was some in 2006 and last year

---

**47**

1    in, last year in, probably, it was either, oh,
2    May, probably sometime in May.
3    Q.   Of '07?
4    A.   Of '07, yes.
5    Q.   And you said there was some in 2006.
6    What, were there more than one?
7    A.   I, I think there was only one.
8    Q.   Okay.  And do you recall what month
9    in '06 or --
10   A.   I think it was in, in the autumn
11   sometime.
12   Q.   Okay.  Have you ever attended on
13   behalf, as a representative of Stevens
14   Mattress, a design committee meeting in
15   Illinois for Restonic?
16   A.   I don't understand what you mean by
17   design.
18   Q.   A meeting where the discussion was
19   along the lines of the design of a product or,
20   or the direction the -- Restonic was going to
21   take, any kind of corporate decisions along
22   those lines?
23   A.   I would have attended meetings with
24   the development of a product, but not, not, you
25   know, of, of determining like the different

---

**48**

1    components we'd use in a flammability issue.
2    Q.   Right.
3         Would, would the development of a
4    product meeting be a different meeting than the
5    flammability issue?
6    A.   They're two different things, I
7    believe.
8    Q.   So you said --
9    A.   I'm really not sure, I'm not sure --
10   you're really stating specifically, you know,
11   you're, I think you're kind of crossing lines.
12        If you're looking, what I'm talking
13   about is, actually, we're saying that you use
14   this, you know, this type of material would be
15   the best and the most cost effective to use in
16   a mattress to prevent it from burning and, and
17   I think you're asking is, is it, this the
18   package that we sell to the public.
19        And I, I don't do anything with that
20   package to the public deal.
21   Q.   So when you say that you would have,
22   you said a few minutes ago you would have
23   attended a product development meeting, does
24   that mean -- what do you mean by that?  You're
25   talking about what you just spoke of with the

---

**49**

1    flammability issue or is that --
2         MR. GAUSTAD:  And I'm going to
3    object to the form of the question, because
4    this line of questioning, I believe, dealt with
5    these meetings that occurred in Illinois.  Is
6    that the -- and so I'm going to object to the
7    form of the question as to whether now you're
8    expanding this to include meeting --
9         MS. BERNHEIM:  We're not, we're not
10   expanding it.  I'm just -- you know, the client
11   has testified he didn't attend a product
12   development meeting, then he said he did.  I'm
13   trying to find out what meetings he's attended
14   in Illinois.
15        MR. GAUSTAD:  Okay.
16   Q.   (By Ms. Bernheim)  So --
17   A.   The meetings, the meetings I
18   attended, attend, that I'm part of, are how to
19   develop the product so that it meets the
20   federal flammability issues.
21        And that could be -- you could, I
22   mean, that's what, that's what -- you can call
23   it a product, you can call it, you know,
24   several different names.  I don't know what you
25   want to classify it as, but the meetings that I

---

**50**

1  would have attended would have been
2  specifically for the different flammability
3  issues.
4      And then I attended, you know, a
5  part of that, too, was attending the, the
6  actual, at the Underwriters Laboratory of
7  watching the mattresses being tested to see if
8  they passed the --
9      Q. Where, where was that laboratory?
10     A. It's in, in Chicago. It's UL
11 laboratories. Underwriters Laboratory.
12     Q. And when did you do that, when did
13 you attend that laboratory?
14     A. Probably last May.
15     Q. How many times did you go there?
16     A. It was for two days, two days, I
17 think it was.
18     Q. So you went one time for two days?
19     A. Right.
20     Q. So let me just get to the --
21     A. No, let me take that back. There
22 might have been other times earlier, earlier
23 on, but -- (no further response.)
24     Q. So let's just, let's just discuss a
25 little bit further. Did you, as a

**51**

1  representative of Stevens Mattress
2  Manufacturing Company, ever attend a licensing
3  meeting? And by that I mean a meeting where
4  all the licensees get together in Illinois to
5  discuss the company or to take care of
6  corporate business affairs?
7      A. Have I ever attended one of those
8  meetings?
9      Q. Yes.
10     A. Yes, I have.
11     Q. Okay. Do you recall how many of
12 those meetings you attended?
13     A. No.
14     Q. More than five?
15     A. I just said I don't recall.
16     Q. Do you recall the last time you
17 attended one of those meetings?
18     A. No, I do not specifically.
19     Q. Have you ever attended any of the
20 Sleep Alliance meetings on behalf of -- well,
21 strike that.
22     Have you ever attended any of the
23 Sleep Alliance meetings on behalf of Upper
24 Midwest Sleep, LLC?
25     A. In the state of Illinois?

**52**

1      Q. Yes, in the state of Illinois.
2      A. I, I don't think so.
3      Q. Has Sleep Alliance ever held any
4  meetings in the state of Illinois?
5      MR. GAUSTAD: I'm going to object.
6  I think it's been asked and answered, but --
7      Q. (By Ms. Bernheim) You can still
8  answer.
9      MR. GAUSTAD: Yeah.
10     MS. BERNHEIM: And I apologize if
11 it's been asked.
12     MR. GAUSTAD: No, I understand.
13     A. I don't believe there has been.
14     Now remember, I'm not a member of
15 Sleep Alliance for the last six months, so --
16 (no further response.)
17     Q. (By Ms. Bernheim) All right. So
18 obviously I limit that question to up until the
19 time that you were no longer involved.
20     Okay. Did you ever receive, on
21 behalf of Stevens Mattress, any training in the
22 state of Illinois as an RMC licensee?
23     A. What do you mean by training?
24     Q. Training on products, training on
25 manufacturing, flammability training.

**53**

1      A. Yes, I'm sure.
2      Q. You recall how often you received
3  that training?
4      A. No.
5      Q. Do you recall the last time you
6  would have gone to Illinois to receive
7  training?
8      A. I, I don't recall.
9      Q. Have you ever sent, has Stevens
10 Mattress ever sent any of its employees to
11 attend training with Restonic in Illinois?
12     A. I'm sure I have.
13     Q. I'm going to ask you, Mr. Stevens,
14 to please look at what plaintiffs have marked
15 as Exhibit D.
16     MS. BERNHEIM: I'm just going to
17 ask, it looks like -- do you all have Bates
18 document, Bates stamp number SMND 0362, did I
19 send that? Because I know I marked, I marked D
20 starting on SMND 0363, but I meant to do that
21 on two, so I'm wondering if you have it?
22     MR. GAUSTAD: It wasn't, it wasn't
23 e-mailed to us.
24     MS. BERNHEIM: So you start at 0363?
25     MR. GAUSTAD: Your Exhibit D that

June 3, 2008

RICHARD STEVENS

---

**54**

1  was e-mailed to me, that I have, starts at SMND
2  0363.
3  　　　MS. BERNHEIM: Can I ask you just to
4  look at the last page of Exhibit C and see what
5  that is? Is that, by chance, the VISA account
6  summary?
7  　　　MR. GAUSTAD: The last Exhibit C
8  that, that you e-mailed to me is SMND 0146.
9  　　　MS. BERNHEIM: Okay. Then that's my
10  mistake.
11  　　Q. (By Ms. Bernheim) Okay. So let's
12  just look at 0363.
13  　　　Mr. Stevens, I am looking at, and
14  correct me if I'm wrong, a business card
15  statement for a Chase VISA, the date of the
16  account, of the invoice is 10 -- or the
17  statement is 10-29-07 to 11-28-07. Is that
18  correct?
19  　　A. Yeah.
20  　　Q. Okay. And I'm looking at the top,
21  is this for a Ken Lakes?
22  　　A. Akers.
23  　　Q. Akers, okay.
24  　　　So that's the same Akers, Mr. Akers
25  we were talking about before?

---

**55**

1  　　A. Yes.
2  　　Q. Okay. So on 11 -- if you look down
3  towards the bottom, on November 17 there's a
4  charge, Doubletree Hotel O'Hare, Rosemont,
5  Illinois. Do you see that?
6  　　A. Um-hum.
7  　　Q. Now do you recall what that was for,
8  besides a hotel in Chicago? Is that Mr. Akers
9  going to Chicago?
10  　　A. Yes.
11  　　Q. Okay. And what would be the purpose
12  of that?
13  　　　MR. GAUSTAD: If, if he knows. I
14  mean, I object --
15  　　A. I don't know what it, --
16  　　Q. (By Ms. Bernheim) If you know.
17  　　A. -- what specifically it would be
18  for, no.
19  　　Q. Can you give me a reason why Mr.
20  Akers would be traveling to Chicago?
21  　　　MR. GAUSTAD: Well, I'm going to
22  object to the form of the question, because
23  you're asking him to speculate.
24  　　　MS. BERNHEIM: Okay. Strike that.
25  　　Q. (By Ms. Bernheim) How often, to the

---

**56**

1  best of your knowledge, does Mr. Akers go to
2  Illinois?
3  　　A. I would have to look that up.
4  　　Q. To the best of your knowledge --
5  　　　Okay. If you were going to look
6  that up, what, what would you consult to find
7  out that information?
8  　　A. Well, I would talk to him.
9  　　Q. Are you aware whether -- if Mr.
10  Akers was going to travel to Illinois, would he
11  tell you first, normally?
12  　　A. No.
13  　　Q. And are you aware of Mr. Akers
14  having traveled to Illinois in the past?
15  　　A. Yes.
16  　　Q. And do you recall what he traveled
17  to Illinois for?
18  　　A. He's, he would be on the, he's on
19  some of the marketing arms of the Restonic.
20  　　Q. Would he be going for, he has gone
21  for marketing meetings?
22  　　A. Uh-huh.
23  　　Q. If you would please turn to page
24  Bates stamp number SMND 0365, that's still a
25  part of Exhibit D.

---

**57**

1  　　A. Okay.
2  　　Q. And I'm looking at an e-mail dated
3  May 7, 2008 -- I'm sorry, yes, which has a
4  forwarded message attached to it dated
5  February 11, 2008. Do you see that?
6  　　A. Yes.
7  　　Q. And if we look over at the next
8  page, which is Bates stamp SMND 0366, indicates
9  a flight reservation for you, Mr. Stevens,
10  traveling to Chicago O'Hare on February 12,
11  2008. Do you see that?
12  　　A. Um-hum.
13  　　Q. Do you recall -- well, first of all,
14  did you, did you travel to Chicago on February
15  12, 2008?
16  　　A. Yes.
17  　　Q. Okay. And do you recall why you
18  went to Chicago on February 12, 2008?
19  　　A. The purpose of the meeting was to
20  meet with Stylution.
21  　　Q. Stylution.
22  　　　And what is Stylution?
23  　　A. It's a, it's a mattress company that
24  imports and sells from China and we do some
25  work for them.

---

**58**

1    Q.    Who's we?
2    A.    My -- Stevens Mattress.
3    Q.    And who attended that meeting?
4    A.    Myself and Ken Akers and Ed Scott.
5    Q.    Who is Ed Scott?
6    A.    Stylution.
7    Q.    He works for Stylution?
8    A.    Right.
9    Q.    Okay.  What kind of work does
10   Stevens Mattress do for Stylution?
11   A.    They would, they would sell people
12   contain -- you know, containers of mattresses
13   and they would ask us to make box springs for
14   them.
15   Q.    Now is that something that, did you
16   work in, in conglomeration with Sleep Alliance
17   or is that just Stevens Mattress that did that?
18   A.    That's Stevens Mattress.
19   Q.    Now when you made the, when Stevens
20   Mattress produced the box springs, would those
21   be shipped to Illinois?
22   A.    No.
23   Q.    Where would they go?
24   A.    I believe there was orders to, one
25   order to Kansas and maybe like three to four

**59**

1    orders in Minnesota.
2    Q.    So you were contracting with an
3    Illinois company, Stylution, and then having it
4    shipped somewhere else.  Is that correct?
5         MR. GAUSTAD:  I'm going to object to
6    the foundation.  I don't know that there's been
7    any foundation as to where Stylution exists.
8    Q.    (By Ms. Bernheim) Okay.  Can I, I'm
9    going to go a little bit out of turn, can I
10   have you please, Mr. Stevens, look at Exhibit
11   I, and that's Bates stamped SMND 0491 through
12   SMND 0494.
13        MR. GAUSTAD:  You said 0491 through?
14        MS. BERNHEIM:  494.
15   Q.    (By Ms. Bernheim) And correct me if
16   I'm wrong, Mr. Stevens, but I'm looking at what
17   appears to be an invoice from Upper Midwest
18   Sleep, LLC, to Stylution USA.  Is that correct?
19   A.    Yes.
20   Q.    Now just for clarification purposes,
21   you testified just a few minutes ago that it
22   was Stevens Mattress that conducted business
23   with Stylution, yet, according to this invoice,
24   it appears it's Upper Midwest Sleep, LLC.
25        So can you clarify that for me,

**60**

1    please?  Why would Upper Midwest Sleep, LLC's
2    name be on the invoice if it was Stevens
3    Mattress?
4    A.    I would have to think that through.
5    Q.    Is there anything that you have to
6    consult to help you refresh your recollection
7    on that?
8    A.    Well, that's the name of, that's the
9    name of the company that, you know, Upper
10   Midwest Sleep is the name of the company that,
11   you know, Steven -- I really don't have an
12   explanation for it.
13   Q.    Okay.  Now underneath the section of
14   the invoice where it says Sold To, it says
15   Stylution USA, 1142 Rose Road, Lake Zurich,
16   Illinois, 60047.  Is that correct?
17   A.    Yeah.
18   Q.    Now is it your understanding that
19   Stylution USA is located in Illinois?
20   A.    Yes.
21   Q.    Okay.  Now when you testified just a
22   few minutes ago that you conducted business
23   with Stylution in that they brought mattresses
24   over and Stevens Mattress made box springs for
25   those mattresses.  Is that correct?

**61**

1    A.    Um-hum.
2    Q.    So did you enter into a contract for
3    the manufacturing of the box springs, did
4    Stevens Mattress enter into a contract for the
5    manufacture of the box springs with Stylution
6    USA?
7    A.    Not a contract, no.
8    Q.    What, what kind of an agreement did
9    you have?
10   A.    They asked if we would do the, do
11   the work and ship them to these places in
12   Minnesota and, around there, and we agreed to
13   do it.
14   Q.    You had no written agreement --
15   A.    No.
16   Q.    -- with Stylution USA?
17   A.    No.
18   Q.    Are there any e-mails between you
19   and Stylution USA that discuss the terms of
20   this agreement?
21   A.    Not that I'm aware of.  There
22   probably is someplace.  I'm not aware of any,
23   though.
24   Q.    So, in other words, whatever
25   agreement you had would just be reflected by

RICHARD STEVENS

June 3, 2008

---

**62**

1  the invoices you provided to us?
2      A.  I'm sure we had, we had someplace
3  along the line of a, of a price and all that
4  there, you know, and -- but I don't recall
5  where any of it is.
6      Q.  I'm going to ask you, please, now to
7  look at Exhibit E, which plaintiffs have marked
8  as Bates stamp number SMND 0061.
9      A.  Okay.
10      Q.  Mr. Stevens, do you have that?
11      A.  Yes.
12      Q.  Okay.  And it looks to me that this
13  is a Letter of Intent dated April 28, 2008,
14  between, I apologize if I mispronounce, Evenson
15  or Evenson Peterson Consulting --
16      A.  Okay.
17      Q.  -- and Upper Midwest Sleep.
18          And according to this Letter of
19  Intent, the Description of Services is, is that
20  the consultant will provide client with
21  engineered labor standards that reflect the
22  actual time required to produce a mattress or
23  foundation unit.
24          Mr. Stevens, can you explain a
25  little bit about the purpose of this Letter of

---

**63**

1  Intent?
2      A.  What, what the purpose of this is
3  that we're trying to upgrade our software
4  system and this lady is an industrial engineer,
5  which can help specifically get our time, or
6  cost of direct labor and indirect labor in the
7  products.
8      Q.  And is it, is it Evenson or Evenson?
9      A.  Evenson.
10      Q.  And so, and Evenson Peterson
11  Consulting, according to this Letter of Intent,
12  is located in Illinois, correct?
13      A.  Correct.
14      Q.  And how did it come to be that you
15  began a relationship or were put in touch with
16  Evenson Peterson Consulting?
17      A.  She used to be, work with Restonic
18  as an industrial engineer, and then she was an
19  interim president for Restonic.
20      Q.  Now did you approach Miss Evenson
21  about hiring her as a consultant?
22      A.  It was through the software people
23  that we, that we use and, and she does some
24  work for them and, you know, through those
25  people.  And that was in, I believe I talked to

---

**64**

1  her in Baltimore, at the trade show, back in
2  March.
3      Q.  And did you negotiate any terms in
4  this Letter of Intent?
5      A.  You know, what she would charge us
6  to, to do the work, yes.
7      Q.  Did you do that by telephone?
8      A.  I believe she did, yeah.  I did not
9  do the negotiation personally myself, no.
10      Q.  Who did the negotiation?
11      A.  Pardon?
12      Q.  I'm sorry.  Who did the negotiation?
13      A.  One of the ladies that works for me.
14      Q.  And by telephone.  And Miss Evenson
15  was located in Illinois at the time?
16      A.  Right.
17      Q.  And Miss Evenson generated this
18  Letter of Intent from her to you?
19      A.  To our office, yes.
20      Q.  How did you receive it, by mail?
21      A.  I don't know how we received it.
22      Q.  I'm going to ask you to please turn
23  to what plaintiffs have marked as Exhibit F,
24  and that is Bates stamp number SMND 0063
25  through SMND 0067.

---

**65**

1          Do you have those in front of you?
2      A.  Yes, I do.
3      Q.  Okay.  And I'm just going to
4  represent that what you're looking at is a set
5  of invoices from SFG, which is Service Forms
6  and Graphics, Inc.  Is that correct?
7      A.  Yes.
8      Q.  And, Mr. Stevens, is it your
9  understanding that SFG is located in Darien,
10  Illinois?
11      A.  That's what it says here, yes.
12      Q.  And what does SFG, what services --
13  and let me just, for the record, it reflects
14  on, this is an invoice directed to Barb
15  Litzinger at Upper Midwest Sleep, LLC.  Is that
16  correct?
17      A.  Um-hum.
18      Q.  What services, Mr. Stevens, does SFG
19  provide to Upper Midwest Sleep, LLC?
20      A.  Well, it must be checks.
21      Q.  Checks.
22          Now does SFG also provide checks to
23  Stevens Mattress Manufacturing?
24      A.  I'm not sure they do.
25      Q.  Are you aware of any other entity

---

RICHARD STEVENS

June 3, 2008

66

1  that may provide checks to Stevens Mattress
2  Manufacturing?
3      A.  Probably just our local bank.
4      Q.  Do you recall how long Upper Midwest
5  Sleep has been receiving checks from SFG?
6      A.  I, I do not know.
7      Q.  I'm going to ask you now, please, to
8  turn to what plaintiffs have marked as Exhibit
9  G, and those are documents Bates stamp numbers
10 SMND 0068 through SMND 0071.
11     A.  Okay.  I have those.
12     Q.  And there's an invoice from A. Lava
13 & Son Company, located at 4800 South Kilbourn
14 Avenue in Chicago, Illinois, and it's sent to,
15 it indicates sold to Upper Midwest Sleep
16 Alliance -- I'm sorry, Upper Midwest Sleep,
17 LLC, Restonic, and shipped to Restonic.  Is
18 that correct?
19     A.  Yeah.
20     Q.  What services does -- strike that.
21         Is it your understanding, Mr.
22 Stevens, A. Lava & Son Company --
23     A.  Could you repeat that?  You were
24 cutting out.
25     Q.  Sorry.

67

1         Is it your understanding, Mr.
2  Stevens, that A. Lava & Son Company is located
3  in Chicago, Illinois?
4      A.  Yes.
5      Q.  Okay.  And what services does A.
6  Lava & Son Company provide to Upper Midwest
7  Sleep, LLC and/or Restonic, located in Grand
8  Forks, North Dakota?
9      A.  They supply us with, you know, with
10 foam, some types of foam, you know, time to
11 time we buy thread from them.
12     Q.  What was the last thing, from time
13 to time you buy what from them?
14     A.  Thread.
15     Q.  Thread, okay.
16     A.  You know, different components.
17 They specialize in certain types of components
18 that are, you know, like not easy for us to
19 get, but they have them and, you know, that's
20 why we buy from them from time -- you know,
21 different items.
22     Q.  Do you recall how long you've been
23 buying from A. Lava & Son Company?
24     A.  Oh, I'm sure that our -- you know,
25 all of my life.  You know, you know, as far as,

68

1  as long as I can ever remember, we've bought,
2  we've done business with these people 30,
3  40 years.
4      Q.  40 years?
5      A.  30 to 40 years.
6      Q.  So prior to becoming a sublicensee
7  of Restonic, Stevens Mattress was in the
8  bedding industry?
9      A.  Correct.
10     Q.  I'd ask you, please, to turn to what
11 plaintiffs have marked as Exhibit H, which
12 is --
13         MR. GAUSTAD:  Miss Bernheim, we've
14 been going for a little over an hour, just
15 about an hour and a half, and I may need to
16 have a break here, just because I've had a cup
17 of water.  Would it be -- could I indulge you
18 to take just five minutes?
19         MS. BERNHEIM:  Absolutely.
20         MR. GAUSTAD:  Thank you.
21         MS. BERNHEIM:  We'll reconvene in --
22 what time do you have?
23         MR. GAUSTAD:  I've got -- we'll just
24 keep the phone on.
25         MS. BERNHEIM:  I'll just come back

69

1  in five minutes by my watch time and hopefully
2  you guys will be back.  And we'll wait.
3         MR. GAUSTAD:  Thank you.
4         (Whereupon, a brief recess was
5  taken.)
6         MR. GAUSTAD:  We're back.
7      Q.  (By Ms. Bernheim) I think I left
8  off, I asked you if you could please look at
9  what plaintiffs have marked as Exhibit H.
10     A.  Okay.
11     Q.  And that is documents Bates stamped
12 SMND 0139 through SMND -- the last one doesn't
13 have a Bates stamp number.
14         MR. GAUSTAD:  I believe it does,
15 just right above the --
16         MS. BERNHEIM:  Did I miss it?  I
17 don't see it.
18         MR. GAUSTAD:  I'm looking for it,
19 too, here.
20         Is that the document that at the
21 bottom right-hand corner it says, Received 5-9,
22 2006, and is --
23         MS. BERNHEIM:  That would be the
24 last one I was looking at, that I have, that's
25 why I could identify it as Exhibit H.  It seems

Ruth Ann Johnson - Court Reporter Service
(701) 775-4092

RICHARD STEVENS                                              June 3, 2008

---

**70**

1    that, for whatever reason, it didn't get a
2    Bates stamp number on.
3           MR. GAUSTAD:  Yeah.  And mine
4    doesn't really have a Bates number either.
5           MS. BERNHEIM:  Well, we don't really
6    need that specific page anyway, so . . .
7       Q.  (By Ms. Bernheim)  And for the
8    record, Mr. Stevens, again, please correct me
9    if I'm wrong or if you're looking at something
10   different, I'm looking at what appears to be an
11   invoice from B & C International located at
12   6624 Weather Hill Drive, Willowbrook, Illinois,
13   60527, and this is directed to customer Stevens
14   Mattress Manufacturing, Inc.  Is that correct?
15      A.  Yeah.
16      Q.  Okay.  So is it your understanding,
17   Mr. Stevens, that B & C International is in
18   fact located in Willowbrook, Illinois?
19      A.  Yes.
20      Q.  Okay.  And what services does, or
21   did B & C International provide to Stevens
22   Mattress Manufacturing?
23      A.  What Ben does is that he is, he
24   lines up product in China that we import.
25      Q.  Okay.  So we meaning Stevens

---

**71**

1    Mattress Manufacturing imports product from
2    China?
3       A.  Right.
4       Q.  And B & C International is, for all
5    intents and purposes, like the identifier, the
6    bill man type --
7       A.  Could you repeat that again, please?
8       Q.  Okay.  Is, is -- I'm trying to
9    understand exactly what B & C International's
10   purpose is.
11          Do they act as your agent, as
12   Stevens Mattress Manufacturing's agent in
13   China?
14      A.  No.  He's an independent and we buy
15   it from him.
16      Q.  Okay.  So he locates products in
17   China and you buy through, and Stevens buys
18   through him?
19      A.  Right.
20      Q.  And how long has B & C International
21   been providing Stevens with product from China?
22      A.  Probably, I'm just trying to think
23   here, probably two years.
24      Q.  Two years.
25          And has B & C, in that two-year

---

**72**

1    period of time, always been located in
2    Illinois?
3       A.  I believe he has.
4       Q.  And how did you come to have a
5    relationship with, how did Stevens come to have
6    a relationship with B & C International?
7       A.  Just through, through trade shows.
8    I don't recall how it was, but it's through
9    trade shows somehow I got to know him.
10      Q.  Do you have any type of agreement or
11   contract with B & C International for the --
12   that governs your relationship with them?
13      A.  No.
14      Q.  So for all intents and purposes, the
15   terms of these invoices govern the relationship
16   that you have with them?
17      A.  Yes.  Just invoice to invoice.  We
18   don't, you know, it's just periodically when we
19   buy from them, too.
20      Q.  And when you, when you need product,
21   do you contact them?
22      A.  Yes.
23      Q.  And how do you do that, do you by
24   telephone or --
25      A.  I'm sure that's how we do it.

---

**73**

1       Q.  Have you ever had a, do you, either
2    you personally as Richard -- well, have you
3    personally ever had a meeting with B & C
4    International in Chicago?  And by you I mean
5    Richard Stevens.
6       A.  No.
7       Q.  And have any of the employees of
8    Stevens Mattress Manufacturing ever met with
9    anyone from B & C International in Illinois?
10      A.  No, I don't believe so.  I'm almost
11   positive no.
12      Q.  Okay.  Now previously we had a
13   conversation about flammability program.  Is
14   that the right way to describe, the Restonic
15   flammability program, is that the right way to
16   describe that?
17      A.  Yeah, I guess that's as -- yeah.
18      Q.  Okay.  Can I ask you to look at what
19   plaintiffs have marked as Exhibit J.
20      A.  Okay.
21      Q.  And that, for the record, is
22   document Bates stamp number SMND 0062.
23          And also, for the record, what I'm
24   looking at -- and, Mr. Stevens, if you're
25   looking at something different, please let me

---

RICHARD STEVENS

June 3, 2008

**74**

1  know -- a Restonic Executive Bulletin dated
2  July 12, 2006, to all U.S. licensees, carbon
3  copied to the manufacturing committee from
4  Carlene Evenson, for Evenson Peterson,
5  regarding the flammability program.  Is that
6  correct?
7      A.  Um-hum.
8      Q.  Okay.  Mr. Stevens, what is your
9  understanding of the Restonic flammability
10  program?
11      A.  What -- you know, well, first of
12  all, the flammability program is a federal
13  mandated, not, not Restonic.
14      Q.  Okay.
15      A.  So that's, that's the first thing of
16  it.
17          And so, I mean -- okay.
18      Q.  Now looking back at Exhibit J, the
19  Executive Bulletin, in the end of the first
20  line into the second, indicates that, that RMC
21  has entered into an agreement with Lilly
22  Management Group.  What, what is, who is, what
23  is your understanding of who Lilly Management
24  Group is?
25      A.  Lilly Management Group is a group of

**75**

1  individuals that would take and go to different
2  vendors and test their product and then they
3  would say, okay, this, this certain number --
4  combination of products should work for your
5  flammability thing.
6          And they would do, you know, instead
7  of every Restonic and every -- you know,
8  they're way beyond just Restonic, they
9  represent anybody in the United States that
10  wants to be a flam -- you know, work in their
11  flammability program.
12          And they would test certain
13  products, prototype it, you know, burn them at
14  different laboratories and say, okay, this,
15  this works.
16          And then you could purchase that,
17  that information from Lilly Management Group
18  and then test your own product against that to
19  see if you pass.
20      Q.  Okay.  Now further on, according to
21  this, this bulletin, it says that, It will be
22  required that all Restonic licensees
23  participate in this program; and that there's
24  costs associated with participating in the
25  program, correct?

**76**

1      A.  Yes.
2      Q.  Okay.  Now this agreement with Lilly
3  Management Group, did Stevens Mattress have
4  their own individual agreement with them or was
5  it a corporate agreement between Restonic and
6  Lilly?
7      A.  I'm not, I'm not sure of what, how
8  that actually worked out there.
9      Q.  Well, let me ask it this way.  Does
10  Stevens Mattress Manufacturing have an
11  agreement with Lilly Management Group?
12      A.  I, I do not recall if we have,
13  specifically have an agreement with Lilly or if
14  it's all part of, through Restonic Mattress
15  Company.
16      Q.  Did Stevens Mattress Manufacturing
17  have any involvement in the negotiation of the
18  agreement with Lilly Management?
19      A.  No, we did not.
20      Q.  Did you participate in the program
21  as is referenced in this Executive Bulletin?
22      A.  Did we purchase the program?
23      Q.  Well, I used the word participate.
24  If participate means purchase, then I'm not
25  sure what you had to do to participate.

**77**

1      A.  Yeah.  We, we participated in this
2  program, yes.
3      Q.  Okay.  So you made that payment?
4      A.  Yes.
5      Q.  Okay.  How did Stevens Mattress pay
6  Lilly Management Group?
7      A.  By check.  I don't know how we did
8  it, I mean, who the check was made out to and
9  all that, I do not know.
10      Q.  So do you know where you, do you
11  know where Stevens Mattress would have sent the
12  check?
13      A.  No, I do not.
14      Q.  Now you spoke previously, when you
15  testified, you said that you went to
16  Underwriter Laboratories last May --
17      A.  Uh-huh.
18      Q.  -- to observe flammability testing.
19  Is that correct?
20      A.  That's correct.
21      Q.  Now when you did that, was that on
22  behalf of Stevens Mattress Manufacturing?
23      A.  Yes.
24      Q.  Okay.  So that was not on behalf of
25  Restonic?

78

1   A.  No.
2   Q.  Have you ever conducted any
3   flammability testing or participated in any
4   flammability testing on behalf of Restonic?
5   A.  Yes.
6   Q.  When was that?
7   A.  Prob -- you know, probably some --
8   you know, I don't remember the dates offhand,
9   but it was, let's see, 2005 or something like
10  that.
11      It might have even --
12  Q.  How -- I'm sorry.
13  A.  It might have, even have started in
14  2004, because the government started it and
15  then they held -- then they put a moratorium on
16  it for a year or so, and so, you know, I
17  forget, I kind of forget the chain of events
18  there.
19  Q.  Now how did it come to be, to the
20  best of your recollection, that you
21  participated in the flammability testing on
22  behalf of Restonic?
23  A.  Because I was on the, the, the
24  committee to research the different
25  flammability products.

79

1   Q.  Does that committee have a name?
2   A.  Probably the product development --
3   not the product development committee, probably
4   the -- maybe it was the product development
5   committee, I guess that would probably be the
6   -- and our sole purpose at that time was just,
7   basically, to get through the flammability
8   program.
9   Q.  Do you recall your, your, your dates
10  of service on that committee?
11  A.  I'm still involved on that
12  committee.  And I probably started -- I, I
13  don't recall when I started, to be honest with
14  you.
15  Q.  You're still on the committee you
16  said?  I'm sorry.
17  A.  Yes.
18  Q.  Okay.  And, and I don't, you know, I
19  don't want to get -- I don't want to go to an
20  area that I've asked and answered yet, but can
21  you tell me the last time, to the best of your
22  recollection, that that product development
23  committee met?
24  A.  You mean in person?
25  Q.  I suppose.

80

1   A.  Would be, I would say it would have
2   been in December, probably 17th and something,
3   in Louisville, Kentucky.  Maybe December 13 of
4   2006.
5   Q.  How often, to the best of your
6   recollection, does that product development
7   committee meet?
8   A.  Just depends on what, you know, the
9   needs and the, you know, you know, when we need
10  to.  We, we do a lot of work by, you know,
11  conference call.
12  Q.  Okay.  Now you said that you
13  conducted flammability testing on behalf of
14  Restonic in '04, '05.  Where did that testing
15  occur?
16  A.  Underwriters Laboratory.  I'm not
17  sure of those dates, I just, I just said --
18  Q.  Approximate dates.
19  A.  -- approximately, okay?
20      And that, you know, some of the
21  preliminary testing was done at UL labs in
22  Chicago.
23  Q.  So you, you had to travel to Chicago
24  to conduct that or to observe that?
25  A.  To observe that, yes.

81

1   Q.  Were there other licensees with you?
2   A.  Yes.  I don't recall exactly who it
3   all was, though.
4   Q.  Were you compensated at all by
5   Restonic for your time for conducting the
6   testing?
7   A.  There was a certain point there
8   where, and I can't remember if I was at that
9   point or not, but lately we, we are not
10  compensated at all.  Even our expenses we pay
11  out of our own, our own, out of our own plants.
12  Q.  I thought you said just a second ago
13  there was a certain time.  Do you mean --
14  A.  I don't recall when they were,
15  though.
16  Q.  But at some point prior there was
17  compensation and that has ceased?
18  A.  Right.  And I don't recall the point
19  where it got to the point where -- I would
20  probably say sometime in early '06.
21  Q.  Okay.  Early '06.
22  A.  I'm not sure.  You know, again, it's
23  all -- the dates all run together sometimes.
24  Q.  Mr. Stevens, do you have any
25  relationship, either personally -- well, let's

RICHARD STEVENS

June 3, 2008

82

1 start with personally.
2        Do you personally have any
3 relationship with anyone at Restonic?
4        MR. GAUSTAD: I'm going to object to
5 the form of the question. I mean, it's pretty
6 broad as far as what you mean by a relationship
7 with anybody on a personal level by Mr.
8 Stevens.
9    Q. (By Ms. Bernheim) Strike that.
10        Does Stevens Mattress Manufacturing
11 have any type of business relationship with
12 Mattress Giant?
13    A. With who?
14    Q. Mattress Giant.
15    A. No.
16    Q. Has Stevens Mattress Manufacturing
17 ever had a contract with Mattress Giant?
18    A. No. I don't, I don't understand
19 where this is coming from.
20    Q. As a member of, a former member of
21 Sleep Alliance up until six months ago, so
22 during your tenure as a member of Sleep
23 Alliance, did Sleep Alliance have any type of
24 corporate relationship with Mattress Giant?
25        MR. GAUSTAD: And I'm going to

83

1 object, because the purpose of this deposition
2 is for jurisdictional purposes and the motion
3 that was presented by Mr. Stevens and Stevens
4 Mattress Manufacturing as to jurisdiction, and
5 I would object to the relevancy of this line of
6 questioning as it relates to the jurisdictional
7 question and the purpose of this deposition.
8        MS. BERNHEIM: I would respond to
9 that first by saying there's absolutely no
10 order in place right now that limits the, the
11 area we can go with in this deposition and
12 there is in fact a claim for tortious
13 interference, and this line of questioning goes
14 directly to that claim, and so I'm going to
15 move forward.
16        MR. GAUSTAD: And, and I will
17 respond that when the motion was brought, the
18 plaintiffs then requested discovery on the
19 motion, which, as I understand it, the Court
20 allowed, and so that's the basis of the
21 objection.
22        It's based upon your motion to seek
23 discovery on the jurisdictional issue.
24        MS. BERNHEIM: Okay. We're going to
25 ask the questions --

84

1        MR. GAUSTAD: Yeah, I understand,
2 Miss Bernheim. I've raised the objection.
3        MS. BERNHEIM: Okay. That's fine.
4 We're going to go forward.
5    Q. (By Ms. Bernheim) Okay.
6        MS. BERNHEIM: Actually, can I ask
7 the court reporter to read back the last
8 question I asked, please.
9        (Whereupon, the question was read
10 back by the reporter.)
11    A. The only, the only relationship that
12 was going on at that time was just they were,
13 they were looking for a vendor of some
14 alternative sleep products and I think we made
15 some, not we, but Sleep Alliance, and, you
16 know, however you want to classify that, made
17 some samples for them. And, you know, ob -- we
18 never did any business with them.
19    Q. (By Ms. Bernheim) Are, are you aware
20 whether or not Restonic was previously working
21 with Mattress Giant at the time that Sleep
22 Alliance made the samples?
23    A. I'm not sure it wasn't all together
24 there. I'm not really sure of how all that,
25 all that worked together, because I believe

85

1 Mattress Giant is located in, in, in Texas, and
2 I believe that some of the samples were made in
3 the Texas facility, but I'm not sure who did
4 what or why they did it.
5    Q. Were you present at a Restonic
6 licensee meeting in Las Vegas ever?
7        Did you ever attend a Restonic
8 licensee meeting in Las Vegas?
9    A. Yes, I believe I did.
10    Q. Okay. And that licensee meeting
11 that you attended --
12    A. I think it was a stockholders
13 meeting, not a licensee.
14    Q. Okay. Was Donna, are you familiar
15 with Donna Fabia (phonetic)?
16    A. Yes.
17    Q. Was Donna Fabia present at that
18 stockholders meeting?
19    A. I don't, I don't know. I don't
20 recall.
21    Q. Do you recall ever being present at
22 a meeting where Donna Fabia discussed
23 Restonic's relationship with Mattress Giant?
24        MR. GAUSTAD: I'm going to object to
25 the form of the question. You're going to ask

86

1  him to speculate as to what this Donna Fabia
2  would have said or not said.
3        MS. BERNHEIM:  Well, to the best of
4  his knowledge, if he was there, does he recall
5  ever being present, hearing Donna Fabia discuss
6  the relationship between Restonic and Mattress
7  Giant?
8        A.  I don't remember anything specific
9  or her even saying anything, no.
10        Q.  (By Ms. Bernheim) Do you recall how
11  Sleep Alliance made contact with Mattress
12  Giant?
13        A.  No, I don't.  Don't.
14        Q.  Give me one second.
15        MS. BERNHEIM:  Can we go off the
16  record for a few minutes here, please?
17        MR. GAUSTAD:  Yeah.
18        (Whereupon, there was discussion off
19  the record.)
20        MS. BERNHEIM:  Okay.  I have nothing
21  further.
22        MR. GAUSTAD:  Do any other, do any
23  other attorneys have any questions?
24        MR. LYMAN:  No.  Lyman, no.
25        MR. FRIEDBERG:  Friedberg, no.

87

1        MR. GAUSTAD:  I just have a couple.
2        MS. BERNHEIM:  Who is this speaking
3  now?
4        MR. GAUSTAD:  I'm sorry.  This is
5  Dan Gaustad.
6        MS. BERNHEIM:  Okay.
7
8              EXAMINATION
9  BY MR. GAUSTAD:
10        Q.  If my notes are correct, Mr.
11  Stevens, it's my understanding that the owners
12  of Stevens Mattress Manufacturing are John
13  Stevens, Brian Stevens and yourself.  Is that
14  correct?
15        A.  Yes.
16        Q.  And then there was a line of
17  questioning about managers and members of Upper
18  Midwest Sleep, LLC.  Do you recall that?
19        A.  Yes.
20        Q.  Okay.  And I believe the, if my
21  notes are accurate, there was a line of
22  questioning as to the -- or there was a
23  response by you that Upper Midwest Sleep is
24  owned by Stevens Mattress Manufacturing?
25        A.  Yes.

88

1        Q.  Okay.  Do you know, are there any
2  other owners of Upper Midwest, other than
3  Stevens Mattress Manufacturing?
4        A.  No.
5        Q.  And, and there was a line of
6  questioning as to members or managers of Upper
7  Midwest Sleep, LLC.  Do you recall that line of
8  questioning?
9        A.  Um-hum.
10        Q.  Okay.
11        A.  Yes.
12        Q.  And do you know what the difference
13  between a member and a manager is of an LLC?
14        A.  No.
15        Q.  Okay.  But as I understand, the
16  managers of Upper Midwest Sleep are John
17  Stevens, Brian Stevens and yourself?
18        A.  Correct.
19        Q.  Okay.  Then there was a number of
20  questions about --
21        MS. BERNHEIM:  I'm sorry, this is
22  Melissa, can I interrupt for just one second?
23        Did you say the managers were John,
24  Brian and Richard?
25        MR. GAUSTAD:  That was the question.

89

1        MS. BERNHEIM:  The answer was yes?
2        MR. GAUSTAD:  That was the response.
3        MS. BERNHEIM:  Okay.
4        Q.  (By Mr. Gaustad) And, and as far as
5  your service on committees with Restonic, there
6  was a number of questions about those
7  committees and, and attendance at meetings.  Is
8  it my understanding that that was in your
9  capacity as a representative of Stevens
10  Mattress Manufacturing?
11        A.  Yes.
12        MR. GAUSTAD:  Those are all the
13  questions I have.
14        MS. BERNHEIM:  I have nothing
15  further.  Thank you very much, Mr. Stevens.
16        MR. GAUSTAD:  Mr. Stevens, you have
17  a right to read and review the deposition
18  transcript.  I'd recommend that you do so.
19        THE DEPONENT:  Okay.
20        (Whereupon, the telephonic
21  deposition was concluded at 2:27 o'clock p.m.)
22
23
24
25

RICHARD STEVENS

June 3, 2008

```
                                90
1          I, RICHARD STEVENS, do hereby
2    certify that the foregoing 89 pages contain a
3    full, true and correct transcript of the
4    testimony as given by me at the aforesaid time
5    and place with corrections, if any, as noted on
6    the attached sheet or sheets.
7
8

9                        Richard Stevens

10
11
12  Dated this     day of              , 2008.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                91
1             NOTARY-REPORTER'S CERTIFICATE
2    STATE OF NORTH DAKOTA  )
3                          ) ss
     COUNTY OF GRAND FORKS  )
4          I, RUTH ANN JOHNSON, a Notary Public
5    within and for the County of Grand Forks and
6    State of North Dakota, do hereby certify:
7          That prior to being examined the
8    afore-named witness was by me sworn to testify
9    the truth, the whole truth, and nothing but the
10   truth:
11         That said telephonic deposition,
12   consisting of 89 pages of typewritten
13   materials, was taken down by me in Stenotype at
14   the time and place therein named, and was
15   thereafter reduced to typewriting under my
16   direction.
17         I further certify that I am neither
18   related to any of the parties or counsel nor
19   interested in this matter directly or indirectly.
20         WITNESS my hand and seal this 10 day of June,
21                                          2008
22
23         Ruth Ann Johnson
           Notary Public
           Grand Forks County, North Dakota
24
25   My Commission expires October 5, 2008.
```

Ruth Ann Johnson - Court Reporter Service
(701) 775-4092

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3
 4
   ROYAL SLEEP           )
 5 PRODUCTS, INC., a     )
   Florida Corporation,  )
 6                       )
          Plaintiff,     )
 7                       )
        vs.              )  No. 07 C 6588
 8                       )
   RESTONE CORPORATION,  )
 9 an Illinois           )
   Corporation, et al.,  )
10                       )
          Defendants.    )
11
12
13        The deposition of STEPHEN RUSSO, called
14 by the Plaintiff for examination, pursuant to
15 notice and pursuant to the Federal Rules of
16 Civil Procedure for the United States
17 District Courts pertaining to the taking of
18 depositions, taken before Laura E. Locascio,
19 Certified Shorthand Reporter and Notary
20 Public in and for the County of Cook, State
21 of Illinois, at 330 North Wabash Avenue,
22 Chicago, Illinois commencing at 1:40 p.m. on
23 the 14th day of July, A.D., 2008.
24
```

```
 1 APPEARANCES:
 2
 3    ZARCO EINHORN SALKOWSKI & BRITO
 4    BY:  MR. ROBERT F. SALKOWSKI
 5         Bank of America Tower
 6         100 SE 2nd Street
 7         27th Floor
 8         Miami, Florida  33131
 9         Phone:  305-374-5418
10            On behalf of the Plaintiff;
11
12    BURKE, WARREN, McKAY & SERRITELLA, PC
13    BY:  MR. FREDERIC A. MENDELSOHN
14         IBM Plaza
15         330 North Wabash Avenue
16         Suite 2200
17         Chicago, Illinois  60611
18         Phone:  312-840-7004
19            On behalf of the Defendants,
20            Restonic Corporation and
21            Restonic Mattress Corporation;
22
23
24
```

```
 1 APPEARANCES:  (CONT'D)
 2
 3    SMITH AMUNDSEN, LLC
 4    BY:  MR. THOMAS J. LYMAN, III
 5         150 North Michigan Avenue
 6         Suite 3300
 7         Chicago, Illinois  60601
 8         Phone:  312-894-3241
 9            On behalf of the Defendants,
10            Sleep Alliance, LLC; Royal
11            Bedding Company of Buffalo,
12            Jackson Mattress Co, LLC; and
13            Tom Comer;
14
15    PEARSON CHRISTENSEN & CLAPP
16    BY:  MR. DANIEL L. GAUSTAD
17         645 Hill Avenue
18         Grafton, North Dakota  58237
19         Phone:  701-352-3262
20            Appearing telephonically on
21            behalf of the Defendants,
22            Stevens Mattress Manufacturing
23            Co. and Richards Stevens;
24
```

```
 1 APPEARANCES:  (CONT'D)
 2
 3
 4    FULBRIGHT & JAWORSKI, LLP
 5    BY:  MR. ANDREW FRIEDBERG
 6         1301 McKinney Street
 7         Houston, Texas  77010
 8         Phone:  713-651-5151
 9            Appearing telephonically on
10            behalf of the Defendants,
11            Continental Silverline
12            Products, L.P. and Drew Robins.
13
14
15         *    *    *    *    *    *
16
17
18
19
20
21
22
23
24
```

**EXHIBIT B**

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
         I N D E X
WITNESS                              PAGE

STEPHEN RUSSO
MR. SALKOWSKI                          6
MR. LYMAN                             65
MR. GAUSTAD                           66




         E X H I B I T S

DEPOSITION EXHIBIT                   PAGE


       (No exhibits were marked.)
```

Network Reporting Corporation    (305)358-8188 * (888)358-8188    Page 5

---

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
1                    (Witness sworn.)
2              STEPHEN RUSSO,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6              EXAMINATION
7  BY MR. SALKOWSKI:
8      Q    Good afternoon, sir.  As we met earlier,
9  my name is Robert Salkowski.  And I'm the
10 attorney for Royal Sleep, the plaintiff in this
11 action that they brought against several
12 licensees of Restonic, as well as Restonic
13 Corporation and Restonic Mattress.
14          Could you, please, state your name
15 and address?
16     A    Stephen Russo.  Do you want my home
17 address?
18     Q    Home address, please.
19     A    10007 Symphony Isles Boulevard, Apollo
20 Beach, Florida.
21     Q    Sir, do you also have a business address?
22     A    I'm the president of Restonic.  So I have
23 a business address there, yes.
24     Q    What is the address for Restonic at which
```

Network Reporting Corporation    (305)358-8188 * (888)358-8188    Page 6

---

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
1  you have an office?
2      A    1540 East Dundee Road, Suite 102,
3  Palatine, Illinois.
4      Q    Sir, do you maintain any offices for your
5  business in the state of Florida?
6      A    I have a home office I work out of out of
7  my home.
8      Q    Other than the office in Palatine,
9  Illinois, does Restonic have any offices in
10 Chicago or elsewhere?
11     A    Restonic Mattress Corporation, no.
12     Q    How about Restonic Corporation, too?
13     A    No.
14     Q    Sir, you indicated that you are the
15 president for Restonic Mattress Corporation?
16     A    That's correct.
17     Q    You are the president also for Restonic
18 Corporation?
19     A    Yes, I am.
20     Q    Could you just briefly describe for two
21 corporations for me?
.2     A    Restonic Corporation is the owner of
23 intellectual property that it licenses to
24 Restonic Mattress Corporation and provide --
```

Network Reporting Corporation    (305)358-8188 * (888)358-8188    Page 7

---

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
1  the Restonic Mattress Corporation provides
2  brand management and marketing services to a
3  network of manufacturers who we call licensees
4  or sublicensees in the U.S.
5          Additionally, Restonic Corporation
6  directly licenses that intellectual property to
7  a number of licensees internationally.
8      Q    The same type of intellectual property
9  that Restonic Mattress Corp licenses here in
10 the United States?
11     A    Correct.
12     Q    Sir, how long have you been the president
13 of these two corporations?
14     A    Since -- I think it's late November of
15 2006.
16     Q    Prior to November of 2006 approximately,
17 did you have any roles or responsibilities with
18 Restonic Corporation or Restonic Mattress
19 Corporation?
20     A    I'm not sure I understand the question.
21     Q    Prior to November of 2006, did you have
22 any roles or responsibilities with either of
23 the Restonic corporations?
24     A    For a month.  Prior to that, I was a
```

Network Reporting Corporation    (305)358-8188 * (888)358-8188    Page 8

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   consultant to Restonic Mattress Corporation and
 2   Restonic Mattress Corporation operating as the
 3   interim president of the company.
 4   Q    How long were you in the role of interim
 5   president?
 6   A    I'm not sure exactly.  It was
 7   approximately four or five months.
 8   Q    Now, you've been -- I don't know what the
 9   word is -- promoted or --
10   A    I became an employee.
11   Q    And now you're president; there's no
12   interim before that, president?
13   A    Correct.
14   Q    When did you become an employee?
15   A    Again, I'm not sure exactly.  It was in
16   the spring of 2007.
17   Q    How did you first learn about Restonic?
18   A    I knew Restonic from a prior business
19   that I had managed.  Some of the Restonic
20   licensees were customers of that business.
21   Q    What type of business was that?
22   A    It was latex foam.  Latex International
23   is the company.
24   Q    Did you ever work -- and I saw this in
```

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   some of the papers that have been exchanged --
 2   for Spring Air down in Florida?
 3   A    I did work for Spring Air.  After I left
 4   Latex International, I worked for a --
 5   actually, it was a licensee of the Spring Air
 6   group.
 7   Q    And that was in Florida?
 8   A    It was headquartered in Tampa, Florida,
 9   yes.
10   Q    How long were you with the Spring Air
11   franchisee?
12   A    Approximately 15 months.
13   Q    When you indicated that one or more of
14   the current Restonic licensees were your
15   customers for the latex foam business, who were
16   those customers or which licensees?
17   A    There were several.  I mean, I didn't
18   interface with them directly.  I just knew they
19   were a customer of ours.
20   Q    Did one of those customers introduce you
21   to the Restonic position as a consultant or
22   recommended you to the board of directors for
23   Restonic to become an interim president?
24   A    Yes.
```

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   Q    Who was that?
 2   A    There was -- actually there were two.
 3   There was Tom Comer and Drew Robins.
 4   Q    Prior to you becoming interim president
 5   for Restonic -- sir, just for the sake of this
 6   deposition, I'll use the word Restonic to mean
 7   both Restonic Corporation and Restonic Mattress
 8   Corporation, unless for some reason I need to
 9   separate those two identities.  And I would ask
10   that you do the same.
11   A    That's fine.
12   Q    Did you know Mr. Comer or Mr. Robins
13   prior to November of '06?  And if so, in what
14   capacity?
15   A    I had met Mr. Comer once as the president
16   of Restonic, his license group.  I did not know
17   Mr. Robins prior to.
18   Q    Do you know if there was a search being
19   conducted by Restonic Corporation to fill the
20   position of president?
21   A    I do not know.
22   Q    Do you know why Mr. Comer or Mr. Robins
23   identified you as an individual who may be
24   interested in becoming interim president for
```

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   the corporation?
 2   A    I do not.
 3   Q    Were you friends with either Mr. Comer or
 4   Mr. Robins before November of '06?
 5   A    No.
 6   Q    Did you have any type of business
 7   relationship with either Mr. Comer or
 8   Mr. Robins other than Mr. Comer's business
 9   purchasing foam products from you?
10   A    No, I did not.
11   Q    Now, when you became interim president
12   for Restonic, you obviously replaced a previous
13   president in that role, correct?
14   A    Yes.
15   Q    Do you know who that person that you
16   replaced was?
17   A    Yes.
18   Q    Who was that?
19   A    Carlene Evanson Peterson.
20   Q    Do you know how long Ms. Peterson had the
21   role of president for Restonic?
22   A    Not exactly.
23   Q    Do you know approximately how long?
24   A    Approximately a year.
```

```
 1   Q    Did anyone tell you why Ms. Peterson had
 2   left the company or left the employ of
 3   Restonic?
 4   A    She resigned.
 5   Q    Do you know why she resigned?
 6   A    I don't know.
 7   Q    Prior to Ms. Peterson, do you know who
 8   the president was?
 9   A    I was told it was a fellow by the name of
10   Kevin Tolman.
11   Q    Now, in your role as president for
12   Restonic, could you describe generally for me
13   your roles and responsibilities?
14   A    Yes.  The Restonic Corporation provides
15   brand management, marketing services and other
16   related services to its licensees.
17        My role as the president of the
18   company is to see that those services are
19   provided and that we operate in accordance with
20   the sublicensing agreements between Restonic
21   and its licensees both domestic and
22   international.
23   Q    Is your role the same for both Restonic
24   Corporation and Restonic Mattress Corporation,
```

```
 1   or is your responsibilities different?
 2   A    They're a bit different.
 3   Q    How are they different?
 4   A    The Restonic Corporation's relationship
 5   with the international licensees is less
 6   involved.
 7   Q    Meaning the foreign licensees have more
 8   autonomy in the way their business is operated?
 9   A    That's correct.  The licensing agreements
10   are different.
11   Q    Now, in your role as president for
12   Restonic, do you also have any responsibilities
13   for the Sleep Alliance?
14   A    No, I do not.
15   Q    Do you know what Sleep Alliance is?
16   A    I'm aware of Sleep Alliance.
17   Q    What is your understanding of that
18   company, sir?
19   A    My understanding of the Sleep Alliance is
20   it's a holding company for several of the
21   licensees.
22   Q    Have you ever been asked to provide any
23   type of support to the Sleep Alliance, other
24   than the contractual support that Restonic
```

```
 1   would give the various licensees under the
 2   license agreements?
 3   A    As the president of Restonic?
 4   Q    Yes.
 5   A    No.
 6   Q    Have you done any type of -- have you
 7   performed any type of support on behalf of
 8   Sleep Alliance outside your role as president
 9   of Restonic?
10   A    I facilitated a meeting for Sleep
11   Alliance.
12   Q    What was the nature of that meeting, sir?
13   A    It was a business planning meeting they
14   had.
15   Q    Do you know when that was?
16   A    Not exactly.  It was last year.
17   Q    Do you recall if it was in October of
18   2007 at the Sofitel Hotel?
19   A    That sounds familiar.
20   Q    What was the reason why -- first of all,
21   who asked you to facilitate the meeting for
 2   Sleep Alliance?
23   A    Mr. Comer did.
24   Q    This was at the Sofitel Hotel here in
```

```
 1   Chicago or the Chicago area?
 2   A    Correct.
 3   Q    Do you know why you were asked by
 4   Mr. Comer to facilitate this meeting?
 5   A    Because when I'm not working for
 6   companies, I have a managerial practice that
 7   facilitates meetings.
 8   Q    What's the name of that company, sir?
 9   A    It's called Apollo Solutions.
10   Q    When you say facilitate a meeting, could
11   you describe what that means?
12   A    That means I would work with the
13   principals of the meeting to put together an
14   agenda.  And then I would direct the meeting
15   process to ensure that they achieve their
16   agenda.
17   Q    Does Apollo Solutions have any equity
18   interest or any other type of ownership
19   interest in Sleep Alliance?
20   A    No.
21   Q    Did Sleep Alliance pay you or pay Apollo
22   Solutions for the facilitation of this meeting?
23   A    No.
24   Q    Does Apollo Solutions' customers
```

Deposition of Stephen Russo                          Royal Sleep Products, Inc. vs. Restonic Corporation

1  typically pay Apollo Solutions for the
2  facilitation of these meetings?
3  A    If there are -- if they become ongoing
4  engagements.
5  Q    Is the work Apollo Solutions performs on
6  behalf of its customers limited to facilitating
7  meetings in the bedding industry, or is it any
8  type of industry?
9  A    Any type of industry.
10  Q    With respect to the meeting that occurred
11  in the Sofitel Hotel in Chicago last year, do
12  you recall who was in attendance at that
13  meeting?
14  A    I recall some of the participants, but I
15  may not recall all of the participants.
16  Q    Who do you recall?
17  A    Mr. Comer was present. Ms. Laurie
18  Tokarz. Mr. Robins was present. A fellow by
19  the name of Ken Akers. A fellow by the name of
20  Brent Ford.
21       And there were two representatives
22  of a firm that they were working with,
23  Mann Epperson. But I don't recall their first
24  names, though.

Page 17

Deposition of Stephen Russo                          Royal Sleep Products, Inc. vs. Restonic Corporation

1  Q    Was that an investment firm, do you
2  recall?
3  A    I believe so. I think they do a number
4  of different services, my understanding of
5  them.
6  Q    Mr. Comer is a defendant in this lawsuit,
7  the same person. Laura Tokarz, do you know who
8  she works for?
9  A    Her capacity, I believe, is sales and
10  marketing for Mr. Comer's businesses related to
11  bedding.
12  Q    Do you know if she also works on behalf
13  of Simply Blinds or just Mr. Comer's
14  businesses?
15  A    I don't know.
16  Q    Ken Akers, do you know who he works for?
17  A    Ken Akers is, again, in a similar type of
18  sales and marketing capacity for Mr. Richard
19  Stevens' licensing groups.
20  Q    Then Brent Ford, to your knowledge, he
21  works for Drew Robins?
22  A    Sales and marketing.
23  Q    For Mr. Robins, correct?
24  A    Mr. Robins.

Page 18

Deposition of Stephen Russo                          Royal Sleep Products, Inc. vs. Restonic Corporation

1  Q    Do you know how long that Sleep Alliance
2  meeting that was held in October of '07 lasted?
3  Was it a day? Was it two days?
4  A    I think it was a day approximately.
5  Q    Do you know why the Sleep Alliance
6  elected to hold its meeting here in Chicago, as
7  opposed to elsewhere?
8  A    In working on the planning of the
9  meeting, I think it was the -- there would be a
10  central location for all parties to be able to
11  come to.
12  Q    Other than the meeting that occurred in
13  October of '07 here in Chicago, are you aware
14  of any other meeting in which Sleep Alliance
15  conducted here in Illinois?
16  A    No.
17  Q    Now, sir, I want to talk briefly just for
18  background information about the manner in
19  which Rastonic Corporation and Restonic
20  Mattress Corporation is structured. You have
21  shareholders, correct?
22  A    Yes, we do.
23  Q    Currently do you know who those
24  shareholders are?

Page 19

Deposition of Stephen Russo                          Royal Sleep Products, Inc. vs. Restonic Corporation

1  A    I know in general the shareholders, but I
2  don't know specifically.
3  Q    I just want to run down some names here
4  that are relevant to this action. And let's
5  see if you know they're a shareholder or not.
6  Mr. Comer?
7  A    I believe Mr. Comer's companies, I
8  believe, are shareholders.
9  Q    That includes Royal Bedding or Jackson
10  Mattress. Do you believe either one of those
11  may be shareholders?
12  A    I've seen those names on shareholder
13  records.
14  Q    How about Richard Stevens, do you know if
15  he is a shareholder, either he or Stevens
16  Mattress?
17  A    I believe they are, yes.
18  Q    Drew Robins or Continental Silverline, do
19  you know if they are shareholders?
20  A    I believe, yes.
21  Q    Gary Robinson or his company, do you
22  know?
23  A    I believe so, yes.
24  Q    The Sleep Alliance, do you know whether

Page 20

```
 1   or not they are share -- or it is a shareholder
 2   of Restonic?
 3   A    I believe it to be so.  But I don't
 4   recall personally having seen those records
 5   yet.
 6   Q    In addition to the shareholders, Restonic
 7   also has a board of directors, correct?
 8   A    Restonic Corporation has a board of
 9   directors.  And Restonic Mattress Corporation
10   have a board of directors.  There are two
11   separate boards of directors.
12   Q    Are any of the people who are the
13   directors for Restonic Corporation also
14   directors for Restonic Mattress Corporation?
15   A    Today, yes.  In the past, no.
16   Q    What director who sits on the board of
17   directors for Restonic Corporation is also a
18   director for Restonic Mattress Corporation?
19   A    Tom Comer.
20   Q    How long has Mr. Comer sat as a director
21   on both of these boards?
22   A    From the point in which the Restonic
23   Corporation board was elected at the end of
24   last year.  So it would be -- I think the
```

```
 1   meeting was December 29th or 30th of last year.
 2   Q    December 29th or 30th of '07?
 3   A    Correct.
 4   Q    Prior to December of '07, did Mr. Comer
 5   also sit on one of the boards?
 6   A    He was on the Restonic Mattress
 7   Corporation board from December of '06.
 8   Q    Who nominated Mr. Comer, if you know, to
 9   the boards for both of these corporations?
10   A    I don't know.
11   Q    Now, to your knowledge, are there board
12   of director meetings for Restonic Corporation
13   and for Restonic Mattress Corporation?
14   A    On occasion there are meetings.
15   Q    Sir, are you a board member for either of
16   those two corporations?
17   A    I'm a board member for Restonic Mattress
18   Corporation.
19   Q    And besides yourself and Mr. Comer, who
20   else is a board of director for Restonic
21   Mattress Corporation?
22   A    Daniel Cantor.  Lee Quinn.
23   Darryl Butler.
24   Q    Does either Mr. Cantor, Mr. Quinn or
```

```
 1   Butler have any interest in Restonic Mattress
 2   Corporation, other than in their role as
 3   director?
 4   A    Mr. Quinn is the chief executive officer
 5   of another Restonic Mattress Corporation
 6   sublicensee.
 7   Q    Which one is that?
 8   A    It's the group that's based out of New
 9   Albany, Indiana.
10   Q    Do you know how long Mr. Quinn has been
11   on that board of directors?
12   A    He came on the board of directors on the
13   same day Mr. Comer did; December of 2006.
14   Q    Now, when the board of directors has
15   meetings, are the meetings in person or are
16   they conducted by telephone?
17   A    Which group?
18   Q    Good question.  Let's go with Restonic
19   Corporation first.
20   A    The only meetings of the Restonic
21   Corporation boards that I have participated in
22   have been by phone.
23   Q    Restonic Mattress Corporation, have there
24   been -- in addition to telephone meetings, have
```

```
 1   there been in-person meetings?
 2   A    There's been one in-person meeting in the
 3   time I've been with Restonic.
 4   Q    Where was that in-person meeting?
 5   A    The in-person meeting was in Buffalo,
 6   New York.
 7   Q    Do you know why the directors elected to
 8   have the corporate meeting in Buffalo, New
 9   York, as opposed to Illinois?
10   A    For expense purposes.  Two of the
11   directors live in Buffalo, New York.
12   Q    That's Mr. Comer?
13   A    Mr. Comer and Mr. Cantor.
14   Q    Do you know if Mr. Cantor is friendly
15   with Mr. Comer?
16   A    I do not know.
17   Q    Do you know what Mr. Cantor does other
18   than sit on the board of directors?
19   A    Mr. Cantor -- I believe Mr. Cantor is the
20   executive director for the Jewish Federation
21   League of Buffalo.
22   Q    Now, other than the -- in the time that
23   you had as president for Restonic, other than
24   the Buffalo, New York meeting, were there any
```

Deposition of Stephen Rusin                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   other board of directors meetings conducted by
 2   RNC either in person or by telephone?
 3   A      Yes.
 4   Q      Was that in person or by telephone?
 5   A      By telephone.
 6   Q      Do you know how many times -- let me get
 7   into that, sir.
 8          Do you know how many times a year
 9   the board of directors meet for both of those
10   companies?
11   A      There's not a set schedule.
12   Q      Within the year and a half or so that
13   you've been a president, has the board for
14   those two companies met on pretty much the same
15   type of schedule, same number of times per
16   year?  Or has that changed?
17   A      No.
18   Q      In the last year has it been more or less
19   than when you first joined?
20   A      Less.
21   Q      What is the reason, if any, that the
22   board of directors is meeting less now?
23   A      There's less need to meet.
24   Q      Why is there less need to meet?
```

Deposition of Stephen Rusin                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   A      Because when I first became the interim
 2   president and president of Restonic, you're in
 3   a transition from one president to a new
 4   president.  So the board had greater oversight
 5   of the company.
 6   Q      In this lawsuit, Restonic and Restonic
 7   Mattress Corporation produced some corporate
 8   minutes of the various boards of directors.
 9          And have you seen those prior to --
10   well, let me ask, have you seen the board of
11   directors minutes?
12   A      For the meetings that I've attended, yes.
13   Q      Did those board of directors meetings
14   usually reflect the participants in that
15   meeting, whether or not they were in person or
16   by telephone?
17   A      I believe they do.
18   Q      Now, sir, in addition to board of
19   directors meetings -- strike that.
20          In addition to the board of
21   directors participating in these various
22   meetings by telephone, are there any other
23   Restonic licensees who are asked to participate
24   in the board of directors meetings?
```

Deposition of Stephen Rusin                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   A      On a regular basis, no.
 2   Q      In terms of Restonic Mattress Corporation
 3   and Restonic Corporation, does anyone other
 4   than yourself participate in those meetings?
 5   A      I'm not sure I understand the question.
 6   Q      Other than yourself, does any other
 7   employee of Restonic or Restonic Mattress
 8   Corporation participate in the board of
 9   directors meetings?
10   A      On a regular basis, no.
11   Q      Now, in addition to the
12   regularly-conducted board of directors meetings
13   of the two corporations done either in person
14   or by phone, do you have contact with the board
15   of directors to discuss Restonic business on a
16   frequent basis during the year?
17   A      No.
18   Q      Do you have any contact with any of the
19   board of directors outside of the board of
20   directors meetings to discuss Restonic
21   business; not the business that they may have
 2   as a licensee?
23   A      That's not related to the board?
24   Q      That's not related to the board.
```

Deposition of Stephen Rusin                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   A      Repeat the question again.  They kind of
 2   meld together.
 3   Q      I didn't go over the instructions at the
 4   beginning, but I'll do so now since you brought
 5   it up.
 6          If there are any questions that I
 7   have asked that you're not familiar with in
 8   terms of you don't understand what I'm
 9   saying -- and that may happen once or twice
10   because I'm just going off my head with some of
11   these questions -- let me know and I'll try to
12   rephrase it.
13          If you need to take a break for
14   whatever reason, let me finish the line of
15   questioning and go take a break.
16          If I ask you for an estimate --
17   you're doing pretty well -- you're giving me an
18   estimate.  I don't want you to guess.  An
19   estimate would be how long this table is.  A
20   guess would be long my table in my office is,
21   that type of thing.
22          With respect to contact that you
23   have outside of the board of directors
24   meetings, do you have any contact to discuss
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   with the board of directors Restonic's
 2   business?
 3   A      As individual directors?
 4   Q      As individual directors.
 5   A      That's related to Restonic?
 6   Q      Yes, sir.
 7   A      Yes.
 8   Q      What type of contact -- I don't want
 9   specific conversations that you had.  But
10   generally what are the nature of the
11   discussions you had with the board of directors
12   regarding Restonic outside of the board of
13   director meetings?
14   A      First of all, you need to be clear.
15   Dan Cantor is the chairman of the board.  So
16   any time that there's a meeting -- desired or
17   scheduled -- I'm talking with Dan about the
18   meeting.  I'm doing that.
19          There may be discussions with a
20   board member about clarity of a topic coming
21   into the meeting or information that need to be
22   provided to be prepared for the meetings.
23          Outside of that, whenever there's a
24   matter that involves licensees, those
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   discussions are only held with Dan Cantor and
 2   Darryl Butler, who are outside directors.
 3          So we have no discussion of any
 4   licensee-related matters at the board level
 5   that would involve Mr. Comer or Mr. Quinn since
 6   they are also licensees.
 7   Q      Are you aware of any director meetings in
 8   which Mr. Comer traveled to Illinois to attend
 9   in person?
10   A      Director meetings?
11   Q      Director meetings.
12   A      No.
13   Q      With respect to the shareholders, you
14   also -- you being Restonic -- Restonic also has
15   shareholder meetings, is that correct?
16   A      Yes.
17   Q      Are they annual shareholder meetings?
18   A      There's a requirement for annual
19   shareholder meetings of each group.
20   Q      Each group being Restonic Corporation and
21   Restonic Mattress?
22   A      Yes.
23   Q      Now, with respect to the Restonic
24   Mattress Corporation shareholder meetings,
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   where are they held?
 2   A      I can only speak to where they've been
 3   held as -- while I've been a member of
 4   Restonic.
 5   Q      I understand that.
 6   A      There was a meeting -- the first meeting
 7   with the group was in Louisville, Kentucky.
 8   Q      Do you know when that was?
 9   A      That was in December of 2006.
10   Q      Do you recall who was in attendance at
11   that meeting?  Or let me ask, the shareholders.
12   A      The shareholders.
13   Q      Do you know of any shareholder who was
14   not in attendance at that meeting?
15   A      I'd have to go look at the attendance
16   log.
17   Q      In addition to the Louisville, did you
18   have an annual meeting in December of '07?
19   A      It was a telephonic meeting.
20   Q      Why did you decide to have a telephonic
21   meeting for the annual meeting, as opposed to
22   an in-person meeting?
23   A      Because it was inconvenient for all the
24   licensees to come to a central location.
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   Q      Do you know if Mr. Comer participated in
 2   that telephone meeting?
 3   A      I believe he did, yes.
 4   Q      Do you know if Mr. Robins participated in
 5   that meeting?
 6   A      I believe he did, yes.
 7   Q      Are you aware of whether or not
 8   Richard Stevens participated in that meeting?
 9   A      I believe he did.
10   Q      Now, in addition to the December '07
11   telephonic shareholders meeting, has there
12   recently been a shareholders meeting?
13   A      No.
14   Q      Has there been any recent meeting here in
15   Chicago in which licensees of RMC participated
16   and attended?
17   A      Yes.
18   Q      When was that?
19   A      It was on June 4th.
20   Q      What was the nature of the June 4th, 2008
21   meeting?
22   A      I held a meeting of all the licensees to
23   present to the group a vision and revised
24   company direction.
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   Q     Where was that meeting held, sir?
 2   A     It was at the Double Tree Hotel.
 3   Q     Here in Illinois?
 4   A     Chicago.  The airport.  That was a
 5   licensee meeting.
 6   Q     Different than a shareholder meeting?
 7   A     Correct.
 8   Q     Now, do you know who attended that
 9   meeting?  And I'll ask specific names after
10   that.  Drew Robins?
11   A     Yes, he attended the meeting.
12   Q     How about his employee Brent Ford?
13   A     I believe Mr. Ford was there.  I can't
14   say for sure, but I believe he was.  I don't
15   remember.  He may not have been there.  I don't
16   think he was, as a matter of fact.  He was not.
17   Q     Who about Tom Comer?
18   A     Mr. Comer was there.
19   Q     Was Laura Tokarz?
20   A     I believe she was, yes.
21   Q     Ms. Tokarz is the sales and marketing for
22   Mr. Comer?
23   A     Yes.
24   Q     How about Richard Stevens?
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   A     Richard was there, yes.
 2   Q     And was Ken Akers there also?
 3   A     Yes, he was.
 4   Q     Do you know an individual by the name
 5   of -- I can't find it.
 6         Now, how many times a year do you
 7   hold a licensee meeting?
 8   A     There's no set pattern.
 9   Q     There's no set pattern for the licensee
10   meeting?
11   A     No.  They're as needed.  Generally what
12   we will do -- many of the licensees attend the
13   Las Vegas world market.  We will convene then
14   with those who attend there.
15   Q     So you'd hold the meeting in Las Vegas?
16   A     Yes.
17   Q     Now, in addition to the licensee meeting
18   that you have, do you conduct any type of
19   telephone licensee meetings from time to time?
20   A     Rephrase the question.
21   Q     The meeting that you had on June 4th of
22   '08 was an in-person meeting that you had at
23   the Double Tree Hotel in O'Hare.
24         In addition to bringing the
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   licensees in from the various states to
 2   Illinois, do you also sometimes conduct
 3   telephone meetings in which the licensees
 4   participate?
 5   A     Can I provide some clarity?
 6   Q     Absolutely.
 7   A     The meeting that we had in June was the
 8   first time that we've had all licensees come to
 9   Illinois.  So any other licensee meetings that
10   we've had in person like that have been
11   adjacent to this Las Vegas market, whenever it
12   occurs.
13   Q     So other than either the meetings -- the
14   licensee meetings that take place with the
15   Las Vegas meeting or Las Vegas show and this
16   June 4th, 2008 meeting, there hasn't been any
17   licensee meetings before that time, correct?
18   A     If you're referring to a meeting that
19   would involve all licensees, all licensees
20   invited, no.
21   Q     Now, in addition to the licensee meetings
22   that we talked about, do you ever have occasion
23   to meet with licensees here in Illinois?
24   A     I'm not sure I understand the question.
```

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   Q     In your role as president, do you ever
 2   meet with Restonic licensees?
 3   A     Individually or collectively?
 4   Q     Individually.
 5   A     If they come to Illinois.  And they -- I
 6   mean, they may stop by.
 7   Q     Now, individually, do you know if
 8   Drew Robins has ever stopped by and visited you
 9   in your role as president?
10   A     He has not.
11   Q     Do you know if his employee, Brent Ford,
12   has ever stopped by to visit you in your role
13   as president of Restonic here in Illinois?
14   A     He has not.
15   Q     Tom Comer, has he ever visited you here
16   in the State of Illinois to discuss matters
17   dealing with his license?
18   A     No.
19   Q     How about Laurie Tokarz, has she ever
20   visited you?
21   A     No.
22   Q     How about Richard Stevens, has he ever
23   visited you here in Illinois?
24   A     No.
```

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs Restonic Corporation

```
 1  Q      And his employee Ken Akers?
 2  A      No.
 3  Q      Now, Restonic Corporation or Restonic
 4  Mattress Corporation also has a program known
 5  as the national account program.  Are you
 6  familiar with that?
 7  A      Vaguely.
 8  Q      Tell me what your knowledge of the
 9  national account program is.
10  A      Only -- I've seen a document that
11  reflected -- I believe it was the intent of
12  having a national account program.
13  Q      During the time that you've been
14  president, has that ever been in existence, to
15  your knowledge?
16  A      I have not been able to find any record
17  that it's operational.
18  Q      Have you ever found any document or
19  correspondence indicating that at one point in
20  time there was a national account program that
21  franchisees or licensees of Restonic
22  Corporation participated in?
23  A      Not exactly.  Some licensees have
24  referred to it from time to time, which is why
```

Newark Reporting Corporation        (205)358-8188 * (888)358-8188              Page: 37

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs Restonic Corporation

```
 1  I tried to figure out what it was.  But it's
 2  not an operative matter.
 3         There are no national accounts, nor
 4  are there any accounts that are being proposed
 5  to be national accounts.  So it's never become
 6  an active matter while I've been president of
 7  Restonic.
 8  Q      Have you ever found an account that was
 9  designated as a national account?
10  A      Not while I've been president of
11  Restonic.
12  Q      How about your review of the paperwork
13  for Restonic, have you ever found an account
14  that was designated as a national account
15  program prior to your role as president?
16  A      I know of no record of any account
17  becoming a national account.
18  Q      To your knowledge, there's no national
19  account program in existence today, is that
20  right?
21  A      There's a document that says the national
22  account program, but it's not signed.  And I
23  have no records of the board or anything that
24  says that it was ever approved.  That confuses
```

Newark Reporting Corporation        (205)358-8188 * (888)358-8188              Page: 38

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs Restonic Corporation

```
 1  me.
 2  Q      In your role as president, to your
 3  knowledge, there's no --
 4  A      We have no national accounts.
 5  Q      No national account program?
 6  A      We have no national accounts.
 7  Q      Now, in addition to the various meetings
 8  we've described, is there something also called
 9  an advisory board for Restonic?
10  A      The bylaws of Restonic Mattress
11  Corporation provide for an advisory board.
12  Q      What is the advisory board, sir?
13  A      If I understand it, the advisory board is
14  three licensees, whose role is to provide
15  advisory services -- if that's the right
16  term -- to Restonic president and possibly the
17  board of directors regarding marketing and
18  financial matters.
19  Q      In a way, is that the licensee telling
20  you as president what they believe is a good
21  marketing approach or a financial concern that
22  the licensee group has generally?
23  A      Can I ask him a question?
24  Q      Well, you can't ask him a question if it
```

Newark Reporting Corporation        (205)358-8188 * (888)358-8188              Page: 39

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs Restonic Corporation

```
 1  doesn't relate to some type of attorney/client
 2  privilege.  If you're asking him how to answer
 3  the question, that's not appropriate.
 4         But if you're asking him whether or
 5  not something you're going to tell me may be
 6  protected by an attorney/client privilege or
 7  something that he told you, I'll let you go
 8  ahead and ask him.
 9         MR. MENDELSOHN:  If it's clarification
10  you don't understand the question, just ask him
11  for it to be rephrased.
12         THE WITNESS:  Just restate the question.
13  BY MR. SALKOWSKI:
14  Q      Let me rephrase it, and then I'll get
15  back to the question, sir.
16         The advisory board, is that an
17  active board currently with Restonic?
18  A      No.
19  Q      The board members, are they John Quinn,
20  Robert Parker and Jim McKenny, to your
21  knowledge?
22  A      Yes.
23  Q      Why isn't the advisory board active right
24  now?
```

Newark Reporting Corporation        (205)358-8188 * (888)358-8188              Page: 40

1  A    The need for the advisory board was
2  eliminated when the bylaws of Restonic Mattress
3  Corporation were changed in December of 2006 to
4  add licensee members to their RMC board.
5       Prior to that time, the RMC board
6  was comprised of the president and outside
7  directors. So the advisory board existed, as I
8  understand it, for the licensees to be able to
9  ensure marketing oversight and financial
10 oversight of their holdings, which is Restonic
11 Mattress Corporation.
12 Q    Now, in addition to the meeting we spoke
13 about including the advisory board meeting, is
14 there something called a marketing planning
15 committee or a marketing planning group that
16 holds meetings?
17 A    It's currently called the product
18 marketing committee.
19 Q    Has that been in existence since you took
20 over in the role of president of Restonic?
21 A    Yes.
22 Q    Product marketing?
23 A    Product marketing.
24 Q    Has the name changed, or has it always

Page 41

1  been product marketing --
2  A    There were two committees previously.
3  Q    What was the other committee?
4  A    There was a product committee and a
5  marketing committee.
6  Q    Streamlining our flow charts, right?
7  A    Something like that.
8  Q    Who were the members of the product
9  marketing committee, to your knowledge?
10 A    There are -- you said in addition to
11 myself, there are -- again, this is current
12 membership -- there are six members.
13      David Walker, who is an employee of
14 the Restonic Oregon license. Chris Sanders,
15 who's an employee of the Restonic Twin Falls
16 Idaho license. Laurie Tokarz, who is an
17 employee of the Alliance Sleep Group.
18      Ken Akers, who's an employee of
19 Stevens group. Bob Quinn, who's an employee of
20 the New Albany group. And Brent Ford, who's an
21 employee of Houston.
22 Q    Now, how often does the product marketing
23 committee meet?
24 A    As needed.

Page 42

1  Q    In 2007, approximately how many times did
2  that committee meet?
3  A    It usually meets telephonically. I would
4  have to venture a guess.
5  Q    Have there ever been meetings conducted
6  in the State of Illinois among the members of
7  the product marketing committee during the
8  period of time that you've been president?
9  A    Yes.
10 Q    Approximately how many times have
11 meetings been conducted in the State of
12 Illinois where the product marketing committee
13 members met?
14 A    Maybe three or four times.
15 Q    So since approximately November of '06,
16 the product marketing committee have met in
17 person in the State of Illinois, is that
18 correct?
19 A    For clarity for you, there were two
20 committees. So the marketing committee would
21 have met. The product committee would have
22 met. When I saw that, I said let's make them
23 one. And then the -- to answer your question,
24 yes.

Page 43

1  Q    So regardless if it was a marketing
2  committee or product committee or product
3  marketing committee --
4  A    On occasion they've met --
5  Q    -- approximately six times since you took
6  over as president?
7  A    I don't know.
8  Q    Approximately?
9  A    I don't know. I've been involved with
10 the committee actively since the first of the
11 year.
12 Q    First of '08?
13 A    First of '08.
14 Q    And then who was directing that committee
15 or the committees prior to you actively
16 becoming involved?
17 A    We had a young lady who was the
18 vice-president of sales and marketing for
19 Restonic named Donna Fabia.
20 Q    And she was involved in that?
21 A    Her responsibility was to chair that
22 committee -- one of her responsibilities.
23 Q    Now, to your knowledge, has the
24 make-up -- and when I say make-up, I mean the

Page 44

1  membership -- changed since when you became
2  president up until today?
3  A    Yes.
4  Q    How has the make-up of those two
5  committees, now one, changed?
6  A    Two things happened.  One, there's a
7  fellow who was the sales and marketing VP for
8  Restonic Miami, who was on the -- I think he
9  was on the marketing committee, but he resigned
10 from that company.  So he is no longer an
11 employee.
12       And when we combined the two
13 committees together, there were then two people
14 from Restonic New Albany group.  So one of
15 those two came off.
16 Q    Other than the change in the Miami
17 licensee and the New Albany licensee, has
18 Ms. Tokarz, Mr. Akers and Brent Ford always
19 been on one or both of those committees?
20 A    At my request, yes.
21 Q    Have they always -- have they been --
22 strike that.
23       In the six or so meetings that have
24 taken place in the State of Illinois since you

1  became president, has Mr. Akers, Ms. Tokarz and
2  Mr. Ford always attended in person?
3  A    Not always.
4  Q    Have there been times when Ms. Tokarz has
5  attended a product marketing committee
6  personally in the State of Illinois?
7  A    Yes.
8  Q    Do you know how many times?
9  A    I don't recall.
10 Q    Do you know if it was more than two?
11 A    I don't recall.  More than likely, yes.
12 Q    Ken Akers, do you recall whether or not
13 there was an instance when Mr. Akers personally
14 attended a product marketing committee in the
15 State of Illinois?
16 A    Yes.
17 Q    Do you know how many times?
18 A    Not exactly.
19 Q    And Brent Ford, are you aware of the
20 number of times when Mr. Ford had attended in
21 person a product marketing committee meeting in
22 the State of Illinois?
23 A    Not exactly.  But he has been here.
24 Q    Now, in addition to the various meetings

1  we spoke about on the committees, are there any
2  other committees -- other than the various
3  meetings we spoke about -- and I won't go
4  through them -- are there any other committees
5  or meetings that Restonic holds from time to
6  time either among its board of directors, its
7  shareholders or its licensees?
8  A    There is one other committee.  It's
9  called a manufacturing committee.
10 Q    What is the nature of that committee,
11 sir?
12 A    In the similar fashion, it's a collection
13 of licensees that work to collaborate on
14 manufacturing programs.
15 Q    Last year in some of the documents I
16 reviewed there was some information about a
17 fire retardant program you guys were working
18 on?
19 A    Yes.
20 Q    What committee was responsible for that?
21 Was it the product marketing or manufacturing?
22 A    Manufacturing committee.
23 Q    Who sits on the manufacturing committee,
24 sir?

1  A    I think -- I don't know the exact
2  membership.  It's a pretty open forum.  The
3  manufacturing committee operates, but really
4  doesn't have an operative role.  Whereas the
5  product marketing committee recommends to
6  Restonic, you know, input for marketing
7  services program.  The manufacturing committee
8  is really more of a collection of licensees to
9  discuss or collaborate.
10 Q    To your knowledge, does the marketing
11 committee ever meet in the State of Illinois to
12 discuss---
13 A    You mean the manufacturing committee?
14 Q    I'm sorry.  To your knowledge, has the
15 manufacturing committee ever met in the State
16 of Illinois to discuss manufacturing concerns
17 relative to Restonic?
18 A    I believe it's had one or two meetings
19 since I've been president.
20 Q    Do you know who participated in those
21 meetings?
22 A    I was not there.  But I believe most of
23 the licensees participated.
24 Q    Where was that meeting held?

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   A      I think it was here in Chicago.
 2   Q      Do you know what hotel?
 3   A      No, I don't.
 4   Q      You indicated -- I'm sorry if I'm
 5   misstating your testimony -- there were two
 6   manufacturing committee meetings that you're
 7   aware of?
 8   A      I think so.  I know there was one for
 9   sure.  There may have been a follow-on meeting.
10   Q      You did not participate in that
11   manufacturing committee?
12   A      No.
13   Q      Now, in your role as president of
14   Restonic, are there occasions when licensees
15   call you up or call Restonic up to obtain
16   support in their role as licensee?
17   A      I'm not sure I understand the question.
18   Q      Do you ever get calls from licensees
19   asking for some type of support from Restonic?
20   A      What do you mean by support?
21   Q      Support dealing with the franchise
22   agreement or their license agreement, concerns
23   they have regarding how an aspect of their
24   business is being operated that they would like
```
Network Reporting Corporation        (305)358-8188 * (888)358-8188                Page 49

```
 1   some direction on from you?
 2   A      Yes.  With that definition, yes.
 3   Q      Are those concerns expressed to you by
 4   telephone?  Or do those licensees -- we kind of
 5   went over there -- come to you in person here
 6   in Illinois and discuss those issues?
 7   A      By telephone.  I can only recall once in
 8   the time I've been president where licensees
 9   come to Chicago to see me.  I have visited most
10   of the licensees' facilities.
11          But they don't come to Chicago,
12   unless I ask them to come here or we have a
13   formally-called meeting of some structure.
14   They don't have any reason to come here really.
15   Q      Now, have you ever assisted Tom Comer in
16   relation to the Sleep Alliance stock
17   consolidation of Restonic to develop candidates
18   to transition the leadership of the company
19   beyond the first quarter of 2008?  Does that
20   sound familiar at all to you?
21   A      No.  Try again.
22   Q      I'll show you a document later on during
23   a break or after a break.  But have you ever
24   assisted the Sleep Alliance or Tom Comer
```
Network Reporting Corporation        (305)358-8188 * (888)358-8188                Page 50

```
 1   individually in locating employees for the
 2   Sleep Alliance or employees for Restonic?
 3   A      I'm having a hard time getting the
 4   question.
 5   Q      I'll get the document during a break, and
 6   we'll get back to that.
 7          Now, in addition to the October of
 8   '07 Sleep Alliance meeting that you
 9   facilitated, has there ever been any other
10   Sleep Alliance meetings, to your knowledge,
11   held here in the State of Illinois?
12   A      Not to my knowledge that I can recall.
13   Q      Do you provide any other type of support
14   to the Sleep Alliance other than having
15   facilitated this meeting you spoke about?
16   A      Only anything that would be required in
17   my role as president of Restonic.
18   Q      Sir, do you recall a marketing
19   planning -- product marketing committee meeting
20   that occurred in September of 2007 at O'Hare
21   Double Tree?  I think we may have touched upon
22   that earlier.
23   A      There was a product marketing committee
24   meeting that we had in September, yes.
```
Network Reporting Corporation        (305)358-8188 * (888)358-8188                Page 51

```
 1   Q      That was at the O'Hare Double Tree?
 2   A      I believe it was, yes.
 3   Q      Do you know if Brent Ford was in
 4   attendance at that meeting?
 5   A      I think he was, but I don't recall
 6   exactly.
 7   Q      How about Tom Comer, do you recall if he
 8   was there?
 9   A      He was not.
10   Q      Sir, do you recall a meeting in or about
11   October of 2007 at the Rosemont Sofitel Hotel
12   to discuss brand positioning with a company
13   called Divareto & Associates?
14   A      I called the meeting.
15   Q      And that was in October -- approximately
16   October of '07.  Do you recall that?
17   A      I thought that was September that we were
18   referring to.  That was I thought the meeting
19   you were just referring to.  It may have been
20   October.
21   Q      Do you know if Brent Ford participated in
22   that meeting with Divareto & Associates?
23   A      I don't recall if he was there.  He was
24   invited to be there.
```
Network Reporting Corporation        (305)358-8188 * (888)358-8188                Page 52

```
 1   Q   How about Laurie Tokarz, do you know if
 2   she attended that meeting on behalf of the
 3   Sleep Alliance?
 4   A   I believe Laurie did attend.
 5   Q   Do you know if Mr. Comer -- Tom Comer --
 6   A   He did not attend that meeting.
 7   Q   How about Drew Robins?
 8   A   No.  That was a meeting for the product
 9   marketing committee.
10   Q   Do you recall a meeting that took place
11   in or about November -- I'm sorry.  Strike
12   that.
13        Do you recall a meeting that took
14   place in or about September of '07 at the
15   Continental President's Club at O'Hare to
16   discuss Restonic brand proposal?
17   A   Yes.
18   Q   What was the purpose, just generally, of
19   that meeting?
20   A   I called that meeting also.  The product
21   marketing committee was interviewing three
22   different companies in order to determine which
23   one we wanted to work with on our brand
24   positioning program.
```

```
 1   Q   This was one of the continuations of that
 2   meeting?  The meeting that was held in
 3   September of '07 at the O'Hare airport
 4   Continental President's Club, that was one of
 5   those three meetings?
 6   A   It was one meeting which all three
 7   vendors came in sequence.  What we did is we
 8   held the meeting at the airport in order to be
 9   able to shuttle people in and out and have all
10   the meetings done in half a day.
11   Q   Do you know who participated in that
12   meeting on behalf of Restonic licensees?  And
13   I'll go through the names.  Do you know if
14   Brent Ford was at that meeting?
15   A   Yes, I believe Brent was at that meeting.
16   Q   How about Laurie Tokarz?
17   A   I don't remember if Laurie was at that
18   meeting or not.
19   Q   How about Ken Akers?
20   A   I think Ken was at the meeting.
21   Q   Did I say Brent Ford already?  Yeah, I
22   think I did.  That was the first one.  Was
23   Tom Comer in that meeting?
24   A   I believe Tom came to that meeting.
```

```
 1   Q   Was drew Robins at that meeting?
 2   A   I don't recall.
 3   Q   Do you recall if Richard Stevens was at
 4   that meeting?
 5   A   No, Richard was not at that meeting.
 6   Q   Was anyone on Mr. Stevens' behalf at that
 7   meeting?
 8   A   Akers.
 9   Q   Ken Akers.  I'm sorry.
10   A   Again, we need to be clear.  That's a
11   product marketing committee meeting.  So Ken
12   was a member of it.  He was there on Richard's
13   behalf.  Another fellow by the name of
14   Bob Quinn was also at that meeting.  He was on
15   the product marketing committee.
16   Q   Now, with respect to these product
17   marketing committees, do you have to be a
18   licensee or an employee of a licensee to attend
19   or to participate in these meetings?
20   A   To be a member.
21   Q   Who pays for the cost and expenses of the
22   participation for these meetings?
23   A   Restonic does.  And we reimburse the
24   travel expenses.
```

```
 1   Q   Whose decision is it whether or not a
 2   licensee's employees will sit on one of these
 3   committees?  Ultimately, you as president may
 4   ask a licensee if, you know, one of his or her
 5   employees could sit on the meeting, but it's
 6   the licensee's ultimate decision to decide
 7   whether or not he's going to allow the employee
 8   to participate, correct?
 9   A   Of course.
10   Q   That individual who participates on
11   behalf of the licensee and those product
12   marketing committees are helping not only
13   Restonic, but they're helping their licensee
14   employees, correct?
15   A   The purpose is to help Restonic.
16   Q   Which, in turn, helps the licensees?
17   A   The whole group of licensees.
18   Q   Now, in addition to these various
19   meetings we've spoke about -- again, I'm not
20   going to go through the litany of what they
21   are -- have there been any other meetings that
22   you're aware of that have been held in Illinois
23   in which one or more licensees have
24   participated either directly or through one of
```

1  their employees or agents?

2  A    You know, not that I recall.

3  Q    Sir, are you aware of any employees of

4  Restonic who have actually worked for a

5  licensee of Restonic?

6  A    Could I have the question again.

7  Q    Are you aware of any Restonic employee

8  who has actually worked on behalf of a Restonic

9  licensee?

10 A    You mean like a current employee who was

11 formerly an employee of a licensee?  Is that a

12 way to describe it?

13 Q    While that individual was employed by

14 Restonic Corporation or by Restonic Mattress

15 Corporation, he or she was actually also doing

16 work on behalf of one of the Restonic

17 licensees.

18 A    Again, I'm losing the --

19 Q    We have an employee of Restonic.  He or

20 she does work also on behalf of a licensee for

21 Restonic and is paid by the licensee.  Are you

22 aware of any situations where that occurred?

23 A    I'm not.

24 Q    Are you aware of any situations where

1  Drew Robins employed an employee of Restonic

2  Corporation to do work on his behalf for his

3  facilities in Houston?

4  A    I'm not aware of that.

5  Q    Now, have you ever been asked on behalf

6  of the Sleep Alliance to determine whether or

7  not Gary Robinson was interested in selling his

8  business to the Alliance?

9  A    No.

10 Q    Have you ever had any conversations on

11 behalf of the Sleep Alliance with Gary Robinson

12 where you asked Mr. Robinson whether or not he

13 would accept payments over time if he were to

14 sell his business to either the Sleep Alliance

15 or another one of its licensees?

16 A    The exact answer to that question is no.

17 Q    Through your voice and through the

18 wording you used, is there some other type

19 of --

20 A    I initiated the conversation.

21 Q    With Mr. Robinson?

22 A    Yes.

23 Q    You did that on behalf of who?

24 A    Restonic.

1  Q    What was the purpose of that?

2  A    To facilitate consolidation of Restonic's

3  licensees.  I wasn't asked to do it by anybody.

4  Q    I have a little more time.  I just want

5  to take a five-minute break, and we'll get back

6  and I'll be ten, fifteen minutes.  That's it.

7                   (A short break was had.)

8       MR. SALKOWSKI:  Back on the record.

9       I'm going to show Mr. Russo a

10 document.  It's one of the documents that was

11 produced by Mr. Mendelsohn either on Friday or

12 today.

13      I'm not going to introduce it,

14 unless you guys want me to.  And then I don't

15 have a problem with it.  But I had asked him a

16 question dealing with the developed candidates.

17      I'm going to show him.  For the

18 record, it's marked R00843.  And it's the

19 minutes of a telephonic meeting of the Restonic

20 Mattress Corporation board of directors,

21 October 17, 2007.

22 BY MR. SALKOWSKI:

23 Q    Sir, I'd just ask you to -- you can look

24 at the whole document, of course.  But I'm

1  going to ask you questions on the last

2  paragraph that begins the Alliance sleep

3  program.

4  A    (Witness peruses document.)

5  Q    Sir, I had asked you before the break

6  whether or not you had any contact with either

7  Mr. Comer or Sleep Alliance.

8       And I read to you that portion of

9  the telephonic meetings where it says that

10 Steve Russo -- or you -- is going to work with

11 Comer to develop candidates to transition the

12 leadership of the company beyond the first

13 quarter of 2008.

14      Do you recall what that was

15 referring to?

16 A    Yes, I do.

17 Q    What is that?

18 A    That was to work with Tom to identify

19 candidates to be president of Restonic.

20 Q    Could I assume that position has been

21 filled by you?

22 A    No.

23 Q    So you're still looking actively for

24 another president?

1    A    Yes.

2    Q    Now, sir, does any of the Restonic

3    licensees purchase anything directly from

4    Restonic Corporation or Restonic Mattress

5    Corporation?

6    A    Yes.

7    Q    What is the nature of the products that

8    are purchased or services that are purchased?

9    A    Well, the services are the marketing

10   services of brand management, which they pay a

11   licensing fee for.  The products are actually

12   marketing materials that Restonic develops.

13   Q    Those are purchased by the licensees from

14   Restonic here in Illinois?

15   A    Yes.

16   Q    In addition to marketing materials, do

17   the licensees purchase anything else directly

18   from Restonic?

19   A    Not that I'm aware of.

20   Q    How about whether or not Restonic

21   purchased anything from licensees?

22   A    The only thing that we may purchase from

23   a licensee that we can think of would be some

24   material we would need for our showroom in

---

1    Las Vegas.

2    Q    To your knowledge, has Restonic ever

3    purchased beds for use in the flame retardant

4    tests that were being conducted in the State of

5    Illinois?

6    A    We've purchased -- the mattresses we

7    purchased for fire retardancy qualification

8    came from different licensees based upon when

9    the testing was being performed.

10   Q    Was any test conducted here in the State

11   of Illinois?

12   A    Yes.

13   Q    Who did Restonic purchase the bedding

14   from for the tests that were being conducted in

15   the State of Illinois?

16   A    I believe it was from New Albany.

17   Q    To your knowledge, has Continental

18   Silverline or Drew Robins ever sold bedding to

19   Restonic here in Illinois to be used for fire

20   retardant tests in the state?

21   A    No.

22   Q    To your knowledge, has Tom Comer's

23   businesses ever sold to you products to be used

24   for fire retardant tests here in the State of

---

1    Illinois?

2    A    No.

3    Q    How about Richard Stevens, same question?

4    A    No.

5    Q    How about for any other purpose besides

6    fire retardant tests, has Restonic ever

7    purchased any products from either of those

8    three licensees for the purposes of use somehow

9    in the State of Illinois?

10   A    State of Illinois, no.

11   Q    How about elsewhere?

12   A    Yes.

13   Q    In what context has Restonic purchased

14   products from either Mr. Comer's businesses,

15   Mr. Stevens; business or Mr. Robins' business?

16   A    Only Mr. Robins of the three.

17   Q    Tell me about the purchase Restonic

18   made --

19   A    It was for samples for the showroom in

20   Las Vegas.

21   Q    Were those products shipped directly to

22   Las Vegas, or were they shipped to Illinois

23   first?

24   A    Directly to Las Vegas.

---

1    Q    Now, does Restonic Corporation have a

2    customer service 1 (800) number?

3    A    I believe we do, yes.

4    Q    What is the purpose customer -- is it an

5    active 1 (800) number where customers call up

6    and ask questions?

7    A    Restonic has an (800) number that is

8    answered by our office.  And people can call up

9    and ask any question.

10   Q    Do people call up and ask where we can

11   find Restonic mattresses in my particular

12   state? .

13   A    Not that I'm aware of.  If they do, we

14   direct them to the website because on the

15   website there's a locator where you type in the

16   zip code.  And it lists the retailers in that

17   region if the licensee has updated the list.

18   Q    Now, this 1 (800) number, do you also

19   accept complaints or accommodations from

20   customers dealing with specific licensees?

21   A    Calls come in from time to time.  I'm not

22   sure if it's just an (800) number.  It could be

23   on the regular number as well.  We do receive

24   calls from time to time.

**Panel 1 (Page 65)**

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

1      MR. SALKOWSKI:  Sir, I have no further
2  questions.  For the purposes of the record, the
3  deposition was limited to issues surrounding
4  jurisdiction.  And that I reserve the right to
5  call you on the substantive matters if need be.
6      MR. MENDELSOHN:  Anybody else?
7      MR. LYMAN:  I have a question.
8              EXAMINATION
9  BY MR. LYMAN:
10  Q    Do you know that Sleep Alliance meeting
11  that I think you facilitated?
12  A    Yes.
13  Q    Was that in conjunction with some other
14  meetings that were taking place at the same
15  time like other Restonic meetings, if you know?
16  A    Well, that I recall now as we went
17  through this process, it was the afternoon of
18  and the morning after that this product
19  marketing committee meeting we were having here
20  in Chicago.
21  Q    So, in other words, there were Restonic
22  meetings that proceeded first?
23  A    Correct.
24  Q    I think you already told us that the

Newark Reporting Corporation      (305)358-8188 * (888)358-8188      Page: 65

**Panel 2 (Page 66)**

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

1  reason all these people met for the Sleep
2  Alliance is because it was a convenient
3  location being in Chicago, correct?
4  A    Correct.
5  Q    So now it's even more convenient because
6  everybody was already there because of
7  Restonic -- a Restonic meeting that had taken
8  place before the Sleep Alliance meeting,
9  correct?
10  A    Not everybody.  But most of them,
11  correct.
12      MR. LYMAN:  That's all I have.
13              EXAMINATION
14  BY MR. GAUSTAD:
15  Q    Mr. Russo, you had mentioned Ken Akers on
16  a number of occasions.  As I understand, it's
17  your understanding or you believe Mr. Akers is
18  an employee of the Stevens group, is that
19  right?  Do you know?
20  A    I believe he works for Stevens Mattress
21  Company.  One of the two, if not both.
22  Q    So when he was in attendance at these
23  meetings, was he there on behalf of the entity
24  or Mr. Stevens in an individual capacity?

Newark Reporting Corporation      (305)358-8188 * (888)358-8188      Page: 66

**Panel 3 (Page 67)**

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

1      MR. SALKOWSKI:  Objection.  Lack of
2  foundation.
3
4  BY MR. GAUSTAD:
5  Q    Do you know if Mr. Akers -- what capacity
6  Mr. Akers was there as an employee for the
7  corporation or these entities?
8  A    When he attends the product marketing
9  committee meetings, he, like the other members
10  of the product marketing committee, are coming
11  in as employees of their respective licensees.
12      MR. GAUSTAD:  Thank you.
13      MR. SALKOWSKI:  That's it.  Thank you.
14      MR. MENDELSOHN:  Reserve.
15      (AND FURTHER DEPONENT SAITH NOT)
16
17
18
19
20
21
2
23
24

Newark Reporting Corporation      (305)358-8188 * (888)358-8188      Page: 67

**Panel 4 (Page 68)**

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3
   ROYAL SLEEP          )
4  PRODUCTS, INC.,      )
                        )
5      Plaintiff,       )
                        )
6      vs.              ) No. 07 C 6588
                        )
7  RESTONE CORPORATION, )
   an Illinois          )
8  Corporation, et al., )
                        )
9      Defendants.      )
10      I, STEPHEN RUSSO, state that I have read
11  the foregoing transcript given by me at my
12  deposition on the 14th day of July, 2008, and
13  that said transcript constitutes a true and
14  correct record of the testimony given by me
15  at said deposition except as I have so
16  indicated on the errata sheets provided
17  herein.
18
19                  STEPHEN RUSSO
20  No corrections (Please initial)_____
    Number of errata sheets submitted_____ (pgs.)
21
22  SUBSCRIBED AND SWORN to
    before me this _____ day
23  of _____, 2008.
24
                  NOTARY PUBLIC

Newark Reporting Corporation      (305)358-8188 * (888)358-8188      Page: 68

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1   STATE OF ILLINOIS  )
                        )  SS.
 2   COUNTY OF COOK     )

 3

 4            I, Laura E. Locascio, Certified

 5   Shorthand Reporter and Notary Public, in and

 6   for the County of Cook, State of Illinois, do

 7   hereby certify that previous to the

 8   commencement of the examination, said witness

 9   was duly sworn by me to testify the truth;

10   that the said deposition was taken at the

11   time and place aforesaid; that the

12   testimony given by said witness was reduced

13   to writing by means of shorthand and

14   thereafter transcribed into typewritten form;

15   and that the foregoing is a true, correct,

16   and complete transcript of my shorthand notes

17   so taken as aforesaid.

18            I further certify that there were

19   present at the taking of the said deposition

20   the persons and parties as indicated on the

21   appearance page made a part of this

22   deposition.

23

24
```

Network Reporting Corporation          (305)358-8188 * (888)358-8188          Page: 69

---

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

```
 1            I further certify that I am not

 2   counsel for nor in any way related to any of

 3   the parties to this suit, nor am I in any way

 4   interested in the outcome thereof.

 5            I further certify that this

 6   certificate applies to the original signed IN

 7   BLUE and  certified transcripts only.  I

 8   assume no responsibility for the accuracy of

 9   any reproduced copies not made under my

10   control or direction.

11            IN TESTIMONY WHEREOF I have

12   hereunto set my hand and affixed my notorial

13   seal this    day of       , A.D., 2008.

14

15

16              _____
                Laura Locascio, CSR, RPR

17

18   My Commission Expires
     October 16, 2011
19

20

21

22

23

24
```

Network Reporting Corporation          (305)358-8188 * (888)358-8188          Page: 70

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

## WORD INDEX

**< 0 >**
**06** 11:13 12:4
22:7 43:15
**07** 19:2, 13 22:2, 4
31:18 32:10 51:8
52:16 53:14 54:3
68:6
**08** 34:22 44:12, 13

**< 1 >**
**1** 1:22 64:2, 5, 18
**100** 2:6
**10007** 6:19
**102** 7:2
**1301** 4:6
**14th** 1:23 68:12
**15** 10:12
**150** 3:5
**1540** 7:2
**17** 59:21

**< 2 >**
**2006** 8:15, 16, 21
23:13 31:9 41:3
**2007** 9:16 15:18
43:1 51:20 52:11
59:21
**2008** 1:23 32:20
35:16 50:19 60:13
68:12, 23 70:13
**2200** 2:16
**27th** 2:7
**29th** 22:1, 2
**2nd** 2:6

**< 3 >**
**305** 2:9
**30th** 22:1, 2
**312** 2:18 3:8
**3241** 3:8
**3262** 3:19
**330** 1:21 2:15
**3300** 3:6
**33131** 2:8
**352** 3:19
**374** 2:9

**< 4 >**
**40** 1:22
**4th** 32:19, 20
34:21 35:16

**< 5 >**
**5151** 4:8
**5418** 2:9
**58237** 3:18

**< 6 >**
**6** 5:4
**60601** 3:7
**60611** 2:17
**645** 3:17
**65** 5:5
**651** 4:8
**6588** 68:6
**66** 5:6

**< 7 >**
**7004** 2:18
**701** 3:19
**713** 4:8
**77010** 4:7

**< 8 >**
**800** 64:2, 5, 7, 18, 22
**840** 2:18
**894** 3:8

**< A >**
**A.D** 1:23 70:13
**able** 19:10 37:16
41:8 54:9
**Absolutely** 35:6
**accept** 58:13 64:19
**accommodations**
64:19
**account** 37:5, 9, 12,
20 38:8, 9, 13, 14,
16, 17, 19, 22 39:5
**accounts** 38:3, 4, 5
39:4, 6
**accuracy** 70:8
**achieve** 16:15
**action** 6:11 20:4
**active** 38:6 40:17,
23 64:5

**actively** 44:10, 15
60:23
**add** 41:4
**addition** 21:6
23:24 26:18, 20
27:11 31:17 32:10
34:17, 24 35:21
39:7 41:12 42:10
46:24 51:7 56:18
61:16
**Additionally** 8:5
**address** 6:15, 17,
18, 21, 23, 24
**adjacent** 35:11
**advisory** 39:9, 11,
12, 13, 15 40:16, 23
41:1, 7, 13
**affixed** 70:12
**aforesaid** 69:11, 17
**afternoon** 6:8
65:17
**agenda** 16:14, 16
**agents** 57:1
**agreement** 49:22, 22
**agreements** 13:20
14:9 15:2
**ahead** 40:8
**Air** 10:2, 3, 5, 10
**airport** 33:4 54:3, 8
**Akers** 17:19 18:16,
17 34:2 37:1
42:18 45:18 46:1,
12, 13 54:19 55:8,
9 66:15, 17 67:5, 6
**al** 68:8
**Albany** 23:9 42:20
45:14, 17 62:16
**Alliance** 3:10
14:13, 15, 16, 19, 23
15:8, 11, 22 16:19,
21 19:1, 5, 14
20:24 42:17 50:16,
24 51:2, 8, 10, 14
53:3 58:6, 8, 11, 14
60:2, 7 65:10 66:2,
8
**allow** 56:7
**America** 2:5
**AMUNDSEN** 3:3
**ANDREW** 4:5

**annual** 30:17, 18
31:18, 21
**answer** 40:2 43:23
58:16
**answered** 64:8
**anybody** 59:3 65:6
**Apollo** 6:19 16:9,
17, 21, 24 17:1, 5
**appearance** 69:21
**APPEARANCES**
2:1 3:1 4:1
**Appearing** 3:20 4:9
**applies** 70:6
**approach** 39:21
**appropriate** 40:3
**approved** 38:24
**approximately** 8:16
9:7 10:12 12:23,
24 19:4 43:1, 10,
15 44:5, 8 52:15
**area** 16:1
**asked** 14:22 15:21
16:3 26:23 28:7
58:5, 12 59:3, 15
60:5
**asking** 40:2, 4
49:19
**aspect** 49:23
**assisted** 50:15, 24
**Associates** 52:13,
22
**assume** 60:20 70:8
**attend** 30:8 34:12,
14 53:4, 6 55:18
**attendance** 17:12
31:10, 14, 15 52:4
66:22
**attended** 26:12
32:16 33:8, 11
46:2, 5, 14, 20 53:2
**attends** 67:8
**attorney** 6:10 40:1,
6
**autonomy** 14:8
**Avenue** 1:21 2:15
3:5, 17
**aware** 14:16 19:13
30:7 32:7 46:19
49:7 56:22 57:3, 7,

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

22, 24  58:4  61:19
64:13

< B >
back  40:15  51:6
59:5, 8
background  19:18
Bank  2:5
based  23:8  62:8
basis  27:1, 10, 16
Beach  6:20
becoming  11:4, 24
38:17  44:16
Bedding  3:11  17:7
18:11  20:9  62:13,
18
beds  62:3
beginning  28:4
begins  60:2
behalf  2:10, 19  3:9,
21  4:10  15:7  17:6
18:12  53:2  54:12
55:6, 13  56:11
57:8, 16, 20  58:2, 5,
11, 23  66:23
believe  18:3, 9
20:7, 8, 10, 17, 20,
23  21:3  24:19
26:17  32:3, 6, 9
33:13, 14, 20  37:11
39:20  48:18, 22
52:2  53:4  54:15,
24  62:16  64:3
66:17, 20
beyond  50:19
60:12
bit  14:2
Blinds  18:13
BLUE  70:7
board  10:22  21:7,
8, 10, 16, 23  22:7,
11, 15, 17, 20  23:11,
12, 14  24:18  25:1,
9, 13, 22  26:4, 10,
13, 18, 20, 24  27:8,
12, 14, 19, 19, 23, 24
28:23  29:1, 11, 12,
15, 20  30:4  38:23
39:9, 11, 12, 13, 17
40:16, 17, 19, 23

41:1, 4, 5, 7, 13
47:6  59:20
boards  21:11, 21
22:5, 9  23:21  26:8
Bob  42:19  55:14
Boulevard  6:19
brand  8:2  13:15
52:12  53:16, 23
61:10
break  28:13, 15
50:23, 23  51:5
59:5, 7  60:5
Brent  17:20  18:20
33:12  36:11  42:20
45:18  46:19  52:3,
21  54:14, 15, 21
briefly  7:20  19:17
bringing  34:24
BRITO  2:3
brought  6:11  28:4
Buffalo  3:11  24:5,
8, 11, 21, 24
BURKE  2:12
business  6:21, 23
7:5  9:18, 20, 21
10:15  12:6, 8  14:8
15:13  27:15, 21, 21
29:2  49:24  58:8,
14  63:15, 15
businesses  18:10,
14  62:23  63:14
Butler  22:23  23:1
30:2
bylaws  39:10  41:2

< C >
call  8:3  49:15, 15
64:5, 8, 10  65:5
called  1:13  6:3
16:9  39:8  41:14,
17  47:9  50:13
52:13, 14  53:20
calls  49:18  64:21,
24
candidates  50:17
59:16  60:11, 19
Cantor  22:22, 24
24:13, 14, 17, 19, 19
29:15  30:1

capacity  11:14
18:9, 18  66:24  67:5
Carlene  12:19
central  19:10  31:24
certificate  70:6
Certified  1:19  69:4
70:7
certify  69:7, 18
70:1, 5
chair  44:21
chairman  29:15
change  45:16
changed  25:16
41:3, 24  45:1, 5
charts  42:6
Chicago  1:22  2:17
3:7  7:10  16:1, 1
17:11  19:6, 13
32:15  33:4  49:1
50:9, 11  65:20  66:3
chief  23:4
Chris  42:14
CHRISTENSEN  3:15
Civil  1:16
CLAPP  3:15
clarification  40:9
clarity  29:20  35:5
43:19
clear  29:14  55:10
client  40:1, 6
Club  53:15  54:4
code  64:16
collaborate  47:13
48:9
collection  47:12
48:8
collectively  36:3
combined  45:12
come  19:11  31:24
35:8  36:5  50:5, 9,
11, 12, 14  64:21
Comer  3:13  11:3,
12, 15, 22  12:3, 7
15:23  16:4  17:17
18:6  20:6  21:19,
20  22:4, 8, 19
23:13  24:12, 13, 19
30:5, 8  32:1  33:17,
18, 22  36:15  50:15,

24  52:7  53:5, 5
54:23  60:7, 11
Comer's  12:8
18:10, 13  20:7
62:22  63:14
coming  29:20
67:10
commencement
69:8
commencing  1:22
Commission  70:18
committee  41:15,
18  42:3, 4, 5, 9, 23
43:2, 7, 12, 16, 20,
21  44:2, 2, 3, 10, 14,
22  45:9  46:5, 14,
21  47:8, 9, 10, 20,
22, 23  48:3, 5, 7, 11,
13, 15  49:6, 11
51:19, 23  53:9, 21
55:11, 15  65:19
67:9, 10
committees  42:2
43:20  44:15  45:5,
13, 19  47:1, 2, 4
55:17  56:3, 12
companies  16:6
20:7  25:10, 14
53:22
Company  3:11  9:3,
23  13:2, 18  14:18,
20  16:8  20:21
26:5  32:24  45:10
50:18  52:12  60:12
66:21
complaints  64:19
complete  69:16
comprised  41:6
concern  39:21
concerns  48:16
49:22  50:3
conduct  34:18  35:2
conducted  11:19
19:15  23:16  25:1
27:12  43:5, 11
62:4, 10, 14
confuses  38:24
conjunction  65:13
consolidation

Network Reporting Corporation

(305)358-8188 * (888)358-8188

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

50:17  59:2
constitutes  68:13
consultant  9:1
10:21
contact  27:14, 18
28:22, 24  29:8  60:6
CONT'D  3:1  4:1
context  63:13
Continental  4:11
20:18  53:15  54:4
62:17
continuations  54:1
contractual  14:24
control  70:10
convene  34:13
convenient  66:2, 5
conversation  58:20
conversations  29:9
58:10
Cook  1:20  69:2, 6
copies  70:9
Corp  8:9
corporate  24:8
26:7
Corporation  2:20,
21  6:13  7:11, 12,
15, 18, 22, 24  8:1, 5,
18, 19  9:1, 2  11:7,
8, 19  12:1  13:14,
24, 24  19:19, 20
21:8, 9, 13, 14, 17,
18, 23  22:7, 12, 13,
18, 21  23:2, 5, 19,
21, 23  26:7  27:2, 3,
8  30:20, 24  37:3, 4,
22  39:11  41:3, 11
57:14, 15  58:2
59:20  61:4, 5  64:1
67:7  68:7, 8
corporations  7:21
8:13, 23  22:9, 16
27:13
Corporation's  14:4
correct  7:16  8:11
9:13  12:13  14:9
16:2  18:23  19:21
21:7  22:3  30:15
33:7  35:17  43:18
56:8, 14  65:23

66:3, 4, 9, 11  68:14
69:15
corrections  68:20
correspondence
37:19
cost  55:21
counsel  70:2
County  1:20  69:2,
6
course  56:9  59:24
COURT  1:1  68:1
Courts  1:17
current  10:14
42:11  57:10
Currently  19:23
40:17  41:17
customer  10:19
64:2, 4
customers  9:20
10:15, 16, 20  16:24
17:6  64:5, 20

< D >
Dakota  3:18
Dan  29:15, 17  30:1
DANIEL  3:16  22:22
Darryl  22:23  30:2
David  42:13
day  1:23  19:3, 4
23:13  54:10  68:12
70:13
days  19:3
dealing  36:17
49:21  59:16  64:20
December  22:1, 2,
4, 7  23:13  31:9, 18
32:10  41:3
decide  31:20  56:6
decision  56:1, 6
defendant  18:6
Defendants  2:19
3:9, 21  4:10  68:9
definition  50:2
DEPONENT  67:15
deposition  1:13
5:12  11:6  65:3
68:12, 15  69:10, 19,
22
depositions  1:18

describe  7:20
13:12  16:11  57:12
described  39:8
designated  38:9, 14
desired  29:16
determine  53:22
58:6
develop  50:17
60:11
developed  59:16
develops  61:12
different  14:1, 2, 3,
10  18:4  33:6
53:22  62:8
direct  16:14  64:14
directing  44:14
direction  32:24
50:1  70:10
directly  8:6  10:18
56:24  61:3, 17
63:21, 24
director  21:16, 18,
20  22:12, 20  23:3
24:20  29:13  30:7,
10, 11
directors  10:22
21:7, 9, 10, 11, 13,
14, 17  23:11, 12, 14
24:7, 11, 18  25:1, 9,
22  26:8, 11, 13, 19,
21, 24  27:9, 12, 15,
19, 20  28:23  29:1,
3, 4, 11  30:2  39:17
41:7  47:6  59:20
discuss  27:15, 20
28:24  36:16  48:9,
12, 16  50:6  52:12
53:16
discussion  30:3
discussions  29:11,
19  30:1
DISTRICT  1:1, 17
68:1
Divareto  52:13, 22
DIVISION  1:2  68:2
document  37:10, 18
38:21  50:22  51:5
59:10, 24  60:4
documents  47:15
59:10

doing  28:17  29:18
57:15
domestic  13:21
Donna  44:19
Double  33:2  34:23
51:21  52:1
Drew  4:12  11:3
18:21  20:18  33:10
36:8  53:7  55:1
58:1  62:18
duly  6:4  69:9
Dundee  7:2

< E >
earlier  6:8  51:22
East  7:2
EASTERN  1:2  68:2
EINHORN  2:3
either  8:22  12:3, 7
20:10, 15  22:15, 24
25:2  27:13  35:13
47:6  56:24  58:14
59:11  60:6  63:7, 14
elected  19:6  21:23
24:7
eliminated  41:2
employ  13:2
employed  57:13
58:1
employee  9:10, 14
27:7  33:12  36:11
37:1  42:13, 15, 17,
18, 19, 21  45:11
55:18  56:7  57:7,
10, 11, 19  58:1
66:18  67:6
employees  51:1, 2
56:2, 5, 14  57:1, 3
67:11
engagements  17:4
ensure  16:15  41:9
entities  67:7
entity  66:23
Epperson  17:23
equity  16:17
errata  68:16
estimate  28:16, 18,
19
et  68:8

Deposition of Stephen Russo                                Royal Sleep Products, Inc. vs. Restonic Corporation

Evanson 12:19
everybody 66:6, 10
exact 48:1 58:16
exactly 9:6, 15
  12:22 15:16 37:23
  46:18, 23 52:6
examination 1:14
  6:6 65:8 66:13
  69:8
examined 6:4
exchanged 10:1
executive 23:4
  24:20
EXHIBIT 5:12
exhibits 5:14
existed 41:7
existence 37:14
  38:19 41:19
expense 24:10
expenses 55:21, 24
Expires 70:18
expressed 50:3

< F >
Fabia 44:19
facilitate 15:21
  16:4, 10 59:2
facilitated 15:10
  51:9, 15 65:11
facilitates 16:7
facilitating 17:6
facilitation 16:22
  17:2
facilities 50:10
  58:3
fact 33:16
Falls 42:15
familiar 15:19 28:7
  37:6 50:20
fashion 47:12
Federal 1:15
Federation 24:20
fee 61:11
fellow 13:9 17:18,
  19 45:7 55:13
fifteen 59:6
figure 38:1
fill 11:19
filled 60:21

financial 39:18, 21
  41:9
find 34:5 37:16
  64:11
fine 11:11
finish 28:14
fire 47:17 62:7, 19,
  24 63:6
firm 17:22 18:1
first 6:3 9:17
  15:20 17:23 23:19
  25:19 26:1 29:14
  31:6 35:8 44:10,
  12, 13 50:19 54:22
  60:12 63:23 65:22
five 9:7 59:5
flame 62:3
Floor 2:7
Florida 2:8 6:20
  7:5 10:2, 7, 8
flow 42:6
foam 9:22 10:15
  12:9
follow 49:9
follows 6:5
Ford 17:20 18:20
  33:12, 13 36:11
  42:20 45:18 46:2,
  19, 20 52:3, 21
  54:14, 21
foregoing 68:11
  69:15
foreign 14:7
form 69:14
formally 50:13
formerly 57:11
forum 48:2
found 37:18 38:8,
  13
foundation 67:2
four 9:7 43:14
franchise 49:21
franchisee 10:11
franchisees 37:21
FREDERIC 2:13
frequent 27:16
Friday 59:11
FRIEDBERG 4:5
friendly 24:14

friends 12:3
FULBRIGHT 4:4
further 65:1 67:15
  69:18 70:1, 5

< G >
Gary 20:21 58:7, 11
GAUSTAD 3:16
  5:6 66:14 67:4, 12
general 20:1
generally 13:12
  29:10 34:11 39:22
  53:18
getting 51:3
give 15:1
given 68:11, 14
  69:12
giving 28:17
go 23:18 28:3, 15
  31:15 40:7 47:3
  54:13 56:20
going 28:10 40:5
  56:7, 20 59:9, 13,
  17 60:1, 10
Good 6:8 23:18
  39:20
Grafton 3:18
greater 26:4
group 10:6 11:16
  23:8, 17 30:19, 20
  31:7 32:23 39:22
  41:15 42:17, 19, 20
  45:14 56:17 66:18
groups 18:19
guess 28:18, 20
  43:4
guys 47:17 59:14

< H >
half 25:12 54:10
hand 70:12
happen 28:9
happened 45:6
hard 51:3
head 28:10
headquartered 10:8
held 19:2 30:1
  31:1, 3 32:22 33:1
  48:24 51:11 54:2,

8 56:22
help 56:15
helping 56:12, 13
helps 56:16
hereunto 70:12
Hill 3:17
hold 19:6 34:7, 15
holding 14:20
holdings 41:10
holds 41:16 47:5
home 6:16, 18 7:6,
  7
Hotel 15:18, 24
  17:11 33:2 34:23
  49:2 52:1
Houston 4:7 42:21
  58:3

< I >
IBM 2:14
Idaho 42:16
identified 11:23
identify 60:18
identities 11:9
Ill 3:4
Illinois 1:9, 21, 22
  2:17 3:7 7:3, 9
  19:15 24:9 30:8
  33:3 35:2, 9, 23
  36:5, 13, 16, 23
  43:6, 12, 17 45:24
  46:6, 15, 22 48:11,
  16 50:6 51:11
  56:22 61:14 62:5,
  11, 15, 19 63:1, 9,
  10, 22 69:1, 6
includes 20:9
including 41:13
inconvenient 31:23
Indiana 23:9
indicated 7:14
  10:13 49:4 68:16
  69:20
indicating 37:19
individual 11:23
  29:3, 4 34:4 56:10
  57:13 66:24
Individually 36:3, 4,
  7 51:1
industry 17:7, 8, 9

Deposition of Stephen Russo                                   Royal Sleep Products, Inc. vs. Restonic Corporation

information  19:18
 29:21  47:16
initial  68:20
initiated  58:20
input  48:6
instance  46:13
instructions  28:3
intellectual  7:23
 8:6, 8
intent  37:11
interest  16:18, 19
 23:1
interested  11:24
 58:7  70:4
interface  10:18
interim  9:3, 4, 12
 10:23  11:4, 24
 12:11  26:1
International  9:22
 10:4  13:22  14:5
internationally  8:7
interviewing  53:21
introduce  10:20
 59:13
investment  18:1
invited  35:20  52:24
involve  30:5  35:19
involved  14:6  44:9,
 16, 20
involves  29:24
Isles  6:19
issues  50:6  65:3
its  13:16, 21  17:6
 19:6  47:6, 6, 7
 58:15

< J >
Jackson  3:12  20:9
JAWORSKI  4:4
Jewish  24:20
Jim  40:20
John  40:19
joined  25:19
July  1:23  68:12
June  32:19, 20
 34:21  35:7, 16
jurisdiction  65:4

< K >

Ken  17:19  18:16,
 17  34:2  37:1
 42:18  46:12  54:19,
 20  55:9, 11  66:15
Kentucky  31:7
Kevin  13:10
kind  28:1  50:4
knew  9:18  10:18
know  9:8  11:12, 16,
 18, 21, 22  12:15, 20,
 23  13:5, 6, 7  14:15
 15:15  16:3  18:7,
 12, 15, 16  19:1, 5,
 23  20:1, 2, 5, 14, 19,
 22, 24  22:8, 10
 23:10  24:7, 14, 16,
 17  25:6, 8  28:11
 31:8, 13  32:1, 4
 33:8  34:4  36:7, 11
 38:16  44:7, 9  46:8,
 10, 17  48:1, 6, 20
 49:2, 8  52:3, 21
 53:1, 5  54:11, 13
 56:4  57:2  65:10,
 15  66:19  67:5
knowledge  18:20
 22:11  37:8, 15
 38:18  39:3  40:21
 42:9  44:23  48:10,
 14  51:10, 12  62:2,
 17, 22
known  37:4

< L >
L.P  4:12
Lack  67:1
lady  44:17
Las  34:13, 15
 35:11, 15, 15  62:1
 63:20, 22, 24
lasted  19:2
late  8:14
Latex  9:22, 22
 10:4, 15
Laura  1:18  18:7
 33:19  69:4
Laurie  17:17  36:19
 42:16  53:1, 4
 54:16, 17
lawsuit  18:6  26:6

leadership  50:18
 60:12
League  24:21
learn  9:17
Lee  22:22
left  10:3  13:2, 2
level  30:4
license  11:16  15:2
 36:17  42:14, 16
 49:22
licensee  10:5
 27:22  30:4  33:5
 34:7, 9, 17, 19  35:9,
 14, 17, 21  39:19, 22
 41:4  45:17, 17
 49:16  55:18, 18
 56:4, 11, 13  57:5, 9,
 11, 20, 21  61:23
 64:17
licensees  6:12  8:3,
 7  9:20  10:14, 16
 13:16, 21  14:5, 7,
 21  15:1  26:23
 29:24  30:6  31:24
 32:15, 22  34:12
 35:1, 3, 8, 19, 19, 23
 36:2  37:21, 23
 39:14  41:8  47:7,
 13  48:8, 23  49:14,
 18  50:4, 8, 10
 54:12  56:16, 17, 23
 57:17  58:15  59:3
 61:3, 13, 17, 21
 62:8  63:8  64:20
 67:11
licensee's  56:2, 6
licenses  7:23  8:6, 9
licensing  14:9
 18:19  61:11
limited  17:6  65:3
line  28:14
list  64:17
lists  64:16
litany  56:20
little  59:4
live  24:11
LLC  3:3, 10, 12
LLP  4:4
Locascio  1:18  69:4
locating  51:1

location  19:10
 31:24  66:3
locator  64:15
log  31:16
long  8:12  9:4
 10:10  12:20, 23
 19:1  21:20  23:10
 28:19, 20
longer  45:10
look  31:15  59:23
looking  60:23
losing  57:18
Louisville  31:7, 17
LYMAN  3:4  5:5
 65:7, 9  66:12

< M >
maintain  7:4
managed  9:19
management  8:2
 13:15  61:10
managerial  16:6
Mann  17:23
manner  19:18
manufacturers  8:3
Manufacturing  3:22
 47:9, 14, 21, 22, 23
 48:3, 7, 13, 15, 16
 49:6, 11
marked  5:14  59:18
market  34:13  35:11
marketing  8:2
 13:15  18:10, 18, 22
 33:21  39:17, 21
 41:9, 14, 15, 18, 22,
 23  42:1, 5, 9, 22
 43:7, 12, 16, 20
 44:1, 3, 18  45:7, 9
 46:5, 14, 21  47:21
 48:5, 6, 10  51:18,
 19, 23  53:9, 21
 55:11, 15, 17  56:12
 61:9, 12, 16  65:19
 67:8, 10
material  61:24
materials  61:12, 16
matter  29:24  33:16
 38:2, 6
matters  30:4  36:16
 39:18  65:5

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

Mattress 2:21 3:12, 22 6:13 7:11, 15, 24 8:1, 9, 18 9:1, 2 11:7 13:24 19:20 20:10, 16 21:9, 14, 18 22:6, 13, 17, 21 23:1, 5, 23 26:7 27:2, 7 30:21, 24 37:4 39:10 41:2, 11 57:14 59:20 61:4 66:20
mattresses 62:6 64:11
McKAY 2:12
McKenny 40:20
McKinney 4:6
mean 10:17 11:6 36:6 44:24 48:13 49:20 57:10
Meaning 14:7
means 16:11, 12 69:13
meet 25:9, 23, 24 35:23 36:2 42:23 43:2 48:11
meeting 15:10, 12, 13, 21 16:4, 10, 13, 14, 22 17:10, 13 19:2, 6, 9, 12, 14 22:1 24:2, 4, 5, 8, 24 25:22 26:15 29:16, 18, 21 31:6, 6, 11, 14, 18, 19, 21, 21, 22 32:2, 5, 8, 11, 12, 14, 21, 22 33:1, 5, 6, 9, 11 34:7, 10, 15, 17, 21, 22 35:7, 15, 16, 18 41:12, 13 46:21 48:24 49:9 50:13 51:8, 15, 19, 24 52:4, 10, 14, 18, 22 53:2, 6, 8, 10, 13, 19, 20 54:2, 2, 6, 8, 12, 14, 15, 18, 20, 23, 24 55:1, 4, 5, 7, 11, 14 56:5 59:19 65:10, 19 66:7, 8
meetings 16:7 17:2, 7 22:12, 14 23:15, 15, 20, 24

24:1 25:1 26:12, 13, 19, 22, 24 27:4, 9, 12, 20 28:24 29:13, 22 30:7, 10, 11, 15, 17, 19, 24 34:19 35:3, 9, 13, 14, 17, 21 39:7 41:16 43:5, 11 45:23 46:24 47:3, 5 48:18, 21 49:6 51:10 54:5, 10 55:19, 22 56:19, 21 60:9 65:14, 15, 22 66:23 67:9
meets 43:3
meld 28:2
member 22:15, 17 29:20 31:3 55:12, 20
members 40:19 41:4 42:8, 12 43:6, 13 67:9
membership 42:12 45:1 48:2
MENDELSOHN 2:13 40:9 59:11 65:6 67:14
mentioned 66:15
met 6:8 11:15 25:14 43:13, 16, 21, 22 44:4 48:15 66:1
Miami 2:8 45:8, 16
Michigan 3:5
minute 59:5
minutes 26:8, 11 59:6, 19
misstating 49:5
month 8:24
months 9:7 10:12
morning 65:18

< N >
name 6:9, 14 13:9 16:8 17:19, 19 34:4 41:24 55:13
named 44:19
names 17:24 20:3, 12 33:9 54:13

national 37:5, 9, 12, 20 38:3, 5, 9, 14, 17, 18, 21 39:4, 5, 6
nature 15:12 29:10 32:20 47:10 61:7
need 11:8 25:23, 24 28:13 29:14, 21 41:1 55:10 61:24 65:5
needed 34:11 42:24
network 8:3
never 38:5
New 23:8 24:6, 8, 11, 24 26:3 42:20 45:14, 17 62:16
nominated 22:8
North 1:21 2:15 3:5, 18
Notary 1:19 69:5
notes 69:16
notice 1:15
notorial 70:12
November 8:14, 16, 21 11:13 12:4 43:15 53:11
number 8:7 18:3 25:15 46:20 64:2, 5, 7, 18, 22, 23 66:16

< O >
Objection 67:1
obtain 49:15
obviously 12:12
occasion 22:14 35:22 44:4
occasions 49:14 66:16
occurred 17:10 19:12 51:20 57:22
occurs 35:12
October 15:17 19:2, 13 51:7 52:11, 15, 16, 20 59:21
office 7:1, 6, 8 28:20 64:8
officer 23:4
offices 7:4, 9

O'Hare 34:23 51:20 52:1 53:15 54:3
once 11:15 28:9 50:7
ongoing 17:3
open 48:2
operate 13:19
operated 14:8 49:24
operates 48:3
operating 9:2
operational 37:17
operative 38:2 48:4
opposed 19:7 24:9 31:21
order 53:22 54:8
Oregon 42:14
original 70:6
outcome 70:4
outside 15:8 27:19 28:23 29:12, 23 30:2 41:6
oversight 26:4 41:9, 10
owner 7:22
ownership 16:18

< P >
p.m 1:22
PAGE 5:2, 12 69:21
paid 57:21
Palatine 7:3, 8
papers 10:1
paperwork 38:12
paragraph 60:2
Parker 40:20
part 69:21
participants 17:14, 15 26:14
participate 26:23 27:4, 8 35:4 49:10 55:19 56:8
participated 23:21 32:1, 4, 8, 15 37:22 48:20, 23 52:21 54:11 56:24
participates 56:10
participating 26:21

Deposition of Stephen Russo                                    Royal Sleep Products, Inc. vs. Restonic Corporation

participation 55:22
particular 64:11
parties 19:10
69:20 70:3
pattern 34:8, 9
pay 16:21, 21 17:1
61:10
payments 58:13
pays 55:21
PC 2:12
PEARSON 3:15
people 21:12
45:13 54:9 64:8,
10 66:1
performed 15:7
62:9
performs 17:5
period 43:8
person 12:15 18:7
23:15 24:1, 2, 4, 5
25:2, 4 26:15
27:13 30:9 31:22
34:22 35:10 43:17
46:2, 21 50:5
personally 21:4
46:6, 13
persons 69:20
pertaining 1:17
peruses 60:4
Peterson 12:19, 20
13:1, 7
Phone 2:9, 18 3:8,
19 4:8 23:22 27:14
place 35:14 45:24
53:10, 14 65:14
66:8 69:11
Plaintiff 1:14 2:10
6:10 68:5
planning 15:13
19:8 41:14, 15
51:19
Plaza 2:14
please 6:14, 18
68:20
point 21:22 37:19
portion 60:8
position 10:21
11:20 60:20
positioning 52:12

53:24
possibly 39:16
practice 16:6
prepared 29:22
present 17:17, 18
32:23 69:19
president 6:22
7:15, 17 8:12 9:3,
5, 11, 12 10:23
11:4, 15, 20, 24
12:11, 13, 21 13:8,
11, 17 14:11 15:3,
8 24:23 25:13
26:2, 2, 3, 4 36:1, 9,
13 37:14 38:6, 10,
15 39:2, 16, 20
41:6, 20 43:8 44:6,
18 45:2 46:1
48:19 49:13 50:8
51:17 56:3 60:19,
24
President's 53:15
54:4
pretty 25:14 28:17
48:2
previous 12:12
69:7
previously 42:2
principals 16:13
Prior 8:16, 21, 24
9:18 11:4, 13, 17
13:7 22:4 26:9
38:15 41:5 44:15
privilege 40:2, 6
problem 59:15
Procedure 1:16
proceeded 65:22
process 16:15
65:17
produced 26:7
59:11
product 41:17, 22,
23 42:1, 4, 8, 22
43:7, 12, 16, 21
44:2, 2 46:5, 14, 21
47:21 48:5 51:19,
23 53:8, 20 55:11,
15, 16 56:11 65:18
67:8, 10

PRODUCTS 1:5
4:12 12:9 61:7, 11
62:23 63:7, 14, 21
68:4
program 37:4, 5, 9,
12, 20 38:15, 19, 22
39:5 47:17 48:7
53:24 60:3
programs 47:14
promoted 9:9
property 7:23 8:6,
8
proposal 53:16
proposed 38:4
protected 40:6
provide 7:24 14:22
35:5 39:11, 14
51:13
provided 13:19
29:22 68:16
provides 8:1 13:14
Public 1:20 69:5
purchase 61:3, 17,
22 62:13 63:17
purchased 61:8, 8,
13, 21 62:3, 6, 7
63:7, 13
purchasing 12:9
purpose 53:18
56:15 59:1 63:5
64:4
purposes 24:10
63:8 65:2
pursuant 1:14, 15
put 16:13

< Q >
qualification 62:7
quarter 50:19
60:13
question 8:20
23:18 27:5 28:1
34:20 35:24 39:23,
24 40:3, 10, 12, 15
43:23 49:17 51:4
57:6 58:16 59:16
63:3 64:9 65:7
questioning 28:15
questions 28:6, 11
60:1 64:6 65:2

Quinn 22:22, 24
23:4, 10 30:5
40:19 42:19 55:14

< R >
R00843 59:18
read 60:8 68:10
really 48:3, 8 50:14
reason 11:8 15:20
25:21 28:14 50:14
66:1
recall 15:17 17:12,
14, 15, 16, 23 18:2
21:4 31:10 46:9,
11, 12 50:7 51:12,
18 52:5, 7, 10, 16,
23 53:10, 13 55:2,
3 57:2 60:14 65:16
receive 64:23
recommended
10:22
recommends 48:5
record 37:16 38:16
59:8, 18 65:2 68:14
records 20:13 21:4
38:23
reduced 69:12
referred 37:24
referring 35:18
52:18, 19 60:15
reflect 26:14
reflected 37:11
regarding 29:12
39:17 49:23
regardless 44:1
region 64:17
regular 27:1, 10
64:23
regularly 27:12
reimburse 55:23
relate 40:1
related 13:16
18:10 27:23, 24
29:5 30:4 70:2
relation 50:16
relationship 12:7
14:4
relative 48:17
relevant 20:4

Deposition of Stephen Russo

Royal Sleep Products, Inc. vs. Restonic Corporation

remember 33:15
54:17
Repeat 28:1
rephrase 28:12
34:20 40:14
rephrased 40:11
replaced 12:12, 16
Reporter 1:19 69:5
representatives
17:21
reproduced 70:9
request 45:20
required 51:16
requirement 30:18
reserve 65:4 67:14
resigned 13:4, 5
45:9
respect 17:10
28:22 30:13, 23
55:16
respective 67:11
responsibilities
8:17, 22 13:13
14:1, 12 44:22
responsibility
44:21 70:8
responsible 47:20
restate 40:12
RESTONE 68:7
Restonic 2:20, 21
6:12, 12, 13, 22, 24
7:9, 11, 12, 15, 17,
22, 24 8:1, 5, 9, 18,
18, 23 9:1, 2, 17, 18,
19 10:14, 21, 23
11:5, 6, 7, 7, 16, 19
12:12, 21 13:3, 12,
14, 20, 23, 24 14:4,
12, 24 15:3, 9
19:19, 19 21:2, 6, 8,
9, 13, 14, 17, 18, 22
22:6, 12, 13, 17, 20
23:1, 5, 18, 20, 23
24:3, 23 26:2, 6, 6,
23 27:2, 3, 7, 7, 15,
20 29:5, 12 30:14,
14, 20, 21, 23 31:4
36:2, 13 37:3, 3, 21
38:7, 11, 13 39:9,
10, 16 40:17 41:2,

10, 20 42:14, 15
44:19 45:8, 14
47:5 48:6, 17
49:14, 15, 19 50:17
51:2, 17 53:16
54:12 55:23 56:13,
15 57:4, 5, 7, 8, 14,
14, 16, 19, 21 58:1,
24 59:19 60:19
61:2, 4, 4, 12, 14, 18,
20 62:2, 13, 19
63:6, 13, 17 64:1, 7,
11 65:15, 21 66:7, 7
Restonic's 29:1
59:2
retailers 64:16
retardancy 62:7
retardant 47:17
62:3, 20, 24 63:6
review 38:12
reviewed 47:16
revised 32:23
Richard 18:18
20:14 32:8 33:24
34:1 36:22 55:3, 5
63:3
Richards 3:23
Richard's 55:12
right 38:20 39:15
40:23 42:6 65:4
66:19
RMC 25:2 32:15
41:4, 5
Road 7:2
ROBERT 2:4 6:9
40:20
Robins 4:12 11:3,
12, 17, 22 12:4, 8
17:18 18:21, 23, 24
20:18 32:4 33:10
36:8 53:7 55:1
58:1 62:18 63:15,
16
Robinson 20:21
58:7, 11, 12, 21
role 9:4 12:13, 21
13:11, 17, 23 14:11
15:8 23:2 36:1, 9,
12 38:15 39:2, 14

41:20 48:4 49:13,
16 51:17
roles 8:17, 22
13:13
Rosemont 52:11
Royal 3:10 6:10
20:9
Rules 1:15
run 20:3
RUSSO 1:13 5:3
6:2, 16 59:9 60:10
66:15 68:10, 19

< S >
SAITH 67:15
sake 11:5
sales 18:9, 18, 22
33:21 44:18 45:7
SALKOWSKI 2:3, 4
5:4 6:7, 9 40:13
59:8, 22 65:1 67:1,
13
samples 63:19
Sanders 42:14
sat 21:20
saw 9:24 43:22
saying 28:9
says 38:21, 24 60:9
schedule 25:11, 15
scheduled 29:17
SE 2:6
seal 70:13
search 11:18
see 13:18 20:5
50:9
seen 20:12 21:4
26:9, 10 37:10
sell 58:14
selling 58:7
separate 11:9
21:11
September 51:20,
24 52:17 53:14
54:3
sequence 54:7
SERRITELLA 2:12
service 64:2
services 8:2 13:15,
16, 18 18:4 39:15
48:7 61:8, 9, 10

set 25:11 34:8, 9
70:12
share 21:1
shareholder 20:5,
12, 15 21:1 30:15,
17, 19, 24 31:13
33:6
shareholders 19:21,
24 20:1, 8, 11, 19
21:6 30:13 31:11,
12 32:11, 12 47:7
sheets 68:16
shipped 63:21, 22
short 59:7
Shorthand 1:19
69:5, 13, 16
show 35:15 50:22
59:9, 17
showroom 61:24
63:19
shuttle 54:9
signed 38:22 70:6
Silverline 4:11
20:18 62:18
similar 18:17 47:12
Simply 18:13
sir 6:8, 21 7:4, 14
8:12 11:5 14:18
15:12 16:8 19:17
22:15 25:7 26:18
29:6 33:1 39:12
40:15 47:11, 24
51:18 52:10 57:3
59:23 60:5 61:2
65:1
sit 22:5 24:18
56:2, 5
sits 21:16 47:23
situations 57:22, 24
six 42:12 44:5
45:23
Sleep 3:10 6:10
14:13, 15, 16, 19, 23
15:8, 10, 22 16:19,
21 19:1, 5, 14
20:24 42:17 50:16,
24 51:2, 8, 10, 14
53:3 58:6, 11, 14
60:2, 7 65:10 66:1,

Deposition of Stephen Russo                    Royal Sleep Products, Inc. vs. Restonic Corporation

8
SMITH 3:3
Sofitel 15:18, 24
17:11 52:11
sold 62:18, 23
Solutions 16:9, 17,
22, 24 17:1, 5
sorry 48:14 49:4
53:11 55:9
sound 50:20
sounds 15:19
speak 31:2
specific 29:9 33:9
64:20
specifically 20:2
spoke 41:12 47:1,
3 51:15 56:19
spring 9:16 10:2, 3,
5, 10
State 1:20 6:14
7:5 36:16 43:6, 11,
17 45:24 46:6, 15,
22 48:11, 15 51:11
62:4, 10, 15, 20, 24
63:9, 10 64:12
68:10 69:1, 6
STATES 1:1, 16
8:10 35:1 68:1
STEPHEN 1:13 5:3
6:2, 16 68:10, 19
Steve 60:10
Stevens 3:22, 23
18:19 20:14, 15
32:8 33:24 36:22
42:19 55:3, 6 63:3,
15 66:18, 20, 24
stock 50:16
stop 36:6
stopped 36:8, 12
Streamlining 42:6
Street 2:6 4:6
strike 26:19 45:22
53:11
structure 50:13
structured 19:20
sublicensee 23:6
sublicensees 8:4
sublicensing 13:20
SUBSCRIBED 68:22

substantive 65:5
suit 70:3
Suite 2:16 3:6 7:2
support 14:23, 24
15:7 49:16, 19, 20,
21 51:13
sure 8:20 9:6, 15
27:5 33:14 35:24
49:9, 17 64:22
surrounding 65:3
sworn 6:1, 4 68:22
69:9
Symphony 6:19

< T >
table 28:19, 20
take 28:13, 15
35:14 59:5
taken 1:18 45:24
66:7 69:10, 17
talk 19:17
talked 35:22
talking 29:17
Tampa 10:8
telephone 23:16, 24
25:2, 4, 5 26:16, 22
32:2 34:19 35:3
50:4, 7
telephonic 31:19,
20 32:11 59:19
60:9
telephonically 3:20
4:9 43:3
tell 13:1 37:8 40:5
63:17
telling 39:19
ten 59:6
term 39:16
terms 27:2 28:8
test 62:10
testified 6:4
testify 69:9
testimony 49:5
68:14 69:12 70:11
testing 62:9
tests 62:4, 14, 20,
24 63:6
Texas 4:7
Thank 67:12, 13

thereof 70:4
thing 28:21 61:22
things 45:6
think 8:14 18:3
19:4, 9 21:24
33:16 45:8 48:1
49:1, 8 51:21 52:5
54:20, 22 61:23
65:11, 24
THOMAS 3:4
thought 52:17, 18
three 39:14 43:14
53:21 54:5, 6 63:8,
16
time 24:3, 22
29:16 34:19, 19
35:8, 17 37:13, 20,
24, 24 41:5 43:8
47:5, 6 50:8 51:3
58:13 59:4 64:21,
21, 24, 24 65:15
69:11
times 25:6, 8, 15
34:6 43:1, 10, 14
44:5 46:4, 8, 17, 20
Today 21:15 38:19
45:2 59:12
Tokarz 17:18 18:7
33:19, 21 36:19
42:16 45:18 46:1,
4 53:1 54:16
told 13:9 40:7
65:24
Tolman 13:10
Tom 3:13 11:3
21:19 33:17 36:15
50:15, 24 52:7
53:5 54:23, 24
60:18 62:22
topic 29:20
touched 51:21
Tower 2:5
transcribed 69:14
transcript 68:11, 13
69:16
transcripts 70:7
transition 26:3
50:18 60:11
travel 55:24
traveled 30:8

Tree 33:2 34:23
51:21 52:1
tried 38:1
true 68:13 69:15
truth 69:9
try 28:11 50:21
turn 56:16
twice 28:9
Twin 42:15
two 7:20 8:13
11:2, 9 17:21 19:3
21:10 22:16 24:10
25:14 27:13 42:2
43:19 45:4, 6, 12,
13, 15 46:10 48:18
49:5 66:21
type 8:8 9:21
12:6 14:23 15:6, 7
16:18 17:8, 9
18:17 25:15 28:21
29:8 34:18 40:1
49:19 51:13 58:18
64:15
typewritten 69:14
typically 17:1

< U >
U.S 8:4
ultimate 56:6
Ultimately 56:3
understand 8:20
27:5 28:8 31:5
35:24 39:13 40:10
41:8 49:17 66:16
understanding
14:17, 19 18:4
66:17
United 1:16 8:10
68:1
updated 64:17
use 11:6 62:3 63:8
usually 26:14 43:3

< V >
Vaguely 37:7
various 15:1 26:8,
21 35:1 39:7
46:24 47:2 56:18

Deposition of Stephen Russo                              Royal Sleep Products, Inc. vs. Restonic Corporation

**Vegas** 34:*13, 15*
35:*11, 15, 15* 62:*1*
63:*20, 22, 24*
**vendors** 54:*7*
**venture** 43:*4*
**vice** 44:*18*
**vision** 32:*23*
**visit** 36:*12*
**visited** 36:*8, 15, 20,*
*23* 50:*9*
**voice** 58:*17*
**VP** 45:*7*
**vs** 68:*6*

**< W >**
**Wabash** 1:*21* 2:*15*
**Walker** 42:*13*
**want** 6:*16* 19:*17*
20:*3* 28:*18* 29:*8*
59:*4, 14*
**wanted** 53:*23*
**WARREN** 2:*12*
**way** 14:*8* 39:*19*
57:*12* 70:*2, 3*
**website** 64:*14, 15*
**well** 6:*12* 26:*10*
28:*17* 39:*24* 61:*9*
64:*23* 65:*16*
**went** 50:*5* 65:*16*
**we've** 35:*8, 10*
39:*8* 56:*19* 62:*6*
**WHEREOF** 70:*11*
**WITNESS** 5:*2* 6:*1,*
*3* 40:*12* 60:*4* 69:*8,*
*12*
**word** 9:*9* 11:*6*
**wording** 58:*18*
**words** 65:*21*
**work** 7:*6* 9:*24*
10:*3* 16:*12* 17:*5*
47:*13* 53:*23* 57:*16,*
*20* 58:*2* 60:*10, 18*
**worked** 10:*4* 57:*4,*
*8*
**working** 16:*5*
17:*22* 19:*8* 47:*17*
**works** 18:*8, 12, 16,*
*21* 66:*20*
**world** 34:*13*

**writing** 69:*13*

**< Y >**
**Yeah** 54:*21*
**year** 12:*24* 15:*16*
17:*11* 21:*24* 22:*1*
25:*8, 12, 16, 18*
27:*16* 34:*6* 44:*11*
47:*15*
**York** 24:*6, 9, 11, 24*
**young** 44:*17*

**< Z >**
**ZARCO** 2:*3*
**zip** 64:*16*